**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NIELS TROOST,<br><br>     Plaintiff,<br><br>  v.<br><br>THE ARKIN GROUP DE LLC D/B/A THE ARKIN GROUP, AND VICTORIA KATAOKA,<br><br>     Defendants. | Civ. No. <u>25-CV-6487</u><br><br>**JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

1. This case may have the hallmarks of a Hollywood film—fake spies, theft, and deceit—but at bottom it is quite simple: against overwhelming evidence to the contrary, powerful actors have spread falsehoods about Plaintiff Niels Troost, severely damaging his hard-earned reputation by accusing him of waging a vicious disinformation campaign against his former business partner, Gaurav Srivastava.

2. For the past two years, Srivastava, and his agents, including Defendants The Arkin Group and one of its managing directors, Victoria Kataoka, have carried out a brazen, unrelenting, and devastating smear campaign against Troost.  Among other things, they manufactured and spread the untrue and defamatory claim that Troost lied when he accused Srivastava of falsely claiming to be a CIA operative to defraud and steal from Troost.  In fact, Troost's accusations were entirely accurate.

3. Troost owned a commodities trading company in Switzerland called Paramount Energy & Commodities SA.  When Troost first met Srivastava in 2022, Srivastava told Troost that Srivastava was a CIA operative, and he wanted to work with Paramount to pursue secret projects

that would advance U.S. and western national security and economic interests. Srivastava assured Troost that these efforts were approved at the highest levels of the U.S. government.

4.    Srivastava's claims were bold. But Srivastava was well connected, and prominent U.S. government officials and national security leaders—including General Wesley Clark, the former Supreme Allied Commander of NATO's forces in Europe—vouched for Srivastava and verified his bona fides.

5.    As a result, Troost was convinced that Srivastava worked for the CIA and was running a covert program approved by the U.S. government. Troost entered into a business relationship with Srivastava—which Troost understood was really with the United States—and transferred 50% ownership of Paramount to Srivastava for a token payment that did not correspond to the real value of the company.

6.    As it turned out, Srivastava never worked for the CIA. And there was no secret U.S. government program. Srivastava made up the whole story to defraud Troost, stealing corporate assets (including $25 million to buy a mansion in Los Angeles) and trying to take full control of Troost's company. When Troost learned that Srivastava was a fraudster and lied about being in the CIA, Troost ended their business relationship.

7.    Srivastava responded by launching a malicious smear campaign attacking Troost, his family, and his associates. Srivastava falsely accused Troost of being a Russian spy. Srivastava also falsely accused Troost of concocting the false narrative that Srivastava lied about being in the CIA. Srivastava and his agents created and commissioned articles online to spread these false and defamatory claims.

8.    After another professional government affairs firm refused to assist Srivastava based on red flags about his story, he hired Arkin, a self-described "boutique strategic intelligence

firm" led by former chief of worldwide operations at the CIA, Jack Devine, and former Director of the CIA's Office of Foreign Intelligence Relationships and current member of the Advisory Board of the International Spy Museum, Carol Rollie Flynn, leveraging Arkin's immense credibility in the intelligence community to spread and add legitimacy to Srivastava's false claims.

9.      Arkin managing director Victoria Kataoka, in her capacity as an agent and employee of Arkin, perpetuated these lies.  She falsely accused Troost of orchestrating a massive disinformation campaign against Srivastava, first at a conference and again on a podcast.

10.      Specifically, in December 2024, Kataoka spoke on a panel about disinformation at a high-profile conference in London organized by OffshoreAlert.  During her presentation, Kataoka accused Troost of waging a "disinformation campaign" against Srivastava that was "enormous in scope."  She claimed that Troost "create[d] a big and bold lie" and "a very sexy fiction" that Srivastava was "a fake spy."  Kataoka accused Troost of lying.

11.      On information and belief, Arkin, Kataoka, Srivastava, and Srivastava's other agents (including Vantage Intelligence (USA) LLC and Aron Shaviv), arranged for pay-to-play websites to publish articles online about Kataoka's presentation at the conference.  Those articles repeated and republished Kataoka's defamatory claims that Troost was running a massive disinformation campaign against Srivastava.

12.      Kataoka also repeated those claims on an episode of the podcast *Targeted* in March 2025.  She said Troost created an "incredibly well developed and expertly designed ... disinformation campaign" involving a "very shiny ... sexy fake spy story."  She also falsely accused Troost of making untrue statements that Srivastava is "a con man."  And she said that Troost's disinformation campaign was "very deliberate" and "racist."

13.    Defendants' claims are entirely false.  Troost did not create a big, bold lie.  He did not craft a very sexy fiction.  And he did not orchestrate an enormous, expertly designed disinformation campaign.  All he did was tell the truth.  Srivastava *did* say to Troost (and others) that he was in the CIA.  Srivastava *did* defraud Troost and steal at least $25 million to buy a mansion.  And Srivastava *did* launch a smear campaign to discredit and disparage Troost and his family after Troost uncovered Srivastava's fraud.

14.    What's more, Troost has irrefutable evidence to show that Srivastava lied about being a CIA operative.  Once Troost became suspicious that Srivastava may have been lying to him, Troost recorded several conversations with Srivastava.  Those recordings—the existence of which Defendants knew about before they published their defamatory statements—have been authenticated by a former FBI electronics engineer who is an audio forensics expert.[1]

15.    On the recordings, Srivastava expressly said that:

- He was "part of a program" called "Non-Official Cover" that "only 30 people" were part of"[2];

- He could not say "stuff to [Troost] because of [his] clearances and stuff [he] holds"[3];

- He could "call eight senators in a day ... and the president in the White House and the – you know, the ambassador of this country and – this is not monkey business; this is serious shit"[4];

- "[T]here's only maybe a handful of NOCs in the world," about "30 of them," and Srivastava knew all of them[5];

---

[1] Notarized transcripts of Troost's recordings of his conversations with Srivastava are attached as Exhibits 1–21 and incorporated by reference herein.  Because the Court's CM/ECF system is not compatible with and does not allow filing of audio files, the audio Exhibits are available here.
[2] Ex. 10 7:20-8:3.
[3] Ex. 10 7:6-8.
[4] Ex. 10 7:13-18.
[5] Ex. 14 22:5-15.

- Warren Buffett was "one of [the NOCs] at one moment in time," and "M&M"—the chocolate company—operated as a NOC "to do all kinds of espionage" in Russia[6];

- Elon Musk was a NOC, "but he went off the deep end because he started collaborating with China"[7];

- "[E]ven Eric Prince was a NOC at one point," but "he's been kicked out of the club. Because, the thing is, when you're a NOC, you make a lot of money"[8];

- He had the "DCI ... the head of operation" at the CIA "Bill Burns" calling him to complain that Troost was not moving fast enough with the "inversion"; and more.[9]

16.    Kataoka knew when she made her false statements that Srivastava had been recorded making these claims about Troost.  The recordings were referenced in a *Wall Street Journal* article titled, "A Fake Spy, Russian Oil and $1 Million Funneled to Democrats," published in August 2024—months before Kataoka's presentation in London.  In fact, Kataoka cited and included a screenshot of this *Journal* article in the slideshow accompanying her presentation.

17.    In the article, the *Journal* noted that its reporting was based on "[m]essages, emails, *and recordings of phone calls*."  (Emphasis added.)  The article stated: "Srivastava tried to convince Troost he was a 'nonofficial cover operative,' or NOC, one of 30 such top-secret agents working for the U.S., *according to recordings*.  'I never lost a f—ing one guy on a mission, man,' he told Troost."  (Emphasis added.)

18.    Arkin and Kataoka recklessly disregarded the *Journal*'s reporting and the credible sources (including phone recordings) on which it was based.  Worse, they tried to discredit the *Journal* article (and other similar articles, including one published by the *Financial Times*, that confirmed Troost is telling the truth) by stating during the London conference that the *Journal*

---

[6] Ex. 14 22:17-23:5.
[7] Ex. 14 23:21-25.
[8] Ex. 14 24:1-4.
[9] Ex. 13 2:20-3:18.

"was itself targeted as part of the disinformation campaign." The *Journal* was not targeted. It reviewed Troost's irrefutable evidence and correctly concluded that Srivastava lied about being a CIA operative.

19.    Defendants also knew about and recklessly disregarded other credible sources that corroborated Troost's claims and contradicted their false and defamatory narrative about Troost. For example, during the conference and the podcast, Kataoka referenced a malpractice lawsuit Paramount filed against the law firm Baker Hostetler for Baker Hostetler's role in helping Srivastava perpetrate his fraud.

20.    Kataoka acknowledged that legal filings are often "one of the more legitimate sources of information." But in this instance, Defendants disregarded and intentionally sought to discredit the allegations in Paramount's complaint because it "wasn't filed by a major law firm. It was filed by a very small esoteric law firm." This was misleading because the lawsuit was filed by one of California's top legal malpractice litigation boutiques.

21.    Kataoka also claimed that she conducted robust due diligence before taking on Srivastava as a client. Given that Arkin claims to specialize in due diligence, surely the diligence Kataoka performed with respect to Srivastava uncovered the many red flag financial transactions that Srivastava orchestrated. Srivastava fraudulently orchestrated a $51 million loan from Paramount's wholly owned subsidiary, PDMCC, to an Indonesian company owned by the brother of Srivastava's close associate. Srivastava then fraudulently induced the Indonesian company to transfer him $25 million from the original $51 million loan.

22.     When Srivastava tried to steal the remaining $26 million that Paramount's subsidiary, PDMCC, loaned to the Indonesian company in May 2023, the Indonesian company started asking questions. Srivastava's personal attorney claimed that the entire $51 million was

compensation for "consulting services" Srivastava performed in 2018. This was nonsense, and the Indonesian company knew it. The company's general counsel responded by email, "First time I heard about a consulting service performed in 2018. Pls provide evidence. No such transaction booked from our side." Not surprisingly, Srivastava could not provide any evidence.

23.    So, why did Kataoka disregard information from legal filings, a source she acknowledged is often one of the more legitimate, and other credible sources? Because she wanted to promote her firm and advance her client's efforts to smear Troost. Motivated by the prospect of financial gain and professional acclaim, as well as her own personal animus against Troost, Defendants made statements about Troost they knew were false. Those statements have caused— and continue to cause—Troost substantial economic, emotional, reputational, and other harm. Troost brings this lawsuit to set the record straight, vindicate his rights, and hold Defendants accountable for the harm their lies have caused.

## PARTIES AND RELEVANT NON-PARTIES

24.    Plaintiff Niels Troost is a Dutch-born businessman who has worked in the energy and commodities industries for more than three decades. Troost is a Dutch citizen who resides and is domiciled in Switzerland.

25.    Troost founded and is the sole owner of Paramount Energy & Commodities SA, an energy and commodity trading company formed under the laws of and with its principal place of business in Switzerland. Troost owns Paramount through the Swiss holding company EZI-Diaroc Holdings SA ("EZI").

26.    Troost built Paramount from the ground up, and until its last deliveries in September 2022, Paramount was actively involved in oil and commodities trading, primarily crude oil and petroleum products of Russian origin. At its peak, Paramount was worth hundreds of millions of dollars. Now, Paramount is in liquidation.

27.     Troost's success was largely the result of his strong relationship with an intermediary who sourced and aggregated crude oil from small, independently owned oil producers in Russia and his ability to aggregate smaller quantities of oil to fill large tankers at key ports, allowing Troost to capture greater profit margins than firms that only marketed oil from large producers. Paramount was able to market that oil to refineries in China, based on Troost's deep understanding of the Chinese market and strong network there.

28.     In 2020, Paramount Energy & Commodities DMCC ("PDMCC") was established in Dubai, UAE, by a third party. PDMCC shares were transferred to Paramount in February 2022 (before the start of the war in Ukraine). It was then an independent wholly owned subsidiary of Paramount. Beginning around April 2022, PDMCC started marketing a type of high-quality Russian origin crude oil called "ESPO." PDMCC stopped marketing Russian origin oil in early June 2023 and ceased deliveries in August 2023.

29.     Defendant The Arkin Group DE LLC is a limited liability company formed under the laws of Delaware with its principal (and only) place of business located at 590 Madison Avenue, New York, New York.

30.     Arkin purports to be a boutique strategic intelligence firm that helps global clients mitigate risk and maximize opportunities. It was founded and is run by Jack Devine, the former chief of worldwide operations for the CIA.[10] Arkin's president is Carol Rollie Flynn, a 30-year veteran of the CIA who held several senior executive positions there after serving as a Chief of Station and an undercover Clandestine Operations Officer in Africa and Southeast Asia.[11]

---

[10] The Arkin Group, About, https://thearkingroup.com/about/.
[11] *Id.*

31.    Arkin boasts that it has an "unrivaled ... ability to discreetly access actionable intelligence in some of the most complex operating environments," which it combines with "on-the-ground insights to deliver specialized and meaningful analysis to clients."[12]

32.    Defendant Victoria Kataoka is, and at all relevant times was, an agent and employee of Arkin.  Kataoka joined Arkin in 2016.  She is currently a managing director who, according to Arkin, "leads strategic investigations for clients in support of complex litigation, due diligence, and crisis resolution."[13]

33.    Prior to joining Arkin, Kataoka worked for nearly two decades "in service of municipal, federal and international organizations including UNESCO, DARPA, and NYPD."[14] At the NYPD, Kataoka "worked as an intelligence analyst ... on a years-long counter-terrorism intelligence investigation in collaboration with several Federal law enforcement partners."[15]

34.    Kataoka resides in, is domiciled in, and is a citizen of Maine.

35.    Non-party Gaurav Srivastava is Defendants' client.  Srivastava fraudulently induced Troost to transfer Srivastava a 50% stake in Paramount by falsely claiming to be a CIA operative.  Srivastava then stole corporate assets, including $25 million from PDMCC, which he used to buy a mansion in Los Angeles and make a $500,000 donation to the Atlantic Council. When Troost discovered Srivastava's fraud, he launched a smear campaign against Troost.

36.    Non-party Vantage Intelligence (USA) LLC is a limited liability company organized under the laws of Delaware.  Vantage purports to "assist decision-makers in the development and implementation of strategies to prevent and solve disputes, protect assets, recover

---

[12] *Id.*
[13] The Arkin Group, About, Victoria Kataoka (BIO), https://thearkingroup.com/about/.
[14] *Id.*
[15] *Id.*

debt and influence policy across jurisdictions."[16]  Vantage was sued earlier this year by an attorney in the United States who alleged that Vantage "paid mercenary hackers [to] tip[] a court battle in his opponents' favor."[17]  According to press reports, one of Vantage's founders, Gretchen King, previously impersonated a U.S. intelligence officer (calling herself "Liz from Langley") to obtain confidential information from an accountant in London.[18]

37.    Non-party Vantage Influence—a branch of Vantage—is a "global political risk and advisory firm" that offers "media services" to "strategically shap[e] the narrative" around "clients' issues across various platforms."[19]

38.    On information and belief, Srivastava hired Vantage to promote and spread his false narrative that Troost is waging a vicious disinformation campaign against him.

39.    Non-party Aron Shaviv purports to be "an international political strategist who has advised some of the top political leaders in the U.S., Central America, Europe, Asia, the Middle East and Africa."[20]  Shaviv is the founder of Vantage Influence.  On information and belief, Shaviv is working with Srivastava to strategically shape the narrative that Troost is conducting a disinformation campaign against Srivastava.  Shaviv's work included helping create the *Targeted* podcast hosted by his friend, Zach Abramowitz, as a showcase for the Defendants' false narrative.

40.    Vantage was a sponsor of the conference in London where Kataoka made the false and defamatory statements that Troost is waging a disinformation campaign, and Shaviv was the

---

[16] Vantage, About Us, https://www.vantageintelligence.com/about.
[17] Raphael Satter, *US Lawyer says UK intel firm paid for hack operation against him*, Reuters (Apr. 15, 2025), https://www.reuters.com/legal/us-lawyer-says-uk-intel-firm-paid-hack-operation-against-him-2025-04-15/.
[18] Jeff Patch, *Did Lobbyists Break the Law?*, Politico (Mar. 14, 2007), https://www.politico.com/story/2007/03/did-lobbyists-break-the-law-003137.
[19] Vantage Influence, https://www.vantageintelligence.com/influence.
[20] Aron Shaviv, Home, https://www.aronshaviv.com/.

moderator of Kataoka's panel at the conference.  After Kataoka delivered her remarks, Shaviv commented that Srivastava needed to "play dirty."[21]

## JURISDICTION AND VENUE

41.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there exists complete diversity between Troost and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

42.    Troost is a foreign national who resides and is domiciled in Switzerland.  Arkin is a limited liability company that has its principal (and only) place of business in New York, New York.  On information and belief, all Arkin's members are domiciled in and citizens of the United States.  Arkin lists seven employees on its website: (1) Jack Devine, the founder, who resides in, is domiciled in, and is a citizen of New Jersey; (2) Carol Flynn, Arkin's President, who resides in, is domiciled in, and is a citizen of Maryland; (3) Kataoka, who resides in, is domiciled in, and is a citizen of Maine; (4) Julia Stone, who resides in, is domiciled in, and is a citizen of New York; (5) Aaron Springer, who resides in, is domiciled in, and is a citizen of Virginia; (6) John Barry, who resides in, is domiciled in, and is a citizen of New York; and (7) Zachary Cole, who resides in, is domiciled in, and is a citizen of New York.

43.    The Court has general personal jurisdiction over Arkin because its principal (and only) place of business is in New York.

44.    The Court has specific personal jurisdiction over Kataoka because, as an employee of Arkin, she routinely transacts business within New York.  CPLR § 302(a)(1).  On information and belief, Kataoka routinely transacted business through Arkin's New York office in connection with the defamatory statements giving rise to Troost's claims, including by communicating,

---

[21] Ex. 33 42:19-23.

meeting, and otherwise working with other Arkin employees doing business from the firm's sole office in New York to research and investigate Srivastava and Troost and to prepare her defamatory statements.

45.    The Court's exercise of personal jurisdiction over Defendants is consistent with due process and permitted under New York's long-arm statute.  CPLR §§ 301–302.

46.    Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### *Niels Troost founds a successful and lucrative energy and commodities trading firm.*

47.    Niels Troost graduated in 1991 from the Hogere Economische School in Amsterdam, Netherlands with a degree in economics, international business, and marketing.  He then earned a graduate degree in international business from the University of Plymouth in the United Kingdom and a degree in Creative International Trading in Crude Oil and Petroleum Products from the College of Petroleum and Energy Studies in Oxford, United Kingdom.

48.    After completing his studies, Troost began a career in the energy and commodity trading industry.  He first worked as an operator and junior trader for Taurus Petroleum, a Geneva-based oil company.  He eventually rose to the position of senior crude oil trader where he was responsible for selling crude oil to refineries.

49.    In this role, Troost gained a deep understanding of the nuances and intricacies of the oil industry.  As a result, Troost and one of his business contacts identified an opportunity to market oil obtained from small, independent producers, rather than from the large producers that trading firms like Trafigura and Vitol typically worked with.

50.    Troost's company marketed oil purchased from a non-Russian supply company that obtained oil from small, independent producers in Russia who each lacked enough volume to fill entire oil tankers on their own.  The supply company aggregated cargoes from these smaller

producers into large shipments that Troost's company sold to refineries in China where the company built a reputation as a reliable supplier by leveraging its knowledge and experience in this complicated niche market. Such aggregation of small cargoes yielded higher profit margins than purchasing large cargoes from large producers.

51.    In around 2009, Troost founded Tenergy Trading SA in Geneva, Switzerland with a business partner. Troost marketed crude oil, and his partner marketed refined oil products—two distinct oil markets. Troost and his business partner eventually parted ways, and in 2017, Troost founded Paramount, which was also based in Geneva.

52.    Around 2019 or 2020, Paramount began marketing crude oil to refineries in China. Paramount worked with a business partner who accumulated oil from multiple small, non-state producers. Paramount then leveraged its expertise to market those aggregated cargoes.

53.    Troost also utilized his energy and commodity trading experience to develop a sustainable business supplying affordable power and agricultural products to Africa. In fact, Troost launched Paramount in 2017 with a focus on implementing the "Empowering Africa" initiative, which Troost established to empower local companies through partnerships. Troost directed a portion of his companies' profits to invest in or finance projects focused on providing affordable energy and food to Africa.

54.    Paramount partnered with a local food distributor in Angola to supply affordable food products to the region.

55.    Paramount also helped raise financial investments in a construction project to build a large food processing plant in Angola. Once the plant was operational, Paramount helped finance and financially supported the supply of wheat, corn, rice, sugar, and other agricultural products

that were processed there.  This initiative created more than 1,000 local jobs, reduced food prices, and led to the creation of local food brands, adding to Angola's sense of national pride.

56.    In 2019, Troost and Paramount partnered with a Swiss grain trading company, Harvest Group S.A.  Troost provided Harvest with substantial financial and operational support and helped establish a vital agricultural supply chain that delivered affordable products in Africa.

57.    Paramount's partnership with Harvest was a resounding success, so much so that EZI—the holding company through which Troost owns Paramount—organized Harvest Commodities, S.A. to co-manage Paramount's agribusiness operations.

58.    In 2020, Paramount expanded its operations further.  Troost's long-standing business partner formed PDMCC in the UAE to develop an oil project in Iraq.  PDMCC provided significant financial support to a company building a private oil export terminal in Iraq and exporting oil products through this terminal.

59.    In February 2022 (before the start of the war in Ukraine), Paramount purchased PDMCC, making it a wholly owned, independent subsidiary of Paramount.  As a Swiss company, Paramount's operations were governed by Swiss law.  And as a UAE company, PDMCC's operations were governed by UAE law.

### Troost's business faces challenges after Russia invades Ukraine.

60.    On February 24, 2022, Russia invaded Ukraine, throwing oil markets into turmoil. Western European countries immediately raised the specter of economic sanctions.  Banks in Switzerland and elsewhere refused to finance companies in any way connected to Russian oil, even those like Paramount that marketed Russian-origin oil purchased indirectly from small, independent producers rather than Russian state-owned enterprises and even if such activities were, at the time, permitted.

61.    This created significant challenges for Paramount, which relied on ready access to credit to fund its operations given the incredibly high costs of crude oil cargoes.  ESPO trades several months before loading, and Asian refineries—Paramount's primary customers—typically cover their supply needs far in advance.  Paramount had committed to selling cargoes to China, and it needed access to lines of credit to fulfill its contractual obligations.

62.    Around the same time, with oil markets in crisis, Paramount's business already in trouble, and Russian aggression threatening Ukraine, a debtor threatened to spread false allegations that Troost was connected with and working on behalf of the Russian government.

**_Troost's associates tell him about "Mr. G" (i.e., Gaurav Srivastava) who works for the CIA and can help Troost resolve a problem he is facing with a debtor._**

63.    Troost confided in his close business partner, Ibrahima Camara, about the debtor's threats to publish untrue claims that Troost had ties to Russian intelligence.  Camara believed their mutual associate, Habib Kagimu, a prominent Ugandan businessman and diplomat, could put Troost in touch with an individual known as "Mr. G," who supposedly worked for the CIA and might be able to protect Troost from the debtor.[22]

64.    At Camara's suggestion, Troost contacted Kagimu, who introduced Troost to Gaurav Srivastava, also known as "Mr. G."  According to Kagimu, Kagimu was first introduced to Srivastava in 2020 by a business acquaintance.[23]  That business acquittance told Kagimu that Srivastava was an influential person in the United States who worked with the CIA.[24]

---

[22] Ex. 23 (Camara Decl.).

[23] *See* Ex. 25 ¶ 3 (Kagimu Aff.).

[24] *Id.* ¶ 3.

65.    When Kagimu met Srivastava, Srivastava sought Kagimu's help (supposedly on behalf of the U.S. government) to secure the release of a prisoner in an African country.[25] Srivastava told Kagimu that the project fell under CIA's Special Operations Division, which is why the United States could not make the request through normal diplomatic channels, and Srivastava needed Kagimu to serve as an intermediary.[26]

66.    Although Kagimu was unable to secure the prisoner's release, Srivastava remained in contact with Kagimu.  Srivastava said he wanted to use Kagimu's network to conduct U.S. government operations in Africa.[27]

67.    According to Kagimu, Srivastava told him that the CIA recruited Srivastava when Srivastava was 16 years old, after Srivastava responded to a roadside advertisement.[28]  The CIA supposedly gave Srivastava military and special training to carry out CIA operations in Afghanistan.[29]  Srivastava bragged to Kagimu that, during one such CIA operation, Srivastava rescued the former governor of Herat, a province in Afghanistan.[30]  Srivastava even arranged for Kagimu to speak on the phone with someone claiming to be the former governor of Herat, who said Srivastava was his "saviour" for getting him safely out of Afghanistan.[31]

68.    Srivastava also showed Kagimu scars on his body that Srivastava claimed were from injuries he suffered during an undercover CIA mission.  On information and belief, the scars were in fact from a childhood kidney operation.

---

[25] *Id.* ¶ 3.
[26] *Id.* ¶ 3.
[27] *Id.* ¶ 4.
[28] *Id.* ¶ 11.
[29] *Id.* ¶ 12.
[30] *Id.* ¶ 12.
[31] *Id.* ¶ 12.

69.    Srivastava told Kagimu that Srivastava was negotiating a weapons deal with a general in a North African country so the CIA could spy on the Wagner Group.[32]

70.    On numerous occasions, Srivastava told Kagimu directly that Srivastava worked for the CIA.  In addition, Kagimu witnessed Srivastava tell other people—including high-ranking foreign government officials—the same story.

71.    For example, around August 2021, Srivastava told officials of a certain country that Srivastava was a CIA operative with experience carrying out special operations, according to Kagimu.[33]  Srivastava claimed that the CIA could prevent the U.S. government from sanctioning those officials and help that country improve relations with the United States.[34]

72.    Srivastava also claimed that, because of his CIA affiliation, he was able to have Indonesian Defense Minister Prabowo Subianto removed from a U.S. no-entry list.[35]  On another occasion, Srivastava showed Kagimu a picture of Srivastava with the sons of Libyan General Haftar, to whom he claimed he sold weapons with permission from the U.S. government to validate his false claims.[36]

73.    Srivastava boasted that he prevented Mohamed Hamdan Dagalo, commander of the Rapid Support Forces in Sudan, from being sanctioned by the United States.[37]

---

[32] Ex. 25 ¶ 9 (Kagimu Aff.).

[33] *Id.*  ¶ 5.

[34] *Id.* ¶ 5.

[35] The U.S. banned Subianto from entry in 2000 until 2020.  *See* Anthony Kuhn, *Indonesia's Next President Has a Complicated History with the U.S.*, NPR (May 8, 2024), https://www.npr.org/2024/05/08/1248663743/indonesia-prabowo-election-human-rights-us-relations.

[36] Ex. 25 ¶ 9 (Kagimu Aff.).

[37] *Id.* ¶ 5; Ex. 37; Ex. 38.

74.    In addition, Kagimu heard Srivastava tell the leader of the same African nation that Srivastava was personally connected to then-U.S. Vice President Kamala Harris, claiming that his wife, Sharon Srivastava, was the financial controller of her campaign funds (she was not).[38]

75.    Srivastava claimed to Kagimu that he regularly communicated with then-President Biden, that he could make demands of President Biden in the interests of U.S. national security, and that President Biden could not refuse Srivastava's requests given his position within the CIA.[39]

76.    Kagimu also witnessed Srivastava tell the leader of that country that Srivastava sought to deploy 500 fishing vessels outfitted with special equipment to map the floor of the South China Sea to spy on China.[40]

77.    In 2022, Kagimu heard Srivastava on the phone with someone that Srivastava falsely claimed was then-U.S. National Security Advisor, Jake Sullivan.[41]  Srivastava told Kagimu that Srivastava operated a company called Unity Resources Group, which supposedly was a front company for the CIA.  According to Kagimu, Srivastava claimed to be negotiating a deal for gold with an African nation.  The CIA allegedly planned to store the gold at "Fort Knox."[42]

78.    Srivastava also introduced Kagimu to retired U.S. Army General Wesley Clark, who served as Supreme Allied Commander for NATO's forces in Europe.[43]

79.    These are just some of the many claims Srivastava made to and in front of Kagimu associating himself with the CIA and the U.S. government, as Kagimu has recounted in a sworn

---

[38] Ex. 25 ¶ 6 (Kagimu Aff.).
[39] *Id.*
[40] *Id.* ¶ 8.
[41] *Id.* ¶ 14.
[42] *Id.* ¶ 13.
[43] *Id.* ¶ 13.

statement.  Because Kagimu believed that Srivastava worked for the CIA, Kagimu thought

Srivastava would be able to help Troost resolve his issue with the debtor.

### *Troost contacts Srivastava, who claims to be a CIA operative,*
### *and Srivastava hatches a plan to defraud Troost and steal millions from his company.*

80.    After speaking with Camara and Kagimu, Troost contacted Srivastava in May 2022.

Srivastava, who claimed to be extremely busy working on several important projects for the U.S.

government, said he would speak to Troost as a favor to Kagimu—a "good friend" for whom

Srivastava would "do anything."  Troost told Srivastava about the debtor's threats to make false

claims about Troost, including to the U.S. government.  Srivastava said he could help.

81.    Shortly after their initial conversation, Srivastava told Troost that Srivastava

learned from his contacts within the U.S. government that the FBI had a several-hundred-page

report relating to Troost's purported ties with Russian intelligence.  On information and belief,

there was no report, and Srivastava fabricated those claims.

82.    Srivastava said that the debtor was a powerful adversary who wanted to destroy

Troost.  Although Troost did not realize it at the time, Troost's real adversary, was Srivastava who

saw Troost's problems with the debtor as an opportunity to defraud Troost.

83.    Troost was shocked and worried to learn about the debtor's supposed report to the

FBI.  Claims that Troost was a Russian agent were devastating.  But they were also entirely false.

*Troost is not and has never been a Russian agent or in any way connected to the Russian*

*government*.

84.    This was the reaction Srivastava sought to elicit from Troost, and why he fabricated

a story about a purported report to the FBI linking Troost to Russia.  Now, Srivastava could offer

to leverage his (fake) status with the CIA to solve this made-up problem for Troost, earning his

trust, which Srivastava exploited to steal tens of millions of dollars from Troost and Paramount.

***Srivastava purports to recruit Troost for a covert***
***U.S. government program known as the "Program."***

85.    Srivastava contacted Troost soon after to tell Troost that Srivastava convinced "the Agency"—referring to the CIA—that the purported FBI report was false.  Srivastava also told Troost that he wanted to work with Troost.  According to Srivastava, the CIA needed people like Troost aligned with Western ideals who had knowledge of and access to Russian oil markets because the U.S. government wanted to secure the value of the U.S. dollar, and it was concerned that malevolent "pop-up" oil traders who emerged after Russia invaded Ukraine were providing funding for Russia to purchase weapons and carry out terrorist activities.

86.    Srivastava proposed that Troost and his businesses enter a secret U.S. government program—that Srivastava simply called the "Program."  Srivastava guaranteed that he would obtain the issuance of a license from the Office of Foreign Assets Control ("OFAC") that would allow Troost and Paramount to continue trading Russian oil even if sanctions were imposed.  But to enter the "Program," Srivastava needed to vet Troost to satisfy "the Agency."  Srivastava said that Nicolas Bravard, whom Srivastava described as the FBI's "man" inside the Swiss banking network, would conduct an initial assessment of Troost in Switzerland.

87.    In June 2022, Troost met with Bravard in Switzerland.  Bravard peppered Troost with questions about Russia, certain oligarchs, terrorism, and Ukraine, ostensibly because Srivastava, the CIA, and the U.S. government needed to know everything about Troost so they could evaluate the risks of partnering with him.

88.    At Bravard's request, Troost met with Bravard again the next day.  Troost was with Camara when he went back to meet Bravard, and Troost shared with Camara that he would be meeting with Srivastava's "agent."  Camara saw Troost meet with Bravard.

89.    Troost's second meeting with Bravard was hostile.  Bravard accused Troost of lying when Troost denied working for Russia.  Bravard threatened to forward this assessment to the Director of the FBI.

90.    When Troost came out of the meeting, Camara could see that Troost was visibly shaken.  Troost told Camara that Bravard exerted a lot of pressure on Troost, which worried Troost because Srivastava and Bravard claimed to be U.S. government agents.

***Srivastava and Troost meet in Bali so Srivastava can vet Troost for the "Program."***

91.    After Troost's meetings with Bravard, Troost told Srivastava that Troost was very concerned that Bravard would provide a false, negative report to the FBI.  This was exactly what Srivastava intended.

92.    After letting Troost stew for a time and become more anxious, Srivastava delivered some good news.  He told Troost that Srivastava spoke with then-director of the FBI, Christopher Wray.  According to Srivastava, Bravard's report was positive, and the FBI cleared Troost to work with the U.S. government.  In retrospect, it is clear that Bravard did not make any report to the FBI about Troost, and the FBI did not clear Troost to work with the U.S. government.  These were lies intended to convince Troost to partner with Srivastava.  And ultimately, they worked.

93.    Troost was impressed by Srivastava.  People Troost knew (like Kagimu) vouched for Srivastava, and he seemed to be well connected with government officials (like Subianto).

94.    To validate Srivastava's false claim that he was a CIA operative and secure Troost's agreement to participate in the "Program," Srivastava arranged a video call between Troost and the former Supreme Allied Commander of NATO's forces in Europe and U.S. presidential candidate, retired General Wesley Clark.  Srivastava said that General Clark was also a participant in the "Program," and he introduced Troost to General Clark as his "latest recruit," telling Troost, "we have lots of special things we'll do together."  General Clark replied that it would be nice to

work with Troost.  General Clark asked whether Troost could help lift grain from Ukraine.  Troost had the impression from General Clark that by partnering with him and Srivastava, Troost would be part of a select group able to use the grain corridor to work toward food security in various impoverished African regions.  Srivastava claimed the call was spart of Troost's "evaluation."

95.    After the call, Srivastava told Troost that Troost could never tell anyone that Troost had just met General Clark or say a word about what they were working on.  Troost knew of General Clark and respected his military service and reputation.  Srivastava's ability to put Troost in touch with General Clark bolstered Srivastava's credibility.

### *Srivastava and Troost meet in Bali so Srivastava can vet Troost for the "Program."*

96.    Srivastava also claimed that he, too, needed to personally interview Troost before granting Troost final approval to enter the "Program."  Srivastava met with Troost in Bali, Indonesia.  Srivastava said that he led numerous special operations missions in Bali and supposedly needed to travel there in connection with the upcoming G20 Summit.  Troost made three trips to Indonesia in summer 2022 to meet with Srivastava so Srivastava could interview Troost and clear him for the "Program." During those trips, Srivastava conducted several, lengthy interviews of Troost.  Many of the interviews lasted late into the night and continued for several days.  Srivastava repeatedly referred to "Homeland Security" (the U.S. Department of Homeland Security), "the Agency" (the CIA), the "Bureau" (the FBI[44]), and his purported training at "the Farm" (a CIA training facility in Virginia).

---

[44] Troost made contemporaneous notes of some of his conversations with Srivastava, writing down the FBI director's name on his iPhone's notes app on July 29, 2022 after one conversation.  Troost had no reason to document the name of the Director of the FBI other than that Srivastava had been making claims about him.

97.     Srivastava also told Troost about his purported career with the CIA.  Srivastava said he was recruited by the CIA when he was 16 years old after he responded to an advertisement. He claimed that he trained at "the Farm."  And he told Troost he was "put on the ground" in various conflict zones, after which he was assigned to a secret, joint CIA-FBI program to combat terrorist financing.  Srivastava said that he was involved in an operation to map the South China Sea, for which he needed to acquire 500 boats.  Troost offered to introduce Srivastava to Troost's contacts in the Netherlands, who Troost believed could help Srivastava acquire the boats.

98.     Srivastava's lies were bold.  But his story matched what Kagimu told Troost, lending credibility to Srivastava's false claims.  Throughout his fraud, Srivastava sought to bolster his appearance as a CIA operative to ensure Troost and others continued to go along with his plan.

99.     Srivastava did not just claim to be a CIA officer during private meetings with Troost.  He also made those claims in front of other people.  For example, Camara accompanied Troost on one of Troost's trips to meet with Srivastava in Indonesia.  Srivastava said to Camara and Troost, "If I tell you I am [an operative] then I can't be, but if I don't tell you, then you'll know that I am."  Another time during the same trip, Srivastava told Camara he was trying to catch people in Africa wanted by the U.S. government.[45]

100.     Srivastava also asked Camara to set up a call between Srivastava and the president of an African country.  Camara was with the president when the president took the call on speakerphone.  Camara helped translate.  Srivastava said he was part of the CIA and could provide security assistance to the country.  He promised to bring then-President Joe Biden and a U.S.

---

[45] Ex. 23 ¶¶ 12, 18 (Camara Decl.).

senator to meet the president of this African country.  Later, Camara learned that Srivastava sent a security advisory team, which included a four-star U.S. general, to the country.[46]

101.    To make his ruse more convincing, Srivastava introduced Troost to high-ranking foreign government officials.  On a different trip to Indonesia, Srivastava took Troost to the estate of then-Defense Minister (and now President) Prabowo Subianto.  They traveled in a motorcade accompanied by law enforcement.  Srivastava said that he lived on Subianto's compound for several months when he ran a clandestine CIA mission because Srivastava could not be seen at a hotel or his cover would have been blown.  Subianto appeared to know Srivastava well and to have dealt with him before.

### *Srivastava asks Troost to join the "Program."*

102.    During these meetings in Indonesia, Srivastava said he could "take care" of the debtor who was threatening Troost and get rid of the report the debtor purportedly submitted to the FBI falsely accusing Troost of working for the Russian government.

103.    Srivastava also said he wanted to work with Paramount as part of the "Program," which Srivastava described as a collaboration with other western authorities.

104.    Troost and Paramount's role would involve trading Russian oil in U.S. dollars to secure the value of the U.S. dollar.  This would also help the U.S. government counter terrorist financing and direct business to actors aligned with the United States, according to Srivastava.

105.    Srivastava indicated that the "Program" also served the interests of other Western nations, such as Switzerland.  Srivastava claimed that, as part of the "Program," the CIA would insert covert operatives into Troost's business in African countries to combat terrorist financing.

---

[46] *Id.*

106.    Srivastava assured Troost that the usual rules and regulations did not apply to the "Program," and Troost and Paramount would be protected by the U.S. government and exempt from sanctions related to trading Russian oil, including from aligned Western nations such as Switzerland.  Srivastava gave Troost the business card of a U.S. Treasury Department official, with whom Srivastava was supposedly working on the "Program."  On information and belief, this was yet another carefully crafted lie meant to convince Troost of Srivastava's bona fides.

107.    Once Srivastava finished interviewing Troost, he told Troost that he had "great news."  Srivastava supposedly spoke with the Director of the CIA, who gave the "go-ahead" for Srivastava and the CIA to partner with Troost and Paramount.  Srivastava cautioned Troost not to talk directly about his links to the CIA, "the Agency," or "the Program" with anyone other than Srivastava—including others who might also be part of "the Program."

***Srivastava convinces Troost to give Srivastava control over half of Troost's company.***

108.    Srivastava told Troost that, for the arrangement to work, Paramount must have an American connection or nexus.  Therefore, Srivastava needed to become a 50% owner of Paramount to create such a nexus.  Srivastava said the U.S. Treasury would invest $2 billion in the project from funds it had confiscated.[47]  Troost intended to use his share of the business to continue promoting food and energy security in Africa and Ukraine.  Srivastava also explained that, to outside observers, Paramount would appear like a private business in the way it operated, and only Srivastava and Troost would know that it was part of the CIA "Program."

---

[47] Srivastava separately told Kagimu the same thing.  According to Kagimu, "Srivastava discussed Mr. Troost with me and said that he would need to use Mr. Troost's company as part of a CIA program and, for this purpose, it would be necessary for him to control 50% of Mr. Troost's company and its assets."  Ex. 25 ¶ 18 (Kagimu Aff.).

109.    At this point, Troost was impressed by the high-ranking officials that Srivastava appeared to know, Srivastava's access to those individuals, and his apparent knowledge of internal U.S. government affairs.  Troost believed that Srivastava was, as he claimed, a CIA operative.

110.    In July 2022, Troost called Robin Luisier, the director of Troost's Swiss holding company, EZI—Paramount's sole shareholder.  Troost said he was selling 50% of his corporate assets to an unnamed buyer for its nominal value, *i.e.*, almost nothing.  Luisier was alarmed because Paramount was extremely profitable.  Luisier questioned why Troost would transfer half his company for a token payment.  Troost said his new business partner was "active CIA," and Troost was under pressure to do the deal to avoid U.S. sanctions.  After entering the deal with an "active CIA" business partner, the U.S. government would allow Paramount to continue marketing Russian-origin crude oil and use part of the proceeds to fund anti-terror programs on behalf of the CIA that Srivastava purportedly led.[48]

111.    Troost decided to go forward with transferring half of his company to Srivastava. He informed the staff at Paramount in writing that he negotiated a deal with Bravard (omitting any mention of Srivastava, per Srivastava's instructions), explaining that "[t]he princip[al] idea is a 50/50 ownership split and all the money made up until the new shareholding is finalised is not part of the new deal and remains the current shareholder's [Troost's] money."  Troost further explained that his new partner's "input will consist of making his worldwide network available" and asked his team to find a "creative way to make this work" from a structuring and tax perspective.

---

[48] Not everyone was convinced that Troost should sell an ownership interest to Srivastava.  Luisier texted Jean-Marc Wasem, a tax advisor to Troost, about Troost's plan.  Wasem was concerned about the deal, suggesting that Srivastava "was going to steal $250 million from [Troost] and then get him sanctioned."  Ex. 30 ¶ 9 (Wasem Aff.).  Luisier responded that he believed Paramount and Troost were fine because "Joe Biden is behind this."  Ex. 35 ¶ 12 (Luisier Aff.).  Plaintiff has redacted personal identifying information that appears in any of the Exhibits, including in Exhibits 30 and 35.

112.    Troost's advisors were shocked that Troost would even consider giving away half of his company, and they were also focused on potential tax complications.  When Luisier raised possible tax issues with Troost, Troost assured Luisier that Troost's new partner was connected with OFAC, the Swiss Secret Service, and the Swiss State Secretariat for Economic Affairs ("SECO"), so there would be no negative tax consequences.

113.    To help allay Luisier's concerns, Troost eventually put Luisier in contact with Bravard, who told Luisier that Srivastava was ultimately behind the deal, and Srivastava had ties to the CIA.  Bravard even showed Luisier a photo of Srivastava with President Biden to prove Srivastava's connection to the U.S. government.[49]



114.    Worried that Troost might discover Srivastava's ruse and back out of the deal, Srivastava and Bravard pressured Troost to move quickly.  Bravard repeatedly sent Troost messages stating "[w]e need to move fast" and "move forward asap to close the transaction."

---

[49] Ex. 35 ¶ 15 (Luisier Aff.).

Bravard also wrote to Troost that the "commercial deal started as of 1st of June." This was a lie. No deal had yet been completed.

115.    Troost initially rebuffed Bravard and Srivastava's attempts to push the final deal through quickly, explaining that "[i]t's better to do things correctly from the start instead of rushing into something and then having to potentially rectify."

116.    At the same time, Srivastava also pressured Troost and Paramount to send millions of dollars to a law firm allegedly associated with former-Speaker of the House Nancy Pelosi, called "Global Energy Law Group." Srivastava claimed the money would go toward funding operations organized by the Department of Homeland Security and the U.S. Executive Branch.

117.    In reality, the Global Energy Law Group has no affiliation with former-Speaker Pelosi or the U.S. government. It is run by Owen Onouye, a California lawyer who was suspended in 2011 and 2012.[50]





[50]    The State Bar of California, "Owen Onouye," https://apps.calbar.ca.gov/attorney/Licensee/Detail/174580.

118.    Onouye also represented Srivastava and his company, Unity Resources Group.[51]



119.    On July 14, 2022, Global Energy Law Group emailed Paramount director Maurice Taylor an engagement letter requesting an initial retainer of $6,170,250.  The letter listed hourly rates for partners at $5,000 per hour and charged $995 per hour for its paralegals' time.  Such fees, if real, were entirely unreasonable, much higher than rates charged by any other attorneys, and violative of attorney ethical obligations.  The email to Taylor was also unusual because it was sent (allegedly) by "Mark Elders" to Maurice Taylor, but it was also signed by Maurice Taylor.



---

[51] *See McPherson v. Unity Resources Grp., Inc.*, Case No. 218MCV-00910 (Cal. Super. May 19, 2021) (Ex. 1, at 31).

120.    "Mark Elders" then sent Taylor an invoice instructing Paramount to wire Global Energy Law Group $6,170,250 to a Bank of America account in California ending in x4608.

121.    Paramount's Swiss bank rejected the payment request, stating that it "would need additional explanation in order to understand the underlying transactions/services linked to this mandate, in line with the size of the retainer fees paid to the law firm."

122.    When Srivastava's gambit to extract this money failed, Srivastava decided to personally pressure Troost to complete the deal to make Srivastava a partner in Paramount. Bravard messaged Srivastava that Troost was renegotiating the deal—which was untrue. Srivastava then contacted Troost via Signal.  Srivastava wrote that he would call Troost "[a]fter speaking to US," referring to U.S. government officials at the Department of Homeland Security and within the Executive Branch (as Srivastava previously mentioned to Troost).

123.    Troost asked Srivastava, "What renegotiating?"  Srivastava replied, "Let me call you.  After speaking to US," again apparently referring to the U.S. government.



124.    Troost ultimately agreed for EZI to enter into a Share Purchase Agreement with a company 1234 Holding SA (which would hold the shares on behalf of and for the benefit of Srivastava) on July 30, 2022, effectively transferring 50% of Troost's interest in Paramount to Srivastava for a token payment of CHF 50,000 (then just over $50,000).  This was an important first step for Srivastava, but he still needed Troost to sign a shareholders' agreement to finalize the

deal.  So, Srivastava had to maintain his false CIA persona and continue to appear able to deliver on his false promises to get his hands on Paramount's money.

### *Srivastava cons the Atlantic Council to bolster his credentials and convince Troost to sign the final shareholders' agreement.*

125.    Not long after the Share Purchase Agreement was signed, Srivastava invited Troost to attend the 2022 Global Citizen Awards Gala, hosted by the Atlantic Council, in New York.  The Atlantic Council, led by Frederick Kempe, is a prestigious American think tank focused on international security and global economic prosperity.  Srivastava was the co-chair of the gala, and his photo was in its program, along with an ad for Srivastava's supposed charity, the Gaurav and Sharon Srivastava Family Foundation.[52]  Contrary to Srivastava's representations, his foundation did not exist at that point as a legal entity.

126.    On information and belief, Srivastava intended for the gala to reinforce Troost's belief that Srivastava was a CIA operative with great influence.  They were still negotiating the shareholders' agreement between their companies and still deciding how to handle Paramount's corporate business, now that Srivastava owned a 50% stake in Paramount.

127.    To this end, Srivastava arranged for Troost to sit with General Clark and Mary Beth Long, a former Assistant Secretary of Defense and a CIA officer, among other well-connected and notable public figures.  Srivastava told Troost that Long was active-duty CIA, and she would question Troost during the dinner.  Long asked Troost questions about his background and business.  After about 90 minutes, Long abruptly left the gala.  Srivastava claimed she had to handle a CIA emergency.

---

[52] The Atlantic Council, *Full Transcript: The Atlantic Council's 2022 Global Citizen Awards* (Sept. 19, 2022), https://www.atlanticcouncil.org/commentary/transcript/full-transcript-the-atlantic-councils-2022-global-citizen-awards/.

128.    Srivastava was publicly thanked by Atlantic Council President Kempe at the end of the gala.  Kempe said, "I'm also delighted to announce that, thanks to Gaurav Srivastava's support and also that of General Wes Clark, a member of our board, former Supreme Allied Commander Europe, and the Indonesian Ministry of Defense and Minister Prabowo, and the Coordinating Minister for Maritime Affairs and Investment, Minister Luhut, who is here tonight, we will be hosting an international conference on food security alongside the G20 in Bali in November."[53]

129.    During his visit to New York for the gala, Troost introduced Srivastava to Ousmane Bamba, a prominent Liberian businessman.  Srivastava told Bamba that he worked for the CIA.[54] Srivastava also told Bamba that the U.S. government was interested in assisting then-Liberian President Weah in his re-election bid.  According to Srivastava, the CIA could damage President Weah's opposition by planting drugs and weapons in the homes of opposition leaders and take other steps to rig the Liberian election.  In exchange, Srivastava wanted help tracking down alleged terrorists in Liberia and obtaining a petroleum block, a designated area for exploration and potentially extraction.

130.    As he had done with Kagimu, Srivastava pulled up his shirt and showed Bamba scars Srivastava supposedly received in battle (again, on information and belief, the scars were from a childhood kidney operation).  Srivastava also introduced Bamba to General Clark, who arrived at the end of their meeting.

131.    Bamba declined Srivastava's offer to rig the election in President Weah's favor, but he arranged to provide Srivastava access to data related to the petroleum block that Srivastava mentioned.  Later, in November 2022, Srivastava called Bamba to ask for an introduction to the

---

[53] *Id.*
[54] Ex. 22 ¶ 7 (Bamba Aff.).

Liberian National Security Agency, and Bamba introduced him to its Deputy Director, Gerald Smith.  Srivastava also told Smith that he was with the CIA and said he would provide Smith with the names of supposed terrorists wanted by the CIA.[55]  Srivastava ultimately produced two names, but those people were not in Liberia.

132.    Srivastava and Smith spoke on several occasions after that.  Srivastava offered the CIA's assistance with President Weah's re-election issues.  He suggested that the CIA and Liberian National Security Agency could work together through Srivastava and Smith to share intelligence. Srivastava claimed he had CIA-level intelligence he could share to support the Liberian government.  Srivastava also said he could arrange for the CIA to train Liberian intelligence, send lists of terrorists, and procure CIA funding to track down those terrorists.  Although Smith agreed to meet with Srivastava in the United States to discuss these matters, Srivastava later cancelled their meeting.

### *Troost and Srivastava finalize the shareholders' agreement.*

133.    Troost was impressed by what he saw in New York.  Still convinced that Srivastava worked for the CIA, in September 2022, Troost executed the final shareholders' agreement.

134.    Srivastava then arranged for Jeffrey Berg, formerly a partner at Baker Hostetler, to serve as counsel to Paramount.  Srivastava said that Baker Hostetler had hundreds of lawyers secretly working for the U.S. government as part of a "special relationship."  At the time, Berg also represented some of Srivastava's other corporate entities.  Paramount signed an engagement letter retaining Berg as outside counsel on November 8, 2022.

135.    Next, Srivastava's foundation sponsored the Atlantic Council's Global Food Security Forum on November 12 and 13, 2022, in Bali, Indonesia.  Plans were finalized in October

---

[55] Ex. 28 ¶ 3 (Smith Aff.).

2022, and the Atlantic Council sent invitations to prominent world leaders, including the British Prime Minister and the Japanese Prime Minister. Each invitation prominently displayed Srivastava's charitable foundation's name and logo next to the Atlantic Council's.

136. Srivastava wanted to secure attendance from notable U.S. politicians. So, in the run-up to the November 2022 elections, Srivastava, individually and through his company, Orbimo Corporation, contributed more than $1.6 million to various political organizations and campaigns. The beneficiaries included politicians such as Representative Pat Ryan, a member of the House Armed Services Committee, whose name Srivastava touted to bolster his fake credentials.

137. On November 12, 2022, the Atlantic Council forum opened with a large "roundtable" discussion. Srivastava featured prominently, providing opening remarks and sitting at the main table with his wife, Atlantic Council President Kempe, and General Clark.

138. The next day (November 13), Srivastava and his wife each gave keynote speeches. Srivastava touted their family foundation.[56] John Legend performed and thanked "Mr. G."[57]

---

[56] The Atlantic Council, *Full Transcript: Global Food Security day two: The role of tempe and cassava in a food-secure future* (Nov. 13, 2022), https://www.atlanticcouncil.org/commentary/transcript/global-food-security-day-two-the-role-of-tempe-and-cassava-in-a-food-secure-future/.
[57] Gaurav & Sharon Srivastava Family Foundation, *John Legend "All of Me" Presented by Gaurav Srivastava & Sharon Srivastava Live at the G20 Summit*, YouTube (Apr. 18, 2023), https://www.youtube.com/watch?v=AuXkqF5fxhU.



139.    The second day of the forum also featured video messages from three Democratic members of congress: then-U.S. Senate Majority Leader Chuck Schumer; Senator Debbie Stabenow of Michigan, Chair of the U.S. Senate Agriculture Committee; and Representative Pat Ryan, member of the U.S. House Committee on Armed Services—all of whom benefitted from Srivastava's October 2022 campaign contributions.  Representative Ryan began his remarks with "a special thank you to Gaurav and your family foundation for hosting and convening such a timely and important conversation."



140.   For Srivastava, the forum was a smashing success.  He ingratiated himself with high-net-worth individuals across the globe, he gained critical access to some of the most influential politicians in Washington, and he further solidified his false persona as a CIA operative with access to the highest levels of the U.S. government.

### Srivastava steals $25 million from PDMCC.

141.   While Srivastava was leading the Atlantic Council's Global Food Security Forum, he was also arranging to steal millions from PDMCC.

142.   As a 50% shareholder of Paramount, Srivastava had no legal right or direct mechanism to obtain money from PDMCC, Paramount's UAE-based subsidiary.   Instead, Srivastava designed a fraudulent scheme that would provide him immediate access to cash to fund his expensive lifestyle.  He engineered a $51 million transfer of PDMCC's Russian oil trading profits to an Indonesian company, Arsari Group, which was owned by Hashim Djojohadikusumo, then-Defense Minister Subianto's brother.

143.   Srivastava arranged for PDMCC to paper over the transaction as a loan for "working capital and other business operations."

144.   At the time, PDMCC's director was Francois Mauron.  He received a call from Srivastava via Signal during which Srivastava instructed Mauron to loan $51 million to Arsari as part of what he claimed was a renewable energy investment in Indonesia.[58]  When Mauron told Srivastava such funding was typically structured via a joint venture, Srivastava replied that it involved the brother of the Indonesian Minister of Defense (now president) who was very powerful, and that it had already been decided that it would be structured as a loan.  To Troost, Srivastava claimed that the money was going to fund the secret "Program".  Srivastava had tried

---

[58] Ex. 36 ¶ 8 (Mauron Aff.).

and failed a few months earlier to get Troost to send money purportedly to the Department of Homeland Security via Global Energy Law Group.

145.    Srivastava put Mauron in contact with Arsari's general counsel.  None of PDMCC's or Paramount's lawyers were involved in the transaction.  On November 26, 2022, Mauron ultimately signed an agreement for PDMCC to loan $51 million to Arsari.

146.    Srivastava then instructed his personal attorney Thomas Giordano-Lascari to extract $25 million from Arsari so Srivastava could purchase a $25 million mansion in Los Angeles, California.  Giordano-Lascari and Arsari's principal (the Indonesian president's brother) fully executed a set of three promissory notes totalling $25 million, making it look like Arsari was issuing a loan secured by the Pacific Palisades estate Srivastava was buying.  Srivastava used a front company, Birdsong Central LLC, which Giordano-Lascari represented, as the loanee.

147.    Initially, Arsari's bank's compliance department refused to honor the transaction because it was suspicious.  So, Srivastava and Giordano-Lascari devised several strategies to evade bank compliance.  After those failed, Srivastava deployed a new strategy to conceal the source of funds by making it look like an inter-company loan payback between two companies affiliated with Arsari's principal.  Even this proved challenging.  It was only completed after several email exchanges between Giordano-Lascari and Arsari's general counsel, and it required Giordano-Lascari to receive the funds initially in his Attorney Trust Account.

148.    Birdsong Central LLC then purchased Srivastava's mansion.  With the help of Giordano-Lascari, not only did Srivastava successfully funnel funds fraudulently taken from PDMCC into the United States, he also concealed his receipt of those funds by routing the mansion purchase through an offshore company and Birdsong Central, in violation of 18 U.S.C.

§§ 1956(a)(1)(B)(i), (a)(2)(B)(i), and (h), and 1957.  All of it is documented in messages, emails, and bank transfer records.

149.    This was not enough for Srivastava.  As soon as he received the first $25 million of PDMCC's funds from Arsari, he quickly tried to extract the remaining $26 million.  Giordano-Lascari sent WhatsApp messages to Arsari's general counsel on January 13 and 19, 2023, asking to speak with him about the "next tranche of funds."

150.    Srivastava later tried to deny that he stole any of the $51 million.  But his claims are completely disproven by contemporaneous emails from Giordano-Lascari sent to Arsari's general counsel on behalf of Srivastava, in which Srivastava offered a personal guarantee in exchange for the loan.

---

INDIVIDUAL GUARANTEE

1.    Parties.

This Guarantee is entered into as of the 1st day of July, 2023, by and between Arsari Capital _____, an Indonesian company ("Borrower"), and Gaurav and Sharon Srivastava, individually (collectively, "Guarantor"), with reference to the following facts:

2.    Recitals.

2.1    Borrower has previously borrowed the amount of USD $51 million for the benefit of Guarantor (the "Funds"), which funds have been held by Borrower to be distributed to Guarantor at Guarantor's direction.

2.2    Borrower has sent the amount of USD $25 million from the Funds to Guarantor on or about January 5, 2023 leaving a balance of the Funds of $26 million.

---

***Paramount forms a U.S. subsidiary to facilitate a transaction in Liberia, and Troost insists on being transparent that PDMCC is engaged in Russian oil transactions.***

151.    In October 2022, Paramount considered investing in a company that was exploring for gold in Liberia, a potential deal generated by Troost.  To acquire and hold the shares in this company, Paramount formed a U.S.-based subsidiary.

152.    On November 24, 2022, in connection with the due diligence for the potential gold transaction, Berg's team at Baker Hostetler proposed a disclosure in the subscription agreement that omitted the fact that PDMCC was engaged in Russian oil transactions.  Although Srivastava was "okay with" hiding that fact, Troost was not.  He wrote that he "want[ed] to be clear" that Paramount's subsidiary in Dubai is "engaged in business with Russia, which is fully compliant with all applicable regulations.  Want to be clear on that."



153.    Critically, this email (in addition to other significant evidence) establishes beyond any doubt that Srivastava was aware that PDMCC was trading Russian oil.  This exchange disproves Srivastava's subsequent counter-narrative that he was unaware of PDMCC's Russian oil business until just before Troost ousted Srivastava from the company.  In truth, Srivastava knew *the whole time*.  Srivastava wanted to profit handsomely from trading Russian oil, and he made clear that halting trading of Russian oil would be against the interests of the CIA and the U.S. government and could have severe repercussions for Paramount, PDMCC, and Troost.

### *Srivastava uses Paramount's U.S. subsidiary to rent office space in Los Angeles and hire a chief of staff to maintain his deception.*

154.    After the U.S. subsidiary was established, Srivastava used the U.S. company to establish his own office in rented space in Los Angeles.  Srivastava and his team organized the space to resemble a U.S. government office to reinforce his false association with the U.S. government.  He displayed the Great Seal of the United States and swords he bought that were engraved with his name, which he told various people he received from government officials.

155.    Around this time, Srivastava hired a Chief of Staff, Jim Reese.  Reese had previously served as a Delta Force operator in the U.S. Army for 25 years, retiring in 2007 as a Lieutenant Colonel.

156.    Troost had known Reese since 2019, and Reese had worked with Troost in August 2022 to facilitate cargo ships exporting grain and other agricultural products from Odessa, Ukraine.  Ironically, this was how Reese first learned of Srivastava: Srivastava (who was not involved in carrying out the deal) took credit for obtaining the shipment of grain and agricultural products. and he arranged for a public photo of him along with Indonesian president Subianto's brother (left) and a Ukrainian Ambassador (middle).



157.    Reese understood from Troost that Srivastava was a "black ops guy" and that Srivastava was working with Troost on behalf of the CIA or other U.S. intelligence.

158.    Srivastava told Reese that he personally knew two Delta Force commanders, General Austin Scott Miller and Colonel Peter Blaber.  When Reese later asked General Miller and General Blaber about Srivastava, neither of them had ever heard of him.[59]

159.    Srivastava told Reese that he had extensive experience and insight into the U.S. Department of Justice, saying, "I threw my hat in with the DOJ."  During his time working with Srivastava, Reese personally heard Srivastava tell third parties that Srivastava regularly went into the U.S. Federal Building in Los Angeles to meet with the FBI and to conduct business on behalf of the U.S. government.[60]

---

[59] Ex. 26 ¶ 16 (Reese Aff.).
[60] *Id.* ¶ 20.

***Western countries impose a price cap on Russian oil, and Srivastava doubles down on his
promise to secure approval for PDMCC to continue trading Russian oil over the cap.***

160.     On December 5, 2022, the G7 Nations imposed a price cap of $60 per barrel on
Russian seaborne crude oil (the "G7 Price Cap").  The UAE, like many jurisdictions, never adopted
the G7 Price Cap.  The legal effect was that businesses based in countries that imposed the price
cap could not lawfully trade oil above that cap.  But businesses based in countries without the price
cap (like PDMCC in the UAE) could lawfully trade oil above the price cap, doing so without using
tankers and insurance services from countries that imposed the cap.[61]  Thus, PDMCC marketed in
accordance with all applicable laws in force at the time, even though it primarily marketed Russian
ESPO, which was high quality crude oil that usually traded above $60 per barrel.

161.     Troost was advised that because the UAE did not adopt any price cap on Russian
oil, businesses in the UAE (like PDMCC) could lawfully trade oil above the price cap.  Regardless,
Troost would have ordered PDMCC to cease trading Russian oil altogether.  In fact, Troost told
Paramount's Director, Maurice Taylor, that Troost had doubts about the Russian oil industry, and
his family was pressuring him to exit the business completely.  The entire situation was causing
him significant stress.  But Srivastava was pressuring Troost to continue trading Russian oil.
Indeed, Troost told Taylor that he thought Srivastava was blackmailing him and he was scared for
himself and for his family to go against Srivastava.[62]

162.     Troost told Camara the same thing.  When Camara asked Troost why he had not
closed the business, Troost explained that Srivastava was pressuring him and insisting that the U.S.
government wanted it to continue.[63]

---

[61] Ex. 36 ¶¶ 16-17 (Mauron Aff.).
[62] Ex. 29 ¶ 7 (Taylor Aff.).
[63] Ex. 23 ¶ 22 (Camara Decl.).

163.    In January, 2023, Srivastava told Reese that "Mr. Troost was tired of the work and no longer wanted to be in the business and that Mr. Troost wanted G to take it over completely."[64] During a May 2023 call, Reese told Troost, "I remember you telling me, as of December fifth of last year you were going to shut everything down.  I remember that."

### *Srivastava tries to convince Troost to give Srivastava greater control over Paramount through what Srivastava calls the "inversion."*

164.    Although Srivastava would later (falsely) claim he was shocked to discover that Paramount's subsidiary in Dubai was trading Russian oil, at the end of 2022, Srivastava was eager to continue trading Russian oil.  At the same time, he was also seeking a way to gain greater control over Paramount.  To that end, Srivastava's team proposed re-domiciling Paramount as a U.S. company—what Srivastava and Baker Hostetler would call an "inversion."

165.    Srivastava assured Troost that the U.S. government wanted Troost and his businesses to continue marketing Russian oil.  But the United States needed the companies to be restructured under a U.S. parent company controlled by Srivastava that could get a supposed license from OFAC.  Srivastava referred to this as the "inversion."

166.    Srivastava repeatedly told Troost (and others) that U.S. officials either approved (or would approve) such a license and that Srivastava spoke to Helene Budliger Artieda, the director of the Swiss sanctions regulator SECO, who also wanted Troost's companies restructured under a U.S. parent company.

167.    In early 2023, Srivastava organized and led a conference call with Francois Mauron and others from Paramount and PDMCC.  Srivastava announced they would restructure the company so it would be based in the United States.

---

[64] Ex. 26 ¶ 21 (Reese Aff.).

168.    Mauron thought the strategy made little sense—U.S. regulations did not apply to a UAE-based company owned by a Swiss company.  So why restructure the company in the United States and subject it to U.S. sanctions?

169.    To alleviate Mauron's concerns and convince him to support the inversion, Srivastava and Berg traveled to Dubai and met with Mauron and other PDMCC personnel. Srivastava and Berg examined PDMCC's contracts relating to its trading of Russian ESPO crude oil, as well as its Russian oil trading activities more broadly.  Mauron questioned why Srivastava and Berg needed to scrutinize PDMCC's Russian oil trades, since Berg was a U.S. lawyer, PDMCC did not have a U.S. nexus, and PDMCC was lawfully trading Russian oil under UAE law.

170.    Srivastava and Berg claimed that the point of the meeting was to make sure that the Russian oil trades were compliant with U.S. law.  Mauron reiterated his concerns, saying this made little sense because U.S. regulations did not apply to PDMCC.

171.    Srivastava and Berg told him not to worry.  They assured him that the inversion would be fine because they were obtaining an OFAC license.  Mauron asked why the U.S. would give a non-U.S. company an OFAC license.  Srivastava and Berg told Mauron that they had the right contacts in the U.S. government and were confident they would obtain the license because Srivastava had many "friends."  They insisted that they knew the process better than Mauron.  In the end, Berg assured Mauron that PDMCC could continue trading Russian ESPO oil over the price cap because an OFAC license was in the works.

172.    All the while, Srivastava continued to take steps to reinforce the perception that he had connections to the CIA and top levels of the U.S. government.  In January 2023, Srivastava persuaded Congressman Pat Ryan to write an official letter to Janet Yellen, then-U.S. Treasury

Secretary, urging OFAC to investigate companies that Srivastava perceived as competitors to Paramount and PDMCC.[65]



173.    Srivastava employed former (real) CIA operatives to bolster his credentials as a (fake) CIA operative, hiring former CIA station chief John Maguire.  Maguire was recently exposed for his role working with another conman who, like Srivastava, claimed to be a CIA

---

[65] On May 20, 2023, after Srivastava was expelled from Troost's companies, John Maguire—a former CIA station chief—texted Reese that Srivastava used Amos Hochstein, a Special Advisor to President Biden, to get the White House to remove one such competitor from a sanctions list (vessels associated with him have been sanctioned) and that the White House would keep him off this sanctions list if the competitor continued to do business with Maguire and Srivastava.  Ex. 39. The competitor reportedly has been under investigation by the U.S. Department of Justice since October 2023 for potentially violating Russian oil sanctions.

operative to perpetuate a fraudulent scheme.[66]    Maguire worked with Mary Beth Long—who questioned Troost during the Atlantic Council gala—in support of that con.    Long and Maguire appeared on a podcast discussing that fraudulent scheme, during which Long admitted he was a "con man," saying "John [Maguire] and I laughed, we laughed about it the other day, finally after drinking, 'Well, it happens once in everybody's life,' and 'this guy is a master liar, master liar.'"

174.    Maguire admitted that he got "played by a grifter" and that he wanted "to go back to headquarters and talk to personnel.  I want to know what the fuck the truth is."[67]

175.    Maguire travelled with Srivastava and Troost to a meeting with the National Security Advisor of a Middle Eastern country in the private wine cellar of the dining room at the Armani Hotel inside the Burj Khalifa in Dubai.



[66] Ken Silverstein, *How Michael Goguen Got Conned*, New York Magazine (Nov. 22, 2022), https://nymag.com/intelligencer/2022/11/how-michael-goguen-got-conned.html;    Intelligencer Staff, *The Billionaire's Epiphany*, The Intelligencer (Nov. 29, 2022), https://nymag.com/intelligencer/2022/11/cover-story-seed-money-podcast-all-the-voids.html.
[67] Hanna Rosin, *All the Voids*, Cover Story, Season 2, Episode 6 (Nov. 29, 2022), https://podcasts.apple.com/us/podcast/all-the-voids/id1594675355?i=1000587924118.

176.    Srivastava and Maguire told the National Security Advisor that they were there on behalf of the FBI and CIA as part of a program offering offering U.S. government assistance to locate and capture terrorists.  At one point, Srivastava claimed that Maguire would replace then-Secretary of State Anthony Blinken when Blinken resigned. Maguire pulled a handwritten note out of his jacket pocket containing names of supposedly wanted terrorists and passed it to the National Security Advisor. Sometime after the meeting, the National Security Advisor told one of the attendees to stay away from Srivastava and Maguire because they were dangerous.

177.    Maguire later admitted to a former Department of Homeland Security official who used to work for Srivastava that Maguire had been posing as an active-duty CIA officer in meetings with officials in Dubai.[68]

### *Srivastava pressures Troost to complete the inversion.*

178.    Srivastava's scheme started to collapse in April 2023.  The inversion process had been moving slowly for months.  There were complicated multi-jurisdictional tax issues to consider, among other issues, and Srivastava refused to provide written proof of U.S. approval for PDMCC to continue marketing Russian oil (because he was not affiliated with the U.S. government and had no such approval), which Troost considered necessary before putting the business under U.S. jurisdiction.  In March 2023, Srivastava ramped up the pressure, telling Troost he was meeting with President Biden.

---

[68] Ex. 24 ¶ 8 (Hinn Aff.).



179.     Srivastava also assured Troost that foreign governments also approved of PDMCC's continued involvement in Russian oil trading.  Srivastava texted Troost claiming to have spoken with the Dutch ambassador ("ambo").  Srivastava explained that, although the Dutch government did not share the same "opinion as our side," *i.e.*, the U.S. government, they would "comply" with the U.S. government's decision to work with Paramount.



180.     Srivastava told Troost that if the company did not authorize the restructuring under his control, Srivastava had authority on behalf of the U.S. government to take the program to another company. This could expose Troost and his companies to significant risk of secondary sanctions, since it would appear to anyone not aware of the supposed covert partnership with the U.S. government that Troost's companies had independently decided to continue marketing Russian oil over the price cap.

181.     To convince Troost to finalize the inversion, Srivastava convinced then-Senate Majority leader Chuck Schumer and Congressman Pat Ryan to ask OFAC officials to contact Paramount's lawyers so they could promote PDMCC's marketing of Russian oil, a virtually unprecedented maneuver.



182.     On April 28, 2023, Berg and others from Baker Hostetler met with Claire O'Neill McCleskey, an Assistant Director at OFAC.  At Srivastava's direction, the meeting was intended "to introduce Paramount SA and its wholly owned subsidiary [in Dubai] to OFAC for several

reasons, including [Paramount's] impending inversion and to address policy concerns with the price cap sanction on Russian-origin crude oil and petroleum products."[69]

183.    According to the Baker Hostetler attorneys present, the meeting did not go well.  In fact, they remarked after the meeting that OFAC "clearly did not support [PDMCC's] activities" and PDMCC "is the type of company that OFAC is getting calls to impose secondary sanctions on."  OFAC had no intention of changing the price cap or authorizing specific companies to trade above the price cap, "particularly, with respect to the ESPO pipeline" that PDMCC specialized in.

184.    Instead of disclosing to Troost the discussion that took place during this meeting (which would have stopped Srivastava's fraud in its tracks), Berg and Srivastava lied about it.  On May 1, 2023, Berg emailed Troost and Srivastava claiming that "The dialog with OFAC" had "momentum."  During a call on May 5, 2023, Berg told Troost it was a "good conversation" when Troost asked how the meeting with OFAC went.  And Srivastava continued to pressure Troost to complete the inversion, even though Srivastava and his lawyers knew that inverting Paramount was likely to trigger significant issues with OFAC.

185.    The meeting with OFAC was the tip of the iceberg.  On May 1, 2023, Paramount received an information request from the Swiss regulator, SECO, about Paramount and PDMCC's activities trading Russian oil.  Troost—who believed based on Srivastava's representations that Srivastava was in contact with Swiss regulators about obtaining and maintaining permission to trade Russian oil—forwarded it to Srivastava, Bravard, and Berg.  Troost was "very confused" because he understood that Srivastava "was speaking directly to the top person at SECO," and Paramount "got the all clear" to continue trading Russian oil through PDMCC.

---

[69] Berg and his team memorialized the meeting in a memorandum that was originally hidden from Troost and Paramount.  The memo was only obtained after Paramount initiated a lawsuit against Berg that sought client files that he was required to hand over to Paramount under California law.

| From: | Niels Troost[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C796365B1BC54B45AA3BE868A BB79BEE-NTROOST] |
|---|---|
| Sent: | Mon 5/1/2023 11:16:48 AM (UTC+02:00) |
| To: | Gaurav Sri[ggksrivastava@gmail.com]; N. Bravard[nbravard@parencom.ch]; Jeffrey Berg[jberg@bakerlaw.com] |
| Cc: | Jevgeni Barasev[jbarasev@parencom.ch]; Maurice Taylor[mtaylor@parencom.ch] |
| Subject: | Fwd: letter from SECO |
| Attachment: | 4623_001.pdf |

Dear Jeff and G,
Please see attached! I'm very confused because I was constantly informed that G was speaking directly to the top person at SECO, Helen, and dealing with this and that we got the all clear from SECO.

Please call me urgently and let me know how we proceed.

Sent from my iPhone


Best regards,

Niels Troost

186.    Srivastava had told Troost that he personally met with the Deputy Director of OFAC and that he spoke with the director of SECO in Switzerland.  Srivastava also told Mauron that he was speaking with officials from OFAC and SECO and that it was approved.  But the SECO inquiry showed this was not true.

187.    Around the same time, Paramount personnel became suspicious of Srivastava. Paramount hired an investigator to examine Srivastava's background.  The investigator prepared a report showing that Srivastava had a documented history of fraud.  As a result, Paramount resisted further influence from Srivastava, including his attempts to "invert" the company.

188.    Srivastava responded by doubling down on his claims that he was part of a CIA program, using people—like Reese, whom Srivastava duped into believing his false narrative—to bolster his fraudulent claims.  For example, during a May 1, 2023 call, Troost asked Reese if the

Director of the CIA knows Srivastava, and Reese responded, "Yes." When Troost asked if Reese was convinced that Paramount was "building a program with the Agency," Reese again said, "yes," stating that Reese was in meetings with Srivastava and high-level people, including Senator Mark Warner, the Chairman of the U.S. Senate Intelligence Committee.

189.    Two days later, Troost spoke with Srivastava on the phone. Srivastava claimed that he met with Senator Warner, whom Srivastava described as "the most powerful, number four in the whole [Biden] administration, and Senator Warner supposedly supported PDMCC's Russian oil business. Srivastava could not go into details, however, because of his supposed roles in U.S. intelligence "programs." Srivastava instructed Troost to ask Reese instead:

> "Man, … ask Jim [Reese]. I cannot say anything because of the programs I am a part of, but he can. He can talk to you…. [U]nder law, he can speak to you because as a friend or whatever. But I can't speak to you and when I'm part of a program but I cannot tell you about all this stuff, but he can. That's why I put him in the room. Otherwise, I don't need him to be there. [So] you can actually hear and communicate and see what is going on…. [T]hat's why.[70]

190.    Troost called Reese. Reese reported that "G [Srivastava] is a NOC," a "non-official cover operative." Reese continued: "[Srivastava] officially does not exist as an operative of the U.S. government. It's all done commercially." Reese claimed that there was an "official code name" for the program Srivastava was in, but Reese could not share it with Troost. In fact, Reese said he was already "breaking his clearance" by telling Troost Srivastava was a NOC.

191.    Reese also assured Troost that he had not "heard one inkling from any government official or anything about, 'oh my God, Paramount, Geneva, we're coming after him.'" Reese attributed this to Srivastava's efforts, claiming that Troost was part of a "covert action."

---

[70] Ex. 5 3:22-4:12.

192.    Despite what Reese claimed based on his interactions with Srivastava, Srivastava could not substantiate his invented bona fides, and Troost and others at Paramount—including Mauron, the director of PDMCC—remained skeptical.   When they continued to voice their concerns, with Mauron telling Bravard that Srivastava was scamming Troost and stealing Troost's money, Srivastava became angry and threatened Troost.  On May 3, 2023, Srivastava told Troost he would "fucking destroy everything in three seconds" and that Troost "ha[d] no fucking idea."[71]

193.    Later that day, Troost and Srivastava spoke again, and Srivastava pressured Troost to complete the inversion.  He said: "[T]hat's why I have also been trying to push for an inversion because, in an inverted structure, I can give authority for you to talk to the DMCC.  [But] you cannot today. ... You can only do that if you have a proper, … proper documentation. … [B]ut I can't issue anything to you today because you're not even under U.S. control. ... I can write, and so I can make sure there's nothing harmful that happens to you from the U.S., and the U.S. can reach out to counterparts," like SECO, the Swiss sanctioning authority, "to make sure that they don't do anything to you that is going to be ultimately affecting you."[72]

194.    Srivastava also said during that phone call that the U.S. government had "[c]arte blanche" for Paramount and so "SECO" and "everybody else" could "stick it up their ass[es]." Srivastava asked whether Troost could feel "how desperate I am to do this with you."[73]

195.    The next day, Troost spoke with Srivastava and reiterated his concerns about the inversion.  Troost asked Srivastava, "[W]hy does this only work if we inverse the whole, again,

---

[71] Ex. 3 2:18-21.
[72] Ex. 4 3:3-22.
[73] *Id*. 4:18-5:12.

I'm just looking for clarity.  If we inverse the whole thing to the U.S., … we have a U.S. company that they can support? … [W]hy does everything have to become American, is my question?"[74]

196.    Srivastava responded that the U.S. government was "not interested ... in this 'Let's save the Western World agenda,' because that's when America has been fucked many times." Rather, the U.S. government would only try to protect "a pure American enterprise with an American mindset."  In fact, the only reason Srivastava was able to convince the U.S. government to allow Troost to remain involved was because Troost's daughter was in New York.[75]

197.    Troost also questioned Srivastava about a helicopter company Srivastava claimed to own.  The background report on Srivastava prepared by the investigator Paramount hired showed no record of Srivastava having any connection with that company.  Srivastava claimed that there was no documentation of his ownership stake in the company because "when you are an asset, you have to be able to morph into anything you want to be at any given time.  And you don't want a footprint.  You don't want an asset print unless you want to create an asset finally."[76]

198.    Troost sought reassurance from Srivastava that he could protect Paramount from SECO.  Srivastava said SECO wanted Paramount to be a U.S. company.  Srivastava lamented that SECO did not notify Srivastava before seeking information from Paramount.[77]

199.    Finally, Troost asked Srivastava for written proof that Troost was Srivastava's asset and Srivastava could protect Troost from U.S. and Swiss regulators.  Srivastava claimed that Troost was an "MX-1" asset, but Srivastava could not provide any documentation because "[i]t's

---

[74] Ex. 6 2:12-17.
[75] *Id*. 2:20-22; 3:2.
[76] Ex. 7 3:8-11.
[77] Ex. 9 3:2-8.

not like there is a piece of paper that says you are my asset."[78]  On information and belief, there is no such thing as an MX-1 asset.

200.    Srivastava also claimed he would be "breaching the law" if he sent anything to Troost in writing, noting that "[i]t's one thing putting me in jeopardy, but it's a whole other thing that I'm going to put you in jeopardy by giving information that you shouldn't, … this issue is taken very seriously."[79]

201.    The following day (May 5, 2023), Srivastava continued to pressure Troost to move forward with the inversion.  Troost responded that he was concerned "that becoming a U.S. company and owning DMCC, having them do that business that they do [i.e., trading Russian oil], it would be in breach of sanctions."  Srivastava responded: "Not according to either OFAC or Melissa, which is the OFAC attorney at Baker [Hostetler]. ... They've looked at it multiple times. They've spoken to the Agencies. ... These people, once you're part of the system, you're part of the system.  It's a part of the system.  You're all part of the system.  You're always okay.  That's how it works.  But if you're not, and you fuck around with it, it's a different story."[80]

202.    Srivastava said that because Troost was hesitating on the inversion, people were questioning whether he was trying to fool the U.S. government.  Srivastava also attempted to extort Troost during this call, threatening that if he did not follow through with the inversion, "by tomorrow morning, *it will be fucking pandemonium in your life*."[81]  (Emphasis added.)  Srivastava said, "I don't think you understand who you're dealing with ... I can call, it's not a joke man, call

---

[78] Ex. 9 9:4.
[79] *Id*. 9:18-10:2.
[80] Ex. 10 4:18-24.
[81] *Id*. 9:18-21.

eight Senators in a day and the President in the White House and the ambassador of this country. This is not monkey business.  This is very serious shit."[82]

203.    Srivastava claimed this was "possible" because "I am part of a program.  I've told this to you before, in which there is only 30 people part of that program ... I am part of the program so I can call anybody, I can reach out to any state, any agency, anybody but, it is called 'non-official cover,' 'NOC.' …  But you're not supposed to know all this; you're not supposed to even be privy to this information."[83]

204.    To reinforce his threat, Srivastava claimed he was responsible for taking down Sam Bankman-Fried because Bankman-Fried "fucked with" Srivastava.[84]

205.    On May 6, 2023, Srivastava texted Troost that if the inversion was not "done with next week," Srivastava would be "checked out."  He wrote, "the inversion has to happen.  I am really done with the stories.  And after that you on your own.  I feel like I am being strung along."



206.    Srivastava also told Troost to "STOP WITH THE GAMES!    STOP BULLSHITTING AND LYING!"  And Srivastava threatened that he would "personally" write to "SECO & OFAC" about Troost to get him sanctioned, which would "block the funds of the company."



207.    After receiving these text messages, Troost called Srivastava to ask what lie Srivastava was talking about.  Srivastava said he could not talk, so Troost called Reese who was still acting as Srivastava's chief of staff.  Reese said, "G just wanted me to tell you that he's with [then-Speaker of the House] Nancy Pelosi and can't talk right now."

208.    Troost spoke with Srivastava later that day (May 6, 2023).  During the call, Srivastava continued to pressure Troost to complete the inversion.  Srivastava said that he had the "DCI calling" him.  He explained that the DCI was "the head of operations," who was "Bill Burns," the "head of the CIA.  It's been crazy."  Srivastava claimed that CIA Director Burns was

"shouting" at him, saying "what the fuck are you doing?,"[85] and CIA leadership was starting to

suspect that Troost was a Russian agent because Troost had not completed the inversion.

209.    When Troost questioned Srivastava about his CIA credentials, saying that Troost

did not understand what a "NOC" is, Srivastava replied: "[T]here is only, you know, maybe a

handful of NOCs in the world," about "30 of them."  Srivastava said he knew all the NOCs.  He

said Warren Buffett was "one of them at one moment in time," and that "M&M"—the chocolate

company—operated as a NOC "to do all kinds of espionage" in Russia.  Elon Musk was also a

NOC, according to Srivastava, "but [Musk] went off the deep end … because he started

collaborating with China."  "[E]ven Erik Prince was a NOC at one point," Srivastava claimed.

"[B]ut he's been kicked out of the club because, … the thing is, when you're a NOC, you make a

lot of money."[86]

210.    Srivastava said that he spoke with the U.S. embassy in Bern, Switzerland.  He told

Troost that SECO "told the guy in Bern [referring to the embassy] that '[y]ou [Troost and

Paramount] need to become a U.S. company, so we don't have to deal with this shit.'"[87]

211.    Over the next couple of days, Srivastava continued to pressure Troost, including by

having Baker Hostetler prepare two memos explaining how the "Corporate inversion" would allow

PDMCC to continue its Russian oil business even without an OFAC license.  According to those

memos, Baker Hostetler concluded that PDMCC was "not subject to the Implementing Countries'

Russian Price Cap and may continue to engage in its business operations under current laws and

---

[85] Ex. 13 2:21-3:8.
[86] Ex. 14 22:5-9; 22:25-23:2; 23:21-25; 24:1-4.
[87] Ex. 18 2:2-4.

regulations. ... The inversion will not make [Paramount or PDMCC] a U.S. person or subject them to OFAC sanctions; they will be the foreign subsidiaries of a U.S. entity."[88]

212.    Baker Hostetler also advised that Srivastava could lawfully receive dividends from PDMCC even though, as Srivastava and Baker Hostetler knew, PDMCC's profits were largely derived from trading Russian oil above the price cap.  Baker Hostetler wrote: "Notwithstanding the origin of the funds for the Dividend (i.e., [PDMCC]'s trading in Russian-origin crude oil above the price cap), we believe that the issuance of the Dividend and receipt of it by the U.S. Shareholder [Srivastava] and the others does not fall within any U.S. sanctions prohibitions."[89]

213.    These memos from Baker Hostetler to Paramount on May 8, 2023, provide contemporaneous evidence that Srivastava knew at the time that PDMCC was trading Russian oil. The memos and recordings completely disprove Srivastava's subsequent narrative, which on information and belief Defendants and Srivastava's other agents helped him construct, that Troost made up the allegations about Srivastava claiming to be a CIA operative after Srivastava supposedly discovered that PDMCC was trading Russian oil above the price cap, confronted Troost about it, and reported it to law enforcement agencies.

### Troost ousts Srivastava from Paramount.

214.    At that point, Troost had enough.  On May 10, 2023, EZI (Troost's holding company) rescinded the share purchase agreement that gave Srivastava a stake in Paramount, stating that EZI had "uncovered tangible evidence that [the company] was misled into entering the [agreement] due to intentional deceit by various parties."  The same day, Paramount terminated Baker Hostetler for cause, citing a conflict of interest in acting for both Srivastava and Paramount.

---

[88] Ex. 32.
[89] Ex. 31.

*Srivastava unsuccessfully tries to steal an additional $26 million from PDMCC.*

215.    After he was removed from Paramount, Srivastava immediately tried to steal the remaining $26 million of PDMCC's proceeds held by Arsari as quickly as possible.  On May 11, 2023, Giordano-Lascari (Srivastava's personal lawyer) messaged Arsari's general counsel, "We need to start repayment of the remaining funds.  How best to proceed?"  And again, the next day, "Were you able to discuss?  We need the first tranche first week of June as I understand was previously agreed."

216.    By that point, Arsari had grown more cautious in dealing with Srivastava, and its general counsel insisted that PDMCC forgive the $51 million loan before any funds could be disbursed to Srivastava.  Giordano-Lascari replied that the $51 million had not come from PDMCC.  He falsely claimed that Srivastava had "performed consulting services" five years before, in 2018, for $51 million, he had "agreed to lend those funds back at an interest rate of 5%," and he was preparing documentation of that 2018 consulting services loan.

217.    This explanation made no sense.  If Srivastava agreed to those terms for consulting services, why did Giordano-Lascari need to prepare documentation five years after the fact?

218.    Arsari's general counsel, who had worked for Arsari's principal since before 2018, responded, "First time I heard about a consulting service performed in 2018. Pls provide evidence. No such transaction booked from our side."  Of course, Giordano-Lascari could not provide evidence because Srivastava was manufacturing a backdated justification to obtain funds to which he was not entitled.  Arsari's general counsel also wrote to Giordano-Lascari, "What has been booked is loan between paramount and arsari for 51m dated November 26, 2022.  This loan has been legalised and apostilled and reported to [the bank] as per G's request."

219.    On June 9, 2023, Arsari's general counsel once again asked Giordano-Lascari to "Pls send paperwork for repayment of Arsari-paramount loan in Dec and future instalment

payments."  Over the next couple of weeks Srivastava and Giordano-Lascari continued to press Arsari's general counsel to release the funds to Srivastava, offering a series of shifting and contradictory justifications as to why Srivastava was entitled to the money but failing to provide any documentation.  Ultimately, Arsari refused to provide the funds to Srivastava.

### *Srivastava launches a retaliatory smear campaign against Troost to cover up Srivastava's fraud.*

220.    Having failed to extract this additional $26 million from PDMCC, Srivastava launched a retaliatory smear campaign falsely accusing Troost of ties to Russia.  Srivastava paid "journalists" to write negative articles about Troost, and he promoted those articles on the internet. He authorized John Maguire to initiate a negative press campaign against Troost and his family, similar to the campaign Maguire initiated on behalf another con-man who posed as a CIA operative.[90]  For example, they paid Armstrong Williams to publish a hit-piece online about Troost titled, "President of Russia Vladimir Putin's Hidden War—Niels Troost Crime Syndicate," that accused Troost of being "a front for" a sanctioned Russian oligarch and further alleged that Troost's wife and daughters had committed crimes, which they then circulated to public officials.[91]

221.    Maguire also sought to have his contacts in the New York Police Department arrest Troost's daughter and interrogate her.  Maguire sent them pictures of Troost's daughter, and told them that Troost, his family, and his companies were part of a "web of key people working for Gannady Timchenko [sic]."

---

[90] Maguire allegedly orchestrated a similar negative press campaign against billionaire Michael Goguen.
[91] Ex. 27, Ex. JPR3.





222.   Maguire also planted an article in *Intelligence Online* that falsely claimed that Srivastava provided "confidential information" about Troost's global business operations indicating that Troost engaged in illegal deals with Russia.

223.   Srivastava also instructed Berg to write letters making false statements intended to buoy Srivastava's reputation.  And Srivastava commissioned and created numerous anonymous websites (such as the website sanctionnielstroost.com) to defame Troost and spread lies about him.

***Several media outlets, including* The Wall Street Journal*, report on Srivastava's fraud.***

224.   Despite these efforts, Srivastava could not hide the truth.  In October 2023, Soobin Kim and Bradley Hope published an article on the website for Project Brazen entitled, "The Old

'I'm a Secret Spy, Pay Me' Con."[92]   The article recounted Srivastava's fraud.   Embarrassed,

Srivastava and his team issued a Digital Millenium Copyright Act notice under the name "Sherrie

Hagen."[93]  "Hagen" claimed she published the content of the article first on Tumblr and that Project

Brazen had violated her copyright by plagiarizing it.   But this was false.   The post purporting to

be the original article was created in November, *after* the Project Brazen article had come out.

Nonetheless, Google initially removed the Project Brazen article from its indexing, only to later

restore it when Srivastava's claims were revealed to be false.[94]



---

[92] Soobin Kim and Bradley Hope, *The Old 'I'm a Spy, Pay Me' Con*, Project Brazen (Oct. 10, 2023), https://whalehunting.projectbrazen.com/the-old-im-a-secret-spy-con/.

[93] Srivastava and his team used the pseudonym "Hagen" multiple times during the attacks on Troost and his family, on information and belief.

[94]        Soobin        Kim,        X,        @soobinskim        (Nov.        9,        2023), https://x.com/soobinskim/status/1722747471888064525.

225.    Other disasters followed for Srivastava.  Srivastava had pledged $10 million to the Atlantic Council.  But in February 2024, the Atlantic Council cut all ties with Srivastava after it discovered that Srivastava lied about properly registering the Gaurav and Sharon Srivastava Family Foundation as a 501(c)(3) and was unable to confirm other critical details about his background.[95]



226.    In August 2024, Democratic politicians froze or returned donations from Srivastava, after discovering that he falsely posed as a CIA operative and defrauded Troost.[96]

[95] Caitlin Oprysko, *The China lobbying terminations continue*, Politico (Feb. 23, 2024), https://www.politico.com/newsletters/politico-influence/2024/02/23/the-china-lobbying-terminations-continue-00143028; *see also* David Lippman, X, @dlippman (Feb. 23, 2024), https://x.com/dlippman/status/1761174354593804554.
[96] Victor Nava, *Democrats distance themselves from megadonor who allegedly posed as a CIA operative to scam millions from Russian oil trader*, New York Post (Aug. 28, 2024), https://nypost.com/2024/08/28/us-news/democrats-distance-themselves-from-megadonor-gaurav-srivastava-who-allegedly-posed-as-a-cia-operative/; New York Post, X, @nypost (Aug. 28, 2024), https://x.com/nypost/status/1828658372255605171.



227.    Around the same time, *The Wall Street Journal* published a damning feature-length article titled "A Fake Spy, Russian Oil and $1 Million Funneled to Democrats," which recounted Srivastava's fraud in painstaking detail.[97]  The *Journal* examined "messages, emails and financial records."[98]  It spoke with people "familiar with the matter[s]."[99]  It reviewed sworn affidavits.  And it listened to "recordings of phone calls."[100]

228.    The *Journal* explained how "Srivastava tried to convince Troost he was a 'nonofficial cover operative,' or NOC, one of 30 such top-secret agents working for the U.S."[101] And it reported on the conversation in which Srivastava claimed "Warren Buffet was once a

---

[97] Joe Wallace, *A Fake Spy, Russian Oil and $1 Million Funneled to Democrats*, Wall Street Journal (Aug. 27, 2024), https://www.wsj.com/politics/national-security/gaurav-srivastava-scam-e7ca3d26?mod.
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] *Id.*

NOC."[102]  Buffet told the *Journal* on the record that he "never heard of Mr. Srivastava and [he has] no connection with the CIA."[103]

229.    Based on this evidence, the *Journal* concluded that "Srivastava siphoned tens of millions of dollars out of [Troost's] firm, which he plowed into his donation spree and a Los Angeles mansion ... Srivastava's story—part Austin Powers, part James Bond—shows the ease with which someone with money and moxie can access Washington's most influential people."[104]

### *Srivastava hires Arkin and Kataoka to defame Troost.*

230.    By December 2024, the evidence against Srivastava in the public domain was overwhelming.  After the *Journal* article, there was no doubt that Srivastava was a fraudster. Worse for Srivastava, the *Financial Times* was planning to publish an article that would reveal more evidence of his fraud.  Srivastava was desperate to change the narrative, and on information and belief, he wanted to get ahead of the impending *Financial Times* piece, so he hired Arkin and Victoria Kataoka to discredit Troost by falsely accusing him of running a disinformation campaign.

231.    Arkin is a widely respected and well-known investigative firm that specializes in business and competitive intelligence and strategic crisis consulting.  It was founded by Jack Devine, the former chief of worldwide operations for the CIA.[105]  Kataoka has extensive law enforcement experience, spending six years as an "intelligence research specialist" for the New York City Police Department.

---

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] John Leland, *Jack Devine: The Spymaster Who Goes to Mass*, New York Times (Sept. 19, 2014),  https://www.nytimes.com/2014/09/21/nyregion/jack-devine-the-spymaster-who-goes-to-mass.html.

232.    On information and belief, Srivastava hired Arkin and Kataoka to provide credibility to the false narrative he manufactured about Troost and to refine that narrative. Srivastava knew that, given Arkin and Kataoka's experience and reputation as seasoned intelligence and investigative professionals, people would believe them if they accused Troost of waging a disinformation campaign.

233.    For their part, Arkin and Kataoka knew Srivastava posed a significant risk when they accepted him as a client. *The Wall Street Journal*,[106] the *New York Post*,[107] *Politico*,[108] and Project Brazen[109] had all published articles documenting how Srivastava defrauded Troost and Paramount, and stole at least $25 million, by falsely claiming to be a CIA operative. Well-respected organizations like the Atlantic Council publicly cut ties with Srivastava. And politicians and political action committees froze or returned contributions from Srivastava.

234.    Defendants ignored these red flags and disregarded the substantial publicly available information contradicting the preconceived narrative they were hired to spread. Instead, motivated by the prospect of financial gain and professional acclaim, they maliciously cast aside the truth and parroted Srivastava's false claims.

---

[106] Joe Wallace, *A Fake Spy, Russian Oil and $1 Million Funneled to Democrats*, Wall Street Journal (Aug. 27, 2024), https://www.wsj.com/politics/national-security/gaurav-srivastava-scam-e7ca3d26?mod.

[107] Victor Nava, *Democrats distance themselves from megadonor who allegedly posed as a CIA operative to scam millions from Russian oil trader*, New York Post (Aug. 28, 2024), https://nypost.com/2024/08/28/us-news/democrats-distance-themselves-from-megadonor-gaurav-srivastava-who-allegedly-posed-as-a-cia-operative/.

[108] Daniel Lippman, Eli Sokols, Lauren Egan and Ben Johansen, *Biden ices a controversial donor*, Politico (Mar. 19, 2024), https://www.politico.com/newsletters/west-wing-playbook/2024/03/19/biden-ices-a-controversial-donor-00147841.

[109] Bradley Hope and Soobin Kim, *The Old 'I'm a Secret Spy, Pay Me' Con*, Project Brazen (Oct. 10, 2023), https://whalehunting.projectbrazen.com/the-old-im-a-secret-spy-con/.

235.    After Srivastava hired Arkin and Kataoka, they immediately went to work to rebuild Srivastava's reputation.  Aware that the *Financial Times* would soon publish an article that most likely would contain highly damaging (but entirely true) statements about Srivastava, Arkin devised a scheme to preempt the article and flip the script on Troost and Paramount.

236.    Together with Srivastava and his other agents, including Vantage and Shaviv, Defendants planned to promote the false narrative that Srivastava was a wealthy American businessman who was the victim of a bad business deal with a vindictive former business partner. When the partnership fell through, Defendants claimed, Troost spent millions of dollars on a disinformation campaign falsely accusing Srivastava lying about being a spy.

### Kataoka defames Troost at a conference in London on December 2, 2024.

237.    Kataoka, in her capacity as an agent and employee of Arkin, participated in a panel discussion on December 2, 2024 (which was sponsored by Vantage and moderated by Shaviv) at a conference in London hosted by OffshoreAlert.[110]   According to OffshoreAlert, its London conference is its "signature in-person European conference on intelligence, investigations, and recovery for participants in high-value international finance," which attracts "over 250 attendees from nearly two dozen countries."[111]

238.    Kataoka's panel was titled "System Abuse & How to Fight It: Sanctions, Red Notices & Black Lists."  She began her presentation with a slide that read, "DISINFORMATION 101: A HOW TO GUIDE."   The slide broke down, step-by-step, how to create a successful disinformation campaign: (1) "find a target"; (2) "create a bold lie, wrapped around a kernel of

---

[110] OffshoreAlert, *Video: System Abuse & How to Fight It: Sanctions, Red Notices & Black Lists* (Dec. 2, 2024), https://www.offshorealert.com/video-system-abuse-how-to-fight-it-sanctions-red-notices-black-lists/.

[111] OffshoreAlert, London 2025, https://www.offshorealert.com/events/london/.

truth"; (3) "find someone to front it"; (4) "weaponize online in volumes"; (5) "deny your involvement"; and (6) "play the long game."[112]



239.    Kataoka used a case study to illustrate these steps.  Although she did not mention Srivastava or Troost by name (she referred to Srivastava as her client and Troost as an individual who had a history of trading Russian oil), there is no doubt that her presentation was about Srivastava and Troost, and anyone familiar with their dispute would have understood her defamatory statements to be about Troost.

240.    Indeed, even people unfamiliar with the dispute could have easily determined that Kataoka's false and defamatory claims were about Troost because Kataoka displayed slides with screenshots of the Project Brazen and *Wall Street Journal* articles.  Srivastava's picture was prominently displayed and the screenshot of the *Journal* article identified Srivastava by name.

---

[112] A notarized transcript of Kataoka's presentation is attached as Exhibit 33 and incorporated by reference herein.





241.    There was no doubt that the person Kataoka accused of orchestrating the so-called "disinformation campaign" was Niels Troost.  Everyone in the audience, and everyone who has since viewed Kataoka's recorded presentation, which remains publicly available on OffshoreAlert's website (and elsewhere) to this day,[113] would have seen the photographs of Srivastava.  Everyone who searched for Srivastava or the Project Brazen article or the *Wall Street Journal* article would have quickly learned that Troost was the former business partner who

---

[113] OffshoreAlert, *Video: System Abuse & How to Fight It: Sanctions, Red Notices & Black Lists* (Dec. 2, 2024), https://www.offshorealert.com/video-system-abuse-how-to-fight-it-sanctions-red-notices-black-lists/.

allegedly created this "fake spy story."  Indeed, the Project Brazen article identified Troost in the heading.



242.    The *Wall Street Journal* article contained an entire section on "The oil trader," which detailed Troost's background and success as a businessman.



243.    Kataoka described Srivastava as an "anonymous businessman" who was "operating in a murky world of frontier markets and commodities for over 15 years."  Srivastava, she said, had a "business relationship with an individual who had a long and privileged history of trading Russian oil, and very shortly after their business dispute, this individual was sanctioned by the UK government for facilitating the unfettered trade of Russian oil."[114]

244.    Kataoka said Troost "waged" a "disinformation campaign" against her client "that is just enormous in scope."  She thought the audience would be "amazed by the animus and the

---

[114] Ex. 33 10:6-10; 10:8-13.

amount of resources that were deployed against the target." She believed that "the skills and resources required to create this fiction [about Srivastava] are actually quite immense."[115]

245. Throughout her presentation, Kataoka accused Troost of completely fabricating a "big and bold lie" and widely publicizing a "sexy fiction" that Srivastava was a "fake spy." She described Troost as an example of a "basic how-to for disinformation." She said:

> [Y]ou need to find a target, which in this case was my client. Create a big and bold lie and wrap it around the kernel of truth. Plant the seed and weaponize it in volumes and in real life. ... So, the big and bold lie was that the target was a fake spy. So, the fake spy is the perfect set-up for a disinformation campaign. It's sexy and sensational. It's very hard to read about it and it's impossible to refute. It immediately discredits the accused, as once you're deemed a fake spy, everybody's going to wonder, "Are you a fake spy?" Where, in fact, in truth, it might just be something far more banal. It's that you are an individual in the middle of a business dispute.[116]

246. Kataoka concluded: "the effect is that one day you wake up and all there is in the public sphere is a fake news narrative about you being a fake spy."[117]

247. Kataoka falsely alleged that Troost paid operatives to make false claims on Wikipedia about Srivastava. She also falsely alleged that Troost and his team "devised a very well- contemplated plan to create a very robust self-referencing environment for this story." She said "there are certain entries on Wikipedia pages and Wikipedia, that are actually impossible to edit because they're high-profile sites" that contain the sexy, fake spy narrative.[118]

---

[115] *Id.* 10:4-5; 10:14-15; 16:10-11.
[116] *Id.* 10:17-11:7.
[117] *Id.* 14:25-15:2.
[118] *Id.* 13:11-12; 13:13-15.



248.    Kataoka accused Troost and his team of initiating false complaints to the FBI about Srivastava.  She said, "[t]here were FBI investigations" into Srivastava, and Troost "target[ed] associates and facilitators and partners of" Srivastava, "which makes me a bit nervous to be up here today."  And she accused Troost of "hack[ing] into [Srivastava's] life," "obtain[ing] access to his property," and "[stealing] things from his property."[119]

249.    She concluded: "I think what the goal, to finish my section here, is that the goal here, I really think, is to destroy the target.  You can never take this back.  It's a zero sum and absolutist."  She warned the crowd: "if something like this [disinformation campaign] starts [against] you," you should "act very quickly … get a counter narrative out there, because at this point, it's terrible and it possibly could be too late."[120]

250.    After her remarks, Shaviv asked Kataoka how much it would cost to create this kind of disinformation campaign.  Kataoka answered, "[I]t has to be very significant in the sense that in this case, there were pre-testing designs ... there were all the efforts to hack into

---

[119] *Id.* 14:17-20; 12:9-10.
[120] *Id.* 15:7-8; 16:4-7: 16:12-15.

[Srivastava's] life, the people that were deployed on the ground," the "process of building out the story." She concluded that she "would put it in the million, tens of millions of dollars."[121]

251.    Kataoka went to great lengths to assure her audience that she had done her due diligence, so they should believe her claims. At the same time, she expressly sought to discredit the numerous reliable sources of information that contradicted her client's preconceived narrative. Those sources included the *Journal* and Project Brazen articles. She claimed that the *Journal* had been duped by Troost and was "itself, targeted as part of the disinformation campaign."[122]

252.    She also sought to cast doubt on a lawsuit Paramount filed against Berg and Baker Hostetler for legal malpractice, breach of fiduciary duty, and violations of California state law.[123] Kataoka admitted that, ordinarily, legal filings are some of the "more legitimate sources for information." But she disregarded Paramount's lawsuit in this case because it was "limited … to the issue about obtaining client files" and "it wasn't filed by a major law firm" but was instead "filed by a very small, esoteric law firm." In fact, the lawsuit was filed by Rosen Saba, LLP, an "award winning civil trial practice and litigation boutique law firm that ... has been named as a top 20 Boutique Law Firm[] in California by California's Legal Newspaper the *Daily Journal*."[124]

253.    Kataoka also said she advised Srivastava to "play clean," meaning he could not be seen publicly accusing Troost of waging a disinformation campaign against him while he was doing the same against Troost's family. A co-panelist at the program, Aron Shaviv of Vantage Influence, told the audience that Kataoka provided him with even more details of the purported

---

[121] *Id.* 24:13-19; 25:11-12.
[122] *Id*. 15:9-10.
[123] *Paramount Energy & Commodities SA v. Baker & Hostetler, LLP*, Case No. 24STCV11278 (Cal. Super. May 6, 2024).
[124] Chambers & Partners, *USA: Spotlight Guide 2025, Firm Profile, Rosen Saba LLP*, https://chambers.com/law-firm/rosen-saba-llp-usa-spotlight-120:23706481.

disinformation campaign the night before the presentation and that it was "scorched earth." He also said that he disagreed with Kataoka and thought Srivastava needed to "play dirty."[125]

254.    The entire thrust of Kataoka's presentation was that Troost had fabricated and disseminated lies about Srivastava. This is false and defamatory, as Kataoka, Arkin, and Srivastava were well aware.

### The Financial Times *publishes its article further corroborating Troost's claims.*

255.    On December 16, 2024, the *Financial Times* published a story detailing Troost's account of his dealings with Srivastava as its lead story in its weekend magazine.[126] The article made clear that the reporting was based on affidavits; contemporaneous, internal business records; witness interviews; and telephone recordings Troost made of Srivastava claiming to be a CIA operative. The author, Tom Wilson, credited Troost's account and rejected the alternate (false) narrative portrayed by Srivastava, Arkin, and Kataoka.

256.    Wilson challenged Srivastava to produce evidence to support his (fabricated) counter-narrative. Srivastava could not.

257.    According to Wilson, he met Srivastava in August 2024 "for breakfast in the London hotel where he was staying, the £1,000-a-night Four Seasons on Park Lane. We had already been speaking by telephone and exchanging messages for several months." Wilson wrote that Srivastava repeated much of the false narrative also put forward by Kataoka; that Srivastava

---

[125] A U.S. lawyer recently accused Vantage in a motion filed in federal court in New York of paying hackers to unlawfully intercept his communications to obtain a litigation advantage. *See* Raphel Satter, *US lawyer says UK intel firm paid for hack operation against him*, Reuters (Apr. 15, 2025), https://www.reuters.com/legal/us-lawyer-says-uk-intel-firm-paid-hack-operation-against-him-2025-04-15/.
[126] Tom Wilson, *Niels Troost has a staggering story to tell about how he got sanctioned*, Financial Times (Dec. 14, 2024), https://www.ft.com/content/eb3b3ea1-5aaa-4136-8f02-01b76fc8f405.

accused Troost of working closely with Russia; and Srivastava challenged many factual assertions put forward by Troost.  "But ultimately," Wilson concluded, Srivastava "provided little evidence to credibly support his account."[127]

258.    Wilson spoke with several third parties "who helped Srivastava set up some meetings with US officials in the spring of 2023," including Ankit Desai and General Clark, and both Desai and General Clark said "they had also been deceived by Srivastava and then terminated their respective consulting contracts with him when he failed to pay.  In hindsight, the money stopped when Troost stopped funding" Srivastava.  Desai has "since lobbied on Troost's behalf, in what he described as an attempt to make amends."[128]

259.    Prior to this article, Wilson wrote several articles that were critical of Troost and Paramount.  Wilson's December 16, 2024, article, therefore, represented a radical shift in position—the kind of shift that typically occurs only after seeing and listening to highly credible and persuasive evidence.

260.    In fact, Troost had a revealing interaction with Srivastava related to a then-forthcoming article that Wilson was working on in March 2023.  Srivastava had hired Ken Frydman as his public relations professional (he was also handling some press announcements for Srivastava about an institute he was planning to start at the Atlantic Council based on his pledge of $10 million).  Frydman was adamant that Paramount should tell Wilson that "Niels and Paramount are operating with the knowledge and consent of the U.S. government.  If he insists on pursuing this story, Wilson needs to know and publish that.  He 'doesn't want to get it wrong.'"  Troost agreed, as this is precisely what Srivastava had been telling him all along.

---

[127] *Id.*
[128] *Id.*

261.    Srivastava, however, vetoed the suggestion.  Srivastava knew that his purported connections with the U.S. government were fake and unsupported.  He could not divulge his supposed dealings with the U.S. government to a reputable journalist without inviting further scrutiny, thereby exposing himself as a fraud.



262.    On December 14, 2024, the European Union sanctioned Troost because PDMCC "repeatedly traded Russian crude oil above the oil price cap after its introduction."[129]   The designation continued: "Niels Troost is affiliated with Livna Shipping Ltd, which has been trading crude oil above the oil price cap after its introduction."

---

[129] *See* Reuters, *EU adds Niels Troost to Russia sanctions list* (Dec. 16, 2024), https://www.reuters.com/world/europe/eu-adds-niels-troost-russia-sanctions-list-2024-12-16/.

263.    Livna Shipping does not trade oil, and Troost sold it in 2018, four years before the Russian invasion of Ukraine.  Wilson posted on X that the Livna Shipping justification "looked weak" and matched information Srivastava passed to Wilson months before.[130]



***Arkin and Kataoka double down and promote Srivastava's false narrative.***

264.    Undeterred by the *Financial Times* article confirming Srivastava is a fraud, Arkin and Kataoka—in coordination with Srivastava's other agents like Vantage and Shaviv—continued to push Srivastava's false narrative that Troost was waging a disinformation campaign.  On information and belief, Srivastava's agents had articles published by pay-to-play media outlets quoting from Kataoka's presentation at the OffshoreAlert conference.

265.    For example, on December 23, 2024, an outlet called *TechBullion* published an article titled, "The Weaponization of Lies: How Gaurav Srivastava's Life Became a Battlefield."[131]

[130]    Tom    Wilson,    X    @thomas_m_wilson,    (Dec.    17,    2024), https://x.com/thomas_m_wilson/status/1868938986682781889.
[131] Luke Wright, *The Weaponization of Lies: How Gaurav Srivastava's Life Became a Battlefield*, TechBullion (Dec. 23, 2024), https://techbullion.com/the-weaponization-of-lies-how-gaurav-srivastavas-life-became-a-battlefield/.



266.    The article extensively quoted Kataoka's presentation at the OffshoreAlert conference.  Specifically, the article stated, "This was a disinformation campaign waged against a client that was enormous in scope," and "[t]he strategy was insidious: find a target, create a big and bold lie, and wrap it around a kernel of truth."  It attributed these quotes to Kataoka.  The article included other quotes from her as well.  For example: "The big and bold lie was that the target was a fake spy," and that made for "the perfect disinformation setup.  It's sexy and sensational.  Once you're deemed a fake spy, everyone starts wondering: Are you a real spy?  Are you a conman?"[132]

267.    *TechBullion*'s website acknowledges that "TechBullion offers a range of services, including press release publishing, content writing and promotion, and digital marketing."[133]  On

---

[132] *Id.*
[133] TechBullion, About, https://techbullion.com/about/.

information and belief, Srivastava and his agents paid for *TechBullion*'s content writing and promotion services to amplify the digital reach of Kataoka's comments during the conference.[134]

268.     Other articles extensively quoting Kataoka's OffshoreAlert presentation appeared on similar websites on the same day (December 23, 2024).

269.     For example, FingerLakes1.com published an article titled, "The Gaurav Srivastava Case: How a Disinformation Campaign Destroyed a Businessman's Life," which was apparently authored by the "Digital Team."  (The lack of attribution to a real author is a hallmark that the article is pay-to-play content.)  The article mentions Kataoka about a dozen times and quotes nearly her entire OffshoreAlert presentation.[135]

270.     FingerLakes1.com purports to be devoted to "relentlessly covering daily news, people and places throughout the Finger Lakes Region of Upstate New York."[136]  Why then would FingerLakes1.com report on Kataoka's presentation, which had nothing to do with the Finger Lakes?  On information and belief, FingerLakes1.com published the story because Srivastava and his agents paid FingerLakes1.com to do so.  Srivastava wanted to spread the false counternarrative about Troost, and no reputable media outlet was willing to report on his story.  So, Srivastava and his agents commissioned a story on FingerLakes1.com, which claims to "serve[] over 30,000 visitors each day and deliver[] over 26 million page views annually."[137]

---

[134] According to Semrush, a digital marketing and search engine optimization platform that provides website traffic data, *TechBullion* had about 588,000 visits across all devises in December 2024 and about 580,000 visits in January 2025.  *See* https://www.semrush.com/website/techbullion.com/overview/.

[135] Digital Team, *The Gaurav Srivastava Case : How a Disinformation Campaign Destroyed a Businessman's Life*, FingerLakes1.com (Dec. 23, 2024), https://www.fingerlakes1.com/2024/12/23/the-gaurav-srivastava-case-how-a-disinformation-campaign-destroyed-a-businessmans-life/.

[136] FingerLakes1.com, About, https://www.fingerlakes1.com/about/.

[137] *Id.*

271.    Likewise, on December 5, 2024, *EU Policies* published an article titled, "How a Shadowy Disinformation Campaign Targeted Gaurav Srivastava," which was purportedly written by the "Editor Team."[138]   The article discussed Kataoka's presentation at the OffshoreAlert conference, stating, "industry insiders and investigative journalists unpacked the anatomy of a sprawling disinformation campaign that targeted Gaurav Srivastava, a businessman previously operating in relative anonymity. Over the course of 12 months, Srivastava's name became mired in controversy through a calculated mix of online fabrication, media manipulation, and targeted harassment."   *EU Policies* expressly invites users to submit articles and contributions for a "publication fee," including "[s]ponsored or affiliation content."[139]

272.    Not only did Defendants, Srivastava, and his other agents commission articles on pay-to-play news websites, but on information and belief, they also helped create several other websites accusing Troost and his advisers of pursuing a vicious disinformation campaign against Srivastava.  Those websites included "officialgauravsrivastava.com" and its linked companion-site, "gauravsrivastavascandal.com," both registered on December 24, 2024, as well as "gauravandsharonsrivastavafoundation.org."

273.    The website gauravsrivastavascandal.com includes a video of Kataoka's presentation at the OffshoreAlert conference.  On information and belief, Srivastava's team also created a You Tube channel with a clip of Kataoka from her later appearance on *Targeted*.[140]

---

[138] Editor Team, *How a Shadowy Disinformation Campaign Targeted Gaurav Srivastava*, EU Policies (Dec. 5, 2024), https://eu-policies.com/news/how-a-shadowy-disinformation-campaign-targeted-gaurav-srivastava/.
[139] EU Policies, About, https://eu-policies.com/about/.
[140]    Gaurav    Srivastava    Official    You    Tube    Channel, https://www.youtube.com/@OfficialGauravSrivastava/videos.

274.    The republication of Defendants' false and defamatory claims on pay-to-play news websites, gauravsrivastavascandal.com, and You Tube was foreseeable and intended.

### *Kataoka repeats her false claims on the podcast "Targeted."*

275.    Around March 2025, promotions appeared for a new podcast called *Targeted* hosted by Zach Abramowitz.  *Targeted* is produced by Next Chapter Podcasts, in California, which offers "bespoke podcast production services," including "scripted narrative" podcasts, "without interviews or incorporat[ing] fake interviews."

276.    Episodes—including a two-part episode about Srivastava—are readily available online to a global internet audience.  The podcast can be viewed and downloaded on the *Targeted* website, YouTube, Spotify, Apple Podcasts, Amazon Music, and iHeart.[141]  On July 17, 2025, *Targeted* announced that it had over 1.2 million viewers since it launched.[142]

277.    *Targeted* purports to cover people who were allegedly the targets of disinformation campaigns.  On March 4, 2025, *Targeted* released a two-part episode about Srivastava and Troost. Indeed, the promotional materials for *Targeted* and other features of the podcast suggest it was created by Srivastava's agents primarily as a vehicle for Srivastava to disseminate his false counternarrative that Troost is waging a disinformation campaign against him.

278.    Abramowitz—the host of *Targeted*—and Shaviv are longtime friends, and the source code for the *Targeted* website reflects that Shaviv played a role in authoring its content.

---

[141]  Targeted, About Us (with links to websites where the podcast is available), https://targeted.com/about-us.
[142] Podcasting Today, *Targeted Podcast hits 1.2 million listeners in three months*, (July 2, 2025), https://podcastingtoday.co.uk/targeted-podcast-hits-1-2-million-listeners-in-three-months/#google_vignette.

279.    The two-part episode about Srivastava, which was published on March 4, 2025, also stands out from the other episodes because it is the only episode accompanied by a developed narrative supported by multiple screenshots.[143]

280.    Abramowitz interviewed Kataoka at the end of the first part of that episode. Kataoka repeated the false claims she made at the OffshoreAlert conference.

281.    Abramowitz introduced her as a "Managing Director of The Arkin Group, an intelligence firm based in New York City," and he explained that Kataoka was "engaged by Gaurav to help him out of this mess."  Abramowitz emphasized that Kataoka (and Arkin) "learned a lot about Gaurav not only in her work with him, but in the diligence The Arkin Group did in order to take Gaurav on as a client in the first place."[144]

282.    Abramowitz prompted Kataoka to tell him "what [she] found" because "when you first looked online, obviously you see the flurry of articles about" Srivastava.  Abramowitz wanted to know "[a]t what point" Kataoka "came to the conclusion [that] … this guy was really unfairly targeted; this is a case I want to work on?"[145]

283.    Kataoka explained that "it took [her] a really long time" before she was comfortable representing Srivastava.  She said that "[t]here is actually a very large ecosystem that is available to vet and validate Gaurav's version of what the logic of the partnership was," and that after understanding that eco-system, "it was easier to" ask about specific "transaction[s]."  Her due diligence "was all very in the weeds and rigorous."[146]

---

[143] Targeted, Gaurav Srivastava (Mar. 4, 2025), https://targeted.com/episode/gaurav-srivastava.
[144] Ex. 34 2:4-5; 2:7-8; 2:8-10.
[145] *Id.* 3:7-12.

[146] *Id.* 3:13-18.

284.    Abramowitz also asked her about the "troubling" articles in *The Wall Street Journal* and the *Financial Times*.  Kataoka dismissed those well-sourced, credible articles because they contradicted her preconceived narrative.  Worse, she once again tried to discredit the reporting by claiming that both outlets were tricked by Troost.  Kataoka said they "were brought an extremely curated and well-developed self-reinforcing narrative with corroborated sourcing and … [a] seemingly affable and sympathetic protagonist."[147]

285.    Kataoka claimed that Troost approached those outlets and said, "'I know you've done this reporting on me but the truth is, is I have been defrauded by this fake spy.'"  Kataoka said that because Troost "presented … a very shiny, like sexy, fake spy story" the outlets were duped.  She said it was "masterful," "extremely well-resourced," and that the "animus and the resources that were brought to bear to do this, I think it is extraordinary.  And terrifying."[148]

286.    Abramowitz pressed Kataoka about the incredible nature of her accusations— asking how is it that someone like Troost who "was trading Russian oil at a time where Russia has to be the least popular country in the west" was able to "get this … incredible treatment."[149]

287.    Kataoka doubled down.  She said that Troost's was a "false narrative," and she cautioned that "[w]hoever gets to set the narrative first, sets the cognitive bias.  And the cognitive bias against Gaurav is so incredibly high now."  She concluded that she was "concerned" about how the statements shifted over the course of the campaign, starting with "a fake spy.  And then it was, you know, a fake you know, squatter, you know, conman.  And now it's monster and an

---

[147] *Id.* 5:13-16.
[148] *Id.* 5:18-5:23-24; 5:25-5:2.
[149] *Id.* 6:10:12.

inhuman nonhuman demon.  And I find that these are very deliberate racist tricks. ... It just speaks to how incredibly well-developed and expertly designed this disinformation campaign is."[150]

### *Srivastava rebrands with Arkin and Kataoka's expert help.*

288.    Rehabilitated by Arkin, Srivastava has attempted to start to rebuild his network. For years, Srivastava cultivated relationships with the most influential members of the Democratic party.  For example, he had lunch with Hunter Biden in Los Angeles as recently as January 2025.[151]



289.    After Srivastava's fraud was discovered and prominent Democratic politicians publicly distanced themselves from him, however, Srivastava began courting influential conservative leaders.  On information and belief, Srivastava is seeking to curry favor with the Trump administration to persuade the administration to levy baseless sanctions on Troost based on false information.  Defendants appear to be helping Srivastava with these efforts.

---

[150] *Id.* 6:14; 6:22-24; 7:24-8:7.
[151] Josh Boswell, *Desperate, broke and his meal ticket dad powerless, Hunter Biden is caught in a cozy lunch with a controversial guest...,*" DailyMail.com (Mar. 30, 2025), https://www.dailymail.co.uk/news/article-14487291/hunter-biden-desperate-broke-lunch-mega-donor-california.html.

290.    After Kataoka and Srivastava appeared on *Targeted*, General Mike Flynn posted on X: "Unchecked power in the hands of dangerous and nefarious people can and will hurt anyone. ... I found this ... interview another fascinating story of targeting people using 'intelligence' agency resources."  General Flynn tagged Attorney General Pam Bondi, FBI Director Kash Patel, and Director of National Intelligence Tulsi Gabbard.[152]



291.    On June 19, 2025, Srivastava posted a picture of himself with Vice President J.D. Vance on his official X account.[153]

---

[152]    Gen.    Mike    Flynn,    X,    @GenFlynn    (Apr.    19,    2025), https://x.com/GenFlynn/status/1913674131717202099.
[153]    Official    Gaurav    Srivastava,    X,    @OffclGauravSriv    (June    19,    2025), https://x.com/OffclGauravSriv/status/1935597889453269341.



292.    Srivastava also appeared on the cover of the Capitol Times Magazine, which published an article about him titled, "Gaurav Srivastava, The American Warrior."[154]  Srivastava is quoted saying: "I realize[d] that I am up against an extremely sophisticated, well-crafted, deeply resourced and incredibly corrupt machinery made up of lawyers, lobbyists, media consultants, influencers, technologists, etc." who are working for foreign governments to harm the United States.  Ironically, Srivastava quoted the Bible, telling the Capitol Times Magazine "ye shall know the truth, and the truth shall make you free."

---

[154]    Official Gaurav Srivastava, X, @OffclGauravSriv (June 27, 2025), https://x.com/OffclGauravSriv/status/1938594846471520687.



293.    Srivastava's shift to the right is consistent with his modus operandi.  Indeed, Reese

observed that Srivastava's frauds depend on "gain[ing] access to various important people. ... He

often collects photos of himself with public officials. ... G then fraudulently claims to have had

long standing relationships with these important people through his supposed service as a source

for the FBI, the DOJ and the CIA. ... However, his entire backstory I believe is fabricated."

***Defendants acted with actual malice by ignoring***
***Srivastava's publicly documented history of fraud.***

294.    Srivastava has a long, publicly documented history of fraud.  He has repeatedly

been sued for fraud and other unlawful conduct, with many of those lawsuits resulting in judgments

against Srivastava.  For example:

- In 2014, Nixon Peabody LLP sued Srivastava for breach of contract, resulting in a default judgment against Srivastava.[155]

- Also in 2014, Seb West Coast LLC sued Srivastava for residential unlawful detainer, and a default judgment was entered against him once again.[156]

- In 2018, Srivastava agreed to pay $30,000 to settle fraud claims against him, but he ultimately defaulted on the payment, resulting in additional litigation.[157]

- In 2019, a $161,000 judgment was entered against Srivastava in a fraud case filed in Los Angeles County Superior Court.[158]

- In 2019, Srivastava was named as a defendant in another lawsuit, this time for breach of contract stemming from his failure to pay agreed upon bills for his father's medical treatment.[159]  The case ultimately settled.

- In 2021, Srivastava's landlord sued the landlord's real-estate agency for breach of fiduciary duty, constructive fraud, intentional misrepresentation, negligence, and negligent and intentional infliction of emotional distress after the agency leased the landlord's home to Srivastava.[160]  The landlord alleged that Srivastava stole art, furniture, and rare wine from a locked wine cellar that Srivastava broke into; destroyed the landscaping; refused to leave the landlord's home after Srivastava's lease ended; and lied about being the owner of the home.  *Los Angeles Magazine* reported on the lawsuit.  On information and belief, Kataoka read the article because she stated that Srivastava was falsely labeled a "squatter."  The article has since been taken down—on information and belief, because of Defendants' efforts.

- In 2023, Srivastava was sued for breach of contract and abuse of process after Srivastava failed to pay an interior designer more than $100,000 for her design services.[161]  Rather than paying what he owed, Srivastava fired the designer, claiming she owed him the money.  Srivastava's attorneys moved to withdraw from the case on September 25, 2024, after "the relationship of trust and confidence essential to the attorney-client relationship … ceased to exist and irreconcilable differences … ar[o]se[] between client and attorney making it unreasonably difficult to carry out the employment effectively."  The case remains pending.

[155] *Nixon Peabody LLC v. Srivastava*, Case No. BC548034 (Cal. Super. 2014).

[156] *Seb West Coast LLC v. Srivastava*, Case No. BC554235 (Cal. Super. 2014).

[157] *Khoudari v. Davalos*, Case No. BC68883 (Cal. Super. Apr. 12, 2019).

[158] *Small v. Johnson & Srivastava*, Case No. BC699586 (Cal. Super. 2018).

[159] *R.M. Galicia Inc. d/b/a Progressive Mgmt. Sys.*, Case No. 19STCV03925 (Cal. Super. 2019).

[160] *McPherson v. UMRO Realty Corp.*, Case No. 21SMCV00857 (Cal. Super. 2021).

[161] *Kleinman v. Srivastava*, Case No. 23SM-CV04447(Cal. Super. 2023).

295.    These court filings are publicly available.  Given Kataoka's claim to have conducted extensive diligence on Srivastava, Defendants surely knew about most (if not all) of these legal actions, which support Troost's claims that Srivastava defrauded him and contradict Defendants' false preconceived storyline that Troost is waging a disinformation campaign.

296.    In fact, Kataoka referenced "prior fraud lawsuits" against Srivastava in her OffshoreAlert presentation.  Yet, Kataoka dismissed them as the "remote basis" for Troost's disinformation campaign, despite also acknowledging that litigation filings are often some of the most reliable sources of information.



297.    Defendants also knew about, but purposefully disregarded and sought to discredit, Paramount's malpractice lawsuit against Berg and Baker Hostetler.[162]  That complaint alleges that Srivastava claimed to be a "non-official cover ('NOC') operative of the U.S. Central Intelligence Agency."  It explains in detail Srivastava's fraudulent scheme to gain control of Paramount.  It exposes Berg's role in that scheme and his conflicts of interest serving as counsel for both

---

[162] *Paramount Energy & Commodities SA v. Baker Hostetler, LLP*, Case No. 24STCV11278 (Cal. Super. 2024).

Paramount and Srivastava.  And it details Berg's unlawful conduct in withholding Paramount's client file.  There was widespread reporting on the lawsuit,[163] and Berg no longer works at Baker Hostetler.[164]

298.    Kataoka and Arkin ignored these legal filings too, downplaying the lawsuit as a claim merely related to a client file brought by a "small" and "esoteric" law firm.  At a minimum, the nature and volume of lawsuits and awards against Srivastava showed him to be an unreliable for source for Defendants to rely on.

### *Defendants acted with actual malice by ignoring credible reporting from major media outlets that contradicted their false narrative.*

299.    In addition to ignoring Srivastava's well-documented history of fraud, Defendants ignored credible, well-sourced reporting from media outlets—including *The Wall Street Journal*, the *Financial Times*, and Project Brazen—that contradicted Defendants' false claims that Troost was waging a vicious disinformation campaign against Srivastava.

300.    These media articles—which Kataoka tried to discredit during her presentation and podcast interview—cited reliable sources including people familiar with the matters, affidavits,

---

[163] Kathryn Rubino, *Lawsuit Alleges Biglaw Partner Duped by Con Man – Or Worse*, Above the Law (May 15, 2024), https://abovethelaw.com/2024/05/lawsuit-alleges-biglaw-partner-duped-by-con-man-or-worse/; David Thomas, *Sanctioned oil trader sues US law firm over alleged fake CIA program*, Reuters (May 8, 2024), https://www.reuters.com/legal/legalindustry/sanctioned-oil-trader-sues-us-law-firm-over-alleged-fake-cia-program-2024-05-08/; Debra Cassens Weiss, *Suit accuses BigLaw partner of 'regurgitating' claims of con artist who claimed to be CIA agent*, ABA Journal (May 14, 2024), https://www.abajournal.com/news/article/suit-accuses-biglaw-partner-of-regurgitating-claims-of-con-man-who-claimed-to-be-cia-agent; Antoine Abou-Diwan, *Baker & Hostetler partner concealed conflict, commodities trader claims*, Daily Journal (May 9, 2024), https://www.dailyjournal.com/article/378705-baker-hostetler-partner-concealed-conflict-commodities-trader-claims.
[164] Jeffrey Berg, LinkedIn, https://www.linkedin.com/in/jeffreypberg/.

memos, emails, messages, and audio recordings.[165]  They quoted Kagimu, General Clark, and others who confirmed Troost's claims that Srivastava was masquerading as a CIA operative.

301.    Even after the *Financial Times* published its article in December 2024 and reported that Srivastava "provided little evidence to credibly support his account," while Troost "shared hundreds of contemporaneous messages and emails, voice recordings and more than a dozen other people, including Paramount employees and advisers, who were able to corroborate many parts of his story,"[166] Defendants refused to correct their prior false claims.  Instead, they doubled down repeating their preconceived narrative during the *Targeted* podcast.  Defendants' failure to correct or retract their false statements is further evidence of actual malice.

302.    Defendants never made any effort to contact Troost or Paramount (or, on information and belief, any of the other sources cited in the media reports) or to investigate the recordings or affidavits or other documents cited in the press.  If they had, Troost would have been happy to have shared that information with them (just as he had with the media), because it completely exonerates him and proves beyond any doubt that Srivastava and Reese (Srivastava's then-chief of staff) repeatedly told Troost and others that Srivastava was a CIA operative.

303.    Defendants also ignored that well-respected entities, like The Atlantic Council and politicians who previously supported Srivastava, ended their affiliations with him and returned his campaign contributions and other donations because of the irrefutable evidence of the fraud he

---

[165] Although Srivastava claimed that Troost doctored the recordings, they have since been authenticated by a former FBI electronics engineer who is an audio forensics expert.
[166] Tom Wilson, *Niels Troost has a staggering story to tell about how he got sanctioned*, Financial Times (Dec. 14, 2024), https://www.ft.com/content/eb3b3ea1-5aaa-4136-8f02-01b76fc8f405.

perpetrated against Troost. *Politico* prominently reported on the Atlantic Council's decision to cut ties with Srivastava,[167] and other outlets picked up the story.[168]

304.    On March 19, 2024, *Politico* also reported that "the Biden campaign and the Democratic Congressional Campaign Committee froze hundreds of thousands of dollars in donations made by a businessman accused of fraudulently pretending to be with the CIA."[169] *Politico* explained that "concerns were raised about the source and legality of the donation." On information and belief, Defendants were aware of this *Politico* reporting.

### Defendants acted with actual malice by ignoring suspicious financial transactions their extensive diligence on Srivastava certainly would have uncovered.

305.    Kataoka claims to have conducted extensive diligence prior to taking on Srivastava as a client. In fact, she said during the *Targeted* podcast that this purported "diligence" revealed supposed "irregularities" in some of PDMCC's transactions. Clearly, then, Defendants must have reviewed PDMCC financial and business records as part of their diligence.

306.    On information and belief, their diligence also revealed that Srivastava—through Arsari, a company owned by the brother of Srivastava's close associate—took at least $25 million from PDMCC to buy a mansion in Los Angeles. And that he sought to steal an additional $26 million from PDMCC after his fraud was discovered. Fortunately, Arsari's general counsel refused to green light this second transaction.

---

[167] Caitlin Oprysko, *The China lobbying terminations continue*, Politico (Feb. 23, 2024), https://www.politico.com/newsletters/politico-influence/2024/02/23/the-china-lobbying-terminations-continue-00143028.

[168] Murtaza Ali Shah, *Atlantic Council terminates relation with donor after fraud expose*, Geo News (Mar. 2, 2024), https://www.geo.tv/latest/533280-atlantic-council-terminates-relation-with-donor-after-fraud-expose.

[169] Daniel Lippman, Eli Stokols, Lauren Egan and Ben Johansen, *Biden ices a controversial donor*, Politico (Mar. 19, 2024), https://www.politico.com/newsletters/west-wing-playbook/2024/03/19/biden-ices-a-controversial-donor-00147841.

307.    Arsari's general counsel documented in emails and other messages his concerns with Srivastava's purported justifications as to why he was entitled to the second tranche of $26 million from PDMCC.  Arsari's general counsel repeatedly asked Srivastava for documentation to validate his request.  Srivastava repeatedly failed to provide any such documentation.

308.    Kataoka would have seen these communications if she conducted the robust diligence she claims.  Certainly, Kataoka could have requested that Srivastava provide her with background on the funds he used to pay for his mansion, which—had Srivastava provided accurate documentation, would have revealed his fraud.

309.    These transactions and requests were obvious red flags that contradicted Srivastava's narrative.  Yet, Defendants ignored these red flags, just like they ignored all the other credible evidence that contradicted the story their client paid them to tell.  This too is evidence of actual malice.

*Defendants acted with actual malice because they were*
*motivated by the prospect of financial gain and professional acclaim.*

310.    Defendants' financial motive provides still more evidence of actual malice.  Not only were they paid (and on information and belief, paid handsomely) by Srivastava to legitimize and spread his false narrative that Troost was waging a disinformation campaign, but Kataoka's appearances at the conference and on the podcast were marketing opportunities for her and Arkin, providing even more incentive for her to disregard credible evidence refuting Srivastava's claims.

*Defendants' statements have irreparably harmed Troost's business and reputation.*

311.    Srivastava and Defendants' concerted smear campaign has had its desired effect. As Srivastava promised, he unleashed "fucking pandemonium" on Troost.  Srivastava's lies caused Troost and his companies to be sanctioned by the EU, UK, and Switzerland and inflicted untold emotional and reputational harm on Troost and his family.

312.    Defendants' statements amplified that harm exponentially.  Just as the truth about Srivastava's fraud was beginning to gain traction with mainstream media outlets like *The Wall Street* and *Financial Times*, clearing Troost's name and vindicating his reputation, Defendants made their false and defamatory statements to stifle that narrative and flip the script back to Srivastava.  Indeed, Defendants expressly sought to cast doubt on this reporting and the credible sources on which it was based.

313.    Given their background and reputation as experienced investigators and intelligence professionals, Defendants' false and defamatory statements carried significant weight and legitimized Srivastava's claims while simultaneously discrediting Troost.  That is precisely why Srivastava hired them.  He knew their credentials would validate the false notion that Troost is waging a disinformation campaign against Srivastava.

314.    Beyond the immense emotional and reputational harm Defendants' statements caused, on information and belief, their false claims were heard and seen by millions.  As a result, Troost has incurred substantial economic costs trying to remedy that harm.  Specifically, Troost has spent $450,254.24 in fees on public relations and investigative professionals since Defendants made their statements as part of his efforts to mitigate the damages directly connected to those statements.  That work is ongoing.  Those fees are separate and apart from the substantial sums Troost has spent, and will have to spend, on this litigation.

## COUNT ONE
### Slander *Per Se* Based on Kataoka's Statements at the OffshoreAlert Conference
### (*Against all Defendants*)

315.    Plaintiff Niels Troost repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

316.    On December 2, 2024, Defendants published the following false statements of fact to an audience that may have included more than 250 people during Kataoka's presentation at the OffshoreAlert conference in London:

a)    My case today that I'm bringing to you is a different sort of system abuse; not of international institutions but the use of press to wage, what I would say, is a disinformation campaign that was waged against a client that is just enormous in scope.

b)    While you listen to this story, I think you'll be amazed by the animus and the amount of resources that were deployed against the target.

c)    So, the big and bold lie was that the target was a fake spy.  So, the fake spy is the perfect set up for a disinformation campaign; it's sexy and it's sensational.  It's very hard not to read about it and it's impossible to refute.  It immediately discredits the accused, as once you're deemed a fake spy, everybody is going to wonder, Are you a fake spy?  Are you a real spy?  Are you a conman?  Who are you?  Where, in fact, in truth, it might just be something far more banal, is that you are an individual in the middle of a business dispute.

d)    And when you do that, when you're the target of a disinformation campaign, you open yourself up to yet more scrutiny and more ways in which someone can distort what's going on, which gets to wrapping it around a kernel of truth.

e)    In this case, in order to build the disinformation campaign, the organizers shone a spotlight on the target and his entire life; bringing daylight to someone whose business operates in obscurity, and nobody wants any sort of daylight shone upon their affairs.  They hacked into his life, they obtained access to his property, they stole things from his property, they contacted his travel agent to find out what his movements were, they scoured the open source to find out everything they could.  And because this individual is of a certain sort of status and has lots of connections and what have you, they were able to create a very sexy fiction and with lots of fodder to play with.  So then when you're looking at the story, there are elements of truth; there are elements of traces of things that are real.  But the whole of it is not.

f)    So, once you've made that fiction, you disseminate it as much as you can.

g)    So, the effect is that one day you wake up and all there is in the public sphere is a fake news narrative about you being a fake spy.

h)    Just ahead of the publication and just to be clear here, I'm not suggesting that the *Wall Street Journal* was part of the disinformation campaign.  I believe that it was, itself, targeted as part of the disinformation campaign.

i)    But I think what the goal, to finish my section here, is that the goal here, I really think, is to destroy the target. You can never take this back. It's zero sum and absolutist. You can't take it back.

j)    I don't know but it has to be very significant in the sense that well, in this case, there were retesting designs so there were all the efforts to hack into his life, the people that were deployed on the ground to go into his properties, all of the due diligence and investigations that were used to break into his life, the process of building up the story, all of the pay-for-play stories. I don't know if it's if it's $5,000 to place one story times 500, you know, in and of itself is a lot of money. But then there's the AI-generated videos. The how do you how do you get to a point where you have the capacity to have a certain legitimacy on Wikipedia to edit these pages?

k)    Now, this is a little in the weeds, but some of the Wikipedia editors have flagged this Wikipedia editor, in particular, as being problematic. But I think it's something that's cultivated over a period of time, was that financed just for the story or was it someone that avails themselves to this kind of activity? Then you have, you know, all of the efforts to continue to perpetuate the narrative, the people who wrote the letters, the people who then hack were able to obtain access to all of the parent's phones at the school. There just I would put it in the millions, the tens of millions of dollars, but I really don't know.

317.    Although Defendants did not name Troost in Kataoka's presentation, Defendants' statements are about Troost, and they are reasonably understood to be about Troost.

318.    The PowerPoint slides accompanying Defendants' presentation included several screenshots of articles and a Wikipedia page that expressly identify Srivastava as the client whose case Kataoka was discussing. Those who know Troost are aware of his dispute with Srivastava. And even the most cursory Google search for Srivastava's name returns numerous links to articles (including the August 27, 2024 *Wall Street Journal* article and an August 28, 2024 *New York Post* article) that explicitly reference Troost.



319.    Kataoka also stated during her presentation that her client's former business partner was sanctioned for trading Russian oil, confirming that her slanderous claims were about Troost.

320.    Defendants' statements are false.  Their statements convey, and are reasonably understood to convey, that Troost conducted a widespread and expensive disinformation campaign accusing Srivastava of lying about being a CIA operative to defraud and steal from Troost.  But that is exactly what Srivastava did.

321.    Srivastava expressly told Troost and others that he was "a non-official cover operative" or a "NOC" affiliated with the CIA, FBI, and other United States government entities. Troost recorded Srivastava saying that Srivastava was a "NOC," that he was affiliated with U.S.

government "programs," and that he had direct access to senior U.S. politicians, policymakers, and other leaders, including then-President Biden.

322.    Srivastava also told third parties including Jim Reese, Maurice Taylor, Habib Kagimu, Ibrahima Camara, and Gerald Smith (all of whom have provided sworn statements) that he was a CIA operative.

323.    Defendants' statements are defamatory because false accusations that Troost lied about Srivastava and is waging a disinformation campaign against him tend to lower, and in fact have lowered, Troost in the estimation of the community and have deterred third persons from associating or dealing with him.

324.    Indeed, Defendants' statements constitute slander *per se* because they accuse Troost of criminal conduct (including hacking into Srivastava's computer systems, gaining unauthorized access to his property, and stealing from him) and they impugn the basic integrity, ethics, and competence of Troost as a businessman, trader, and founder of a prominent commodities business.

325.    They are also slander *per se* because they tend to harm, and indeed have harmed, Troost by imputing to him unfitness to perform or work as a commodities trader, high-level executive, and business partner.

326.    They are also slander *per se* because Defendants' statements are defamatory on their face without reference to extrinsic facts.

327.    As a direct and foreseeable result of Defendants' false and defamatory statements, Troost has suffered significant reputational, emotional, and economic harm as detailed above.

328.    Defendants had no applicable privilege or legal authorization to publish their defamatory statements or, if they did, abused that privilege.

329.    Defendants published the slanderous statements with actual malice because they knew the statements were false or at a minimum recklessly disregarded the truth or falsity of the statements.  Specifically, Defendants acted with actual malice because: (1) Defendants' statements were part of a preconceived narrative concocted by Srivastava to discredit Troost; (2) Defendants ignored and sought to undermine admittedly reliable sources of information, including prior lawsuits accusing Srivastava of fraud, that cast doubt on Srivastava's reliability; (3) Defendants ignored and sought to undermine media reporting from well-respected outlets based on credible sources including affidavits, emails, memos, and audio recordings that contradicted Defendants' preconceived narrative; (4) Defendants ignored information uncovered through their due diligence of Srivastava that showed his involvement in suspicious financial transactions that Srivastava orchestrated to steal money from Troost and his company; (5) Defendants were motivated by the prospect of financial gain and professional acclaim; (6) Defendants were also motivated by hostility and ill will toward Troost, whom they baselessly accused of making "racist" claims about Srivastava;  (7) Defendants never contacted Troost or his representatives to hear Troost's recordings after Defendants' learned about the recordings from the *Wall Street Journal*'s article, and on information and belief, Defendants never sought to contact any of the reliable third parties quoted in the *Journal* article and other press reporting to investigate whether Srivastava was lying; and (8) when confronted with additional irrefutable evidence contradicting their claims after the OffshoreAlert presentation, Defendants refused to retract or correct their statements, instead doubling down and repeating them on *Targeted*.

330.    Defendants acted with common law malice, intending to cause injury to Troost, and their behavior constitutes a willful and conscious disregard of Troost's rights.  Among the other acts described herein, Defendants ignored the evidence demonstrating that Srivastava repeatedly

told Troost and multiple third parties that Srivastava was a "non-official cover operative," or NOC, with the CIA. Defendants' remarks at the OffshoreAlert conference and on the *Targeted* podcast also evince their ill will and hatred of Troost.

331.    Defendants also repeated and republished, and on information and belief, paid others to repeat and republish, their false accusations that Troost was waging a massive disinformation campaign against Srivastava. This serial display of contempt for Troost's rights shows an intent to injure and despicable conduct sufficient to justify an award of exemplary and punitive damages under applicable law.

## COUNT TWO
### Libel *Per Se* Based on the Video Recording of Kataoka's Presentation at OffshoreAlert (*Against all Defendants*)

332.    Troost repeats and re-alleges paragraphs 1–314 as if set forth fully herein.

333.    Kataoka's defamatory presentation at OffshoreAlert was not only delivered to a live, in-person audience (creating a cause of action for slander), but it also was videotaped, and that video remains available online. Kataoka makes the same statements in the videotaped version of her presentation, creating a cause of action for libel based on the false and defamatory statements identified in Count One (¶¶ 315-31) for the same reasons set forth in Count One.

## COUNT THREE
### Libel *Per Se* Based on the Foreseeable and Intended Republication of Kataoka's Statements During the OffshoreAlert Conference (*Against all Defendants*)

334.    Troost repeats and re-alleges paragraphs 1–314 as if set forth fully herein.

335.    On December 23, 2024, the online publication *TechBullion* repeated and republished the following false and defamatory statements of fact originally published by Defendants during the OffshoreAlert conference:

a)    Victoria Kataoka, Managing Director at The Arkin Group and a former NYPD investigator, unpacked the anatomy of the attack against Srivastava. "This was a disinformation campaign waged against a client that was enormous in scope," she

said.  "The strategy was insidious: find a target, create a big and bold lie, and wrap it around a kernel of truth."

b)      "The big and bold lie was that the target was a fake spy," Kataoka explained.  "It's the perfect disinformation setup.  It's sexy and sensational.  Once you're deemed a fake spy, everyone starts wondering: Are you a real spy?  Are you a conman?"

c)      "They contacted everyone he knew," Kataoka said. "Business associates, political connections, even parents at his children's school received anonymous messages labeling him a terrible person."

d)      The financial and emotional toll of such a campaign is staggering.  Kataoka estimated the costs to orchestrate the attack against Srivastava to be in the tens of millions of dollars.  "Pre-testing narratives, hacking, creating AI videos, and leveraging Wikipedia—this isn't cheap," she said.  "It's cultivated over time with significant resources. The scale and sophistication are mind-blowing."

336.    On December 23, 2024, the online publication FingerLakes1.com repeated and republished the following false and defamatory statements of fact originally published by Defendants during the OffshoreAlert conference:

a)      This businessman, Gaurav Srivastava, became the unwitting target of an attack that Victoria Kataoka, Managing Director at The Arkin Group, described as "enormous in scope" during a conference earlier this month.

b)      "You will be amazed by the amount of resources that were deployed against the target," said Ms. Kataoka.  "This was not just a smear campaign; it was a multi-layered, meticulously orchestrated attack designed to completely dismantle his reputation and livelihood", she said as she was invited to OffshoreAlert London 2024 conference, a worldwide gathering of investigators.

c)      "The basic how-to is this: you find a target, create a big and bold lie, and wrap it around a kernel of truth," explained Ms. Kataoka, a former NYPD investigator.  "In this case, the lie was that my client was a fake spy.  It's a perfect setup for a disinformation campaign because it's sexy and sensational.  Once you're deemed a fake spy, the public begins to wonder: Are you a fake spy?  Are you a real spy?  Are you a conman?"

d)      "They hacked into his life," Ms. Kataoka revealed.  "They gained access to his properties, stole personal items, and even contacted his travel agent to track his movements.  Letters were sent to his business associates, lawyers, political connections, and philanthropic partners, labeling him a terrible person.  Anonymous text messages were sent to parents at his children's school.  It created a wave of suspicion and ostracism."

e)  Ms. Kataoka estimates the cost of orchestrating such a sophisticated campaign to be in the tens of millions of dollars.  "Pre-testing designs, hacking, pay-for-play media, AI-generated content, Wikipedia edits, and ground operations—it's a highly resource-intensive process.  And the people orchestrating it were willing to invest immense sums to destroy my client," she said.

f)  The consequences of this campaign were devastating.  "One day you wake up, and all there is in the public sphere is a fake news narrative about you being a fake spy," Ms. Kataoka lamented.  "No one wants to do business with you.  No one wants to associate with you.  No one even wants to attend your children's birthday parties."

337.  Defendants are liable for these foreseeable and intended republications of their statements, which on information and belief, Defendants paid for and commissioned.

## COUNT FOUR
### Libel *Per Se* Based on Kataoka's Statements on *Targeted*
### (*Against all Defendants*)

338.  Troost repeats and re-alleges paragraphs 1–314 as if set forth fully herein.

339.  On March 5, 2025, Defendants published the following false statements of fact to a worldwide internet audience during an episode of the podcast *Targeted*:

a)  And so, he came to them and said, I know you've done this reporting on me but the truth is–is I have been defrauded by this fake spy.

b)  And when you talked earlier before about, you know, the Rorschach of like staring at something and then all of a sudden seeing it, what they were presented with was a very shiny, like sexy, fake spy story.  I mean, it is masterful, it is extremely well-resourced.  The animus and the resources that were, you know, brought to bear to do this, I think is extraordinary.  And terrifying.

c)  But it is another story that someone doesn't want to have anything to do with, you know, this fake spy.

d)  The last thing I'd really like to say, just because I think it's an important point, I am concerned about the kind of statements that the adversary is making about Gaurav over the arc of this campaign.  At first, it was a fake spy.  And then it was, you know, you know, a fake, you know, squatter, you know, conman.  And now it's a monster and an inhuman, nonhuman demon.  And I find that these are very deliberate, racist tricks.  And I think it's worse pointing out because it appeals to the cognitive bias of most people reading these papers.  You know, we're all, you know, sort of formed by that.  And I think it just speaks to how incredibly well-developed and expertly designed this disinformation campaign is.

340.    Defendants' statements are about Troost, and they are reasonably understood by those who know Troost to be about him. Indeed, Troost and Srivastava are both identified by name during the podcast and in the marketing materials for and summary of the episode.

341.    Defendants' statements are false. Their statements convey, and are reasonably understood to convey, that Troost conducted a widespread and expensive disinformation campaign accusing Srivastava of lying about being a CIA operative to defraud and steal from Troost. But that is exactly what Srivastava did.

342.    Srivastava expressly told Troost and others that he was "a non-official cover operative" or a "NOC" affiliated with the CIA, FBI, and other United States government entities. Troost recorded Srivastava saying that Srivastava was a "NOC," that he was affiliated with U.S. government "programs," and that he had direct access to senior U.S. politicians, policymakers, and other leaders, including then-President Biden.

343.    Srivastava also told third parties including Jim Reese, Maurice Taylor, Habib Kagimu, Ibrahima Camara, and Gerald Smith (all of whom have provided sworn statements) that he was a CIA operative.

344.    Defendants' statements are defamatory because false accusations that Troost lied about Srivastava and is waging a disinformation campaign against him tend to lower, and in fact have lowered, Troost in the estimation of the community and have deterred third persons from associating or dealing with him.

345.    Indeed, Defendants' statements constitute libel *per se* because they impugn the basic integrity, ethics, and competence of Troost as a businessman, trader, and founder of a prominent commodities business.

346.    They are also libel *per se* because they tend to harm, and indeed have harmed, Troost by imputing to him unfitness to perform or work as a commodities trader, high-level executive, and business partner.

347.    They are also libel *per se* because Defendants' statements are defamatory on their face without reference to extrinsic facts.

348.    As a direct and foreseeable result of Defendants' false and defamatory statements, Troost has suffered significant reputational, emotional, and economic harm as detailed above.

349.    Defendants had no applicable privilege or legal authorization to publish their defamatory statements or, if they did, abused that privilege.

350.    Defendants published the slanderous statements with actual malice because they knew the statements were false or at a minimum recklessly disregarded the truth or falsity of the statements.  Specifically, Defendants acted with actual malice because: (1) Defendants' statements were part of a preconceived narrative concocted by Srivastava to discredit Troost; (2) Defendants ignored and sought to undermine admittedly reliable sources of information, including prior lawsuits accusing Srivastava of fraud, that cast doubt on Srivastava's reliability; (3) Defendants ignored and sought to undermine media reporting from well-respected outlets based on credible sources including affidavits, emails, memos, and audio recordings that contradicted Defendants' preconceived narrative; (4) Defendants ignored information uncovered through their due diligence of Srivastava that showed his involvement in suspicious financial transactions that Srivastava orchestrated to steal money from Troost and his company; (5) Defendants were motivated by the prospect of financial gain and professional acclaim; (6) Defendants were also motivated by hostility and ill will toward Troost, whom they baselessly accused of making "racist" claims about Srivastava; (7) Defendants never contacted Troost or his representatives to hear Troost's

recordings after Defendants' learned about the recordings from the *Wall Street Journal*'s article, and on information and belief, Defendants never sought to contact any of the reliable third parties quoted in the *Journal* article, *Financial Times* article, and other press reporting to investigate whether Srivastava was lying; and (8) when confronted with additional irrefutable evidence contradicting their claims after the OffshoreAlert presentation, Defendants refused to retract or correct their statements, instead doubling down and repeating them on *Targeted*.

351.    Defendants acted with common law malice, intending to cause injury to Troost, and their behavior constitutes a willful and conscious disregard of Troost's rights.  Among the other acts described herein, Defendants ignored the evidence demonstrating that Srivastava repeatedly told Troost and multiple third parties that Srivastava was a "non-official cover operative," or NOC, with the CIA.  Defendants' remarks at the OffshoreAlert conference and on the *Targeted* podcast also evince their ill will and hatred of Troost.

352.    Defendants also repeated and republished, and on information and belief, paid others to repeat and republish, their false accusations that Troost was waging a massive disinformation campaign against Srivastava.  This serial display of contempt for Troost's rights shows an intent to injure and despicable conduct sufficient to justify an award of exemplary and punitive damages under applicable law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Niels Troost respectfully requests that the Court enter judgment

in his favor, and against Defendants The Arkin Group and Victoria Kataoka. as follows:

a)    Awarding Troost actual and special damages in an amount not less than $450,254.24
to be specifically determined at trial;

b)    Awarding Troost presumed damages of tens of millions of dollars in an amount to
be specifically determined at trial;

c)    Awarding Troost punitive and/or exemplary damages in an amount to be specifically
determined at trial;

d)    Awarding Troost all expenses, costs, disbursements, attorneys' fees, and interest as
authorized by all applicable law and rules;

e)    Issuing a narrowly tailored injunction ordering Defendants to take down the videos
in which they made their false statements and prohibiting them from repeating the
false and defamatory claim that Troost is waging a disinformation campaign; and

f)    Such other and further relief as the Court may deem just and proper.

A JURY TRIAL IS DEMANDED.

(SIGNATURE PAGE FOLLOWS)

Dated: August 6, 2025                    Respectfully Submitted,

                                         /s/ *Nicholas J. Brechbill*
                                         Nicholas J. Brechbill

                                         Thomas A. Clare, P.C. (*pro hac vice* forthcoming)
                                         Nicholas J. Brechbill (N.Y. Bar No. 5658455)
                                         James E. O'Toole (*pro hac vice* forthcoming)
                                         CLARE LOCKE LLP
                                         10 Prince Street
                                         Alexandria, VA 22314
                                         Telephone: (202) 628-7400
                                         tom@clarelocke.com
                                         nick@clarelocke.com
                                         james@clarelocke.com

                                         Jason A. Masimore (N.Y. Bar No. 4147534)
                                         BRODBECKS LAW, PLLC
                                         305 Broadway, 7th Floor
                                         New York, NY 10007
                                         Telephone: (347) 804-1093
                                         jason.masimore@brodbeckslaw.com

                                         *Attorneys for Plaintiff Niels Troost*