# Exhibit 26

|  |  |
|---|---|
| STATE OF TENNESSEE )<br>) ss.:<br>DAVIDSON COUNTY ) | **AFFIDAVIT OF**<br>**JAMES P. REESE** |

**JAMES P. REESE**, being duly sworn, deposes and says:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this affidavit. This affidavit is based in part upon my own observations, my conversations with others, my examination of documents by others, and my experience. This affidavit is a summary of select events and does not include every fact that I have observed or learned throughout the events described in this affidavit. Where the contents of documents and the actions, statements and conversations of others are reported in this affidavit, they are reported in substance and in part, unless otherwise specifically indicated.

### Personal Background

I served in the U.S. Army for 25 years. In 2007, I retired from the U.S. Army, "Delta Force," as a Lieutenant Colonel. I have worked all over the world in my military service.

2. I am a graduate of Mansfield University of Pennsylvania in the United States. I earned a fellowship degree from the Massachusetts Institute of Technology ("MIT") Center for International Studies ("CIS") in U.S. National Security and Foreign Policy.

3. More recently, I have been a co-founder of a company originally called Delta Crescent Energy, which entered a contract with the U.S. government to re-develop and upgrade more than half of the Syrian oil fields under the control of the Syrian Democratic Forces (US allies) through a license granted by the Office of Foreign Assets Control ("OFAC"), U.S. Treasury Department.

### Summary
### All comments are of the best of my recollection

4. I met Gaurav Srivastava, or "G," for the first time in late 2022. Through the events described in this affidavit I ended up working in his team as an independent consultant for Paramount Energy and Commodities, Inc. ("Paramount Inc.") in Los Angeles California. He referred to me as his "chief of staff." I attended meetings with him and others. I ultimately severed ties with G on or about late May 2023 because I concluded through my own observations and information collection that he was a serial liar and a fraud. He owed money to many service providers (including me). Recently, I indirectly reported him to the U.S. Federal Bureau of Investigation ("FBI") for what I believed was him impersonating someone affiliated with the FBI. I later learned that the FBI had sent agents to his house in California.

5. At first, G claimed to me and others that he worked for the FBI or sometimes referred to it as the Department of Justice—not formally as a credentialled Special Agent, but as a source. Then, G's claims inflated into claims he worked as a source for the U.S. Department of

1

09.27.23 / [initials]
Date    Initials

Justice ("DOJ"). After that, I heard G start claiming he worked in a covert program for the U.S. Central Intelligence Agency ("CIA").

6. Gaurav Srivastava's method of deception is simple, yet extremely difficult to detect, because he seems and sounds plausible at first. G interacts with people who formerly worked in various governmental capacities, such as former military officials, former intelligence operatives, and former U.S. Secret Service and FBI agents, and he listens to them speak about their former jobs and their areas of expertise. He is gifted at mimicking their lingo and the way they speak about these issues—he credibly fabricates his own fictional stories patterned on real events told to him by others to make himself seem like he is closely connected to U.S. government personnel because he claimed he was a former operative. But, as I have learned by listening closely to him and following up on some of his claims, I could not confirm with absolute certainty that he is a former operative.

7. G manages to gain access to various important people. In turn, those people introduce him to other important people. He often collects photos of himself with public officials. He even has a photo of himself with the current President of the United States, Joe Biden. G then fraudulently claims to have had long standing relationships with these important people through his supposed service as a source for the FBI, the DOJ and the CIA. While these people might confirm to others that they know who G is, covering him with a veneer of apparent legitimacy. However, his entire backstory I believe is fabricated and could not be vetted.

8. Over the course of the four months I worked as a consultant for Paramount Inc., I uncovered lie after lie by Gaurav Srivastava. He lied to me about being an American citizen born in Ohio. I learned he is not. He has an Indian passport, which I have seen on an image he texted me. He lied to me about knowing certain Delta Force commanders I know personally, who when I asked if they knew Mr. Srivastava, they did not know of him. He lied to me about owning a private jet and lied to others about flying in a private jet to a certain meeting—he did not own a jet; we flew on Jet Blue to NYC on one trip and he told the lobbyist we flew on a PJ from San Diego. He lied to me about owning a helicopter company in Tennessee. His wife told me he had been a hostage of ISIS in the Congo in 2008 (I know full well from my military service and intelligence knowledge that ISIS was not active in that region until many years later).

9. To describe one colorful example illustrating the length to which Gaurav Srivastava has gone to fraudulently portray himself as an important person in the intelligence community: At various times, G bought and had shipped to my apartment a total of approximately 18 samurai and other types of ceremonial swords, many of which G had arranged to be engraved with his name. He asked me to place them into cases to be displayed around Paramount Inc.'s office in Los Angeles. Shortly before I severed ties with him, I heard him tell multiple people in the office that these swords were presented to him by various heads of state. They were not. They were bought from retailers or antique dealers. They seemed to all be engraved with his name by the same engraver. He presented the sabres to himself.

10. During my time with Gaurav Srivastava, he seemed focused primarily on one issue—attempting to obtain complete and total control of Paramount Energy & Commodities SA ("PECSA"), a Swiss company, through an "inversion" in which it would switch from being the parent company of U.S.-based Paramount Inc. to becoming its subsidiary. To accomplish this,

2

09.27.23
Date  Initials

Gaurav Srivastava convinced PECSA's ultimate 100% owner, Niels Troost, that Gaurav Srivastava inferred he was a non-official cover ("NOC") operative with the CIA and that Mr. Troost should make him a 50% shareholder in PECSA and then invert it into a U.S. company so that the company could carry on business on behalf of U.S. intelligence by selling Russian oil under a OFAC license to African countries, hiring other non-official cover operatives to work for the CIA in Africa, and ultimately secretly converting the profits through NGOs into non-lethal aid to Ukraine, all on the behalf of and in the national interest of the U.S.

11. When Mr. Srivastava's lies and misstatements started to accumulate and I believe Mr. Troost became hesitant to follow through with the inversion, G started to put pressure on Mr. Troost to complete the transaction. When Mr. Troost ultimately stopped the transaction, fired the lawyers Mr. Srivastava had earlier convinced Mr. Troost to hire to represent Paramount, and rescinded their partnership agreement, Mr. Srivastava I believe then started having people anonymously contact members of Mr. Troost's family in a threatening manner (I was able to find and preserve a burner (prepaid, untraceable) cellphone Gaurav Srivastava used to do this, which I provided to my attorney for safekeeping). He also participated in meetings with business and government officials in which I heard him tell them false stories designed to damage Mr. Troost and PECSA, such as, Mr. Troost was working for Russians or that he had secretly stolen money to invest into a Turkish oil terminal. In late May 2023, Mr. Srivastava attempted through multiple avenues to freeze PECSA's accounts. Gaurav Srivastava retained a former CIA operative, now a civilian consultant, with excellent knowledge and insight to the Middle East and sources as an adviser. Mr. Srivastava asked him to orchestrate a smear campaign in the press, writing articles with half-truths and false innuendoes which were publicly released against Mr. Troost for the purpose of damaging his reputation and causing him and PECSA business problems.

### My History with Niels Troost and Telephone Introduction to Gaurav Srivastava

12. In or around late 2019 to early 2020, I first met Niels Troost, who wanted PECSA to become a trading partner with Delta Crescent to move oil from northern Syria into the international market. Ultimately, logistical issues prevented moving the oil from Syria.

13. I recall interacting with Mr. Troost again in or about July 2022, when we discussed a partnership that I understood Mr. Troost was entering into with Harvest Commodities SA relating to the exportation of grain and agricultural products from Ukraine to pursue Mr. Troost's interest in transporting grain to the Global South as a matter of international urgency. Ultimately, Mr. Troost asked me to travel to Odessa, Ukraine to facilitate cargo ships leaving Odessa to export the grain and agricultural products. I did so successfully.

14. I first heard of someone named "G" from Mr. Troost in around July 2022, when I was in Odessa. Mr. Troost told me that he believed "G" was an American "black ops guy," or someone from my past government work, and had presumably acted on behalf of the CIA or some other U.S. intelligence group and that Mr. Troost believed this "Mr. G" was not allowed to say much about it. I understood from Mr. Troost that Mr. Troost and "G" were planning to work on some sort of project in the U.S. national interest and I believe was inferred to be on behalf of U.S. intelligence. I also understood from Mr. Troost that he and Mr. G were in some sort of working or partnership agreement.

3

09.27.23 / [initials]
Date   Initials

15. While I was in Odessa, representatives from PECSA and Harvest encouraged me to send real-time photographs and videos of the cargo ships leaving Odessa loaded with agricultural products. I Googled the names of some of the ships I had coordinated moving ("M/V Riva Wind" and "M/V Arizona") and saw an August 2, 2022, story at https://www.ship-technology.com/news/harvest-commodities-grain-ships-ukrainian/ in which someone named "Gaurav Srivastava" took credit for moving the first shipment, which in fact, I had facilitated at Mr. Troost's request for Harvest. A photograph of "Gaura Srivastava" along with the Ukrainian Ambassador and Hashim Djojohadikusumo, the brother of Prabowo Subianto, Indonesia's Minister of Defense, accompanied the story. Through this article and picture, I connected "Gaurav Srivastava" with the person Mr. Troost referred to as "G." Mr. Troost then confirmed that Gaurav Srivastava was the person he referred to as "G."

16. At some point on the trip from Odessa back to the United States Mr. Troost connected me by telephone with Gaurav Srivastava, who thanked me said he wanted to meet me one day. This was a short conversation, and I did not speak with Mr. Srivastava again until December 2022.

### My First Meeting with Gaurav Srivastava, Christmas 2022

17. Just before Christmas in December 2022, Mr. Troost told me that G wanted to meet me in connection with potentially working with Paramount. I met Gaurav Srivastava at the Four Seasons Hotel at 2800 Pennsylvania Avenue NW, Washington, D.C. We met for approximately an hour, after which I left.

18. During our initial small-talk, G asked me where I was from. After I told him I lived in Colorado, he claimed to own a ranch in Sheridan, Wyoming.

19. During the meeting, G mentioned that he personally knew two Delta Force commanders, General Austin Scott Miller and Colonel Peter Blaber. General Miller is a retired four-star general and a former Delta Force commander who served as the commander of NATO forces in Afghanistan. Colonel Blaber is also a retired Delta Force commander, who wrote at least two books and maintains his own website. G claimed to have had lunch with Colonel Blaber. Sometime later, I personally communicated with Gen. Miller and Col. Blaber, each of whom confirmed that he did not know Gaurav Srivastava, had not ever heard of him, and, in the case of Colonel Blaber, had not ever had lunch with Gaurav Srivastava.

20. G claimed to have extensive experience and insight into the U.S. Department of Justice ("DOJ"). I recall him saying at our first meeting something along the lines of, "I threw my hat in with the DOJ." During my time working with him, G often claimed that he regularly went into the Federal Building in Los Angeles, to meet with the FBI and to conduct business on behalf of the U.S. Government.

21. G claimed that he and Mr. Troost were current partners in PECSA, but that Mr. Troost was tired of the work and no longer wanted to be in the business and that Mr. Troost wanted G to take it over completely.

22. I particularly remember the timing of my first meeting with Gaurav Srivastava because I remember him claiming to be in a moral dilemma whether to fly in his private jet or fly

4

09.27.23 / [initials]
Date    Initials

commercial to take his family to visit Mr. Troost in Europe over the Christmas holiday. He said he was worried that his children might feel entitled if he took his jet. So, G said, he and his wife would probably just fly first class and put his two children in economy. I asked G what his tail number was, and he gave me a number. Later, I looked that number up on a database and discovered it did not belong to Gaurav Srivastava.

23. Months later, as I describe below in this affidavit, G chastised me because I had mentioned to someone with whom we were meeting that G and I had traveled to the meeting on Jet Blue, an American airline, after G had already lied to the person and said we had flown to the meeting on a private jet. G asked me to reinforce that lie to the person, but I refused.

24. This first meeting with Gaurav Srivastava lasted about one hour. Sometime after the meeting, I spoke with Mr. Troost who told me that G had reported to him about the same meeting that G and I had gotten drunk, had a great time, and "crashed" in the same room at the Four Seasons. Obviously, this was not true.

### My Second Meeting with Gaurav Srivastava and Retention as a Consultant

25. Shortly after Christmas 2022, Gaurav Srivastava contacted me and asked me to meet him in Los Angeles, California. I flew there on or about the morning of January 1, 2023. I stayed at the JW Marriott in Santa Monica. He picked me up approximately eight hours after my arrival., He picked me up in a Land Rover and we went to a coffee shop and met for a few hours. I was there to learn about how I could become involved in PECSA's business and its U.S. business plans.

26. I asked Gaurav Srivastava about his vision for the business. He said that PECSA was going to "invert" from a Swiss company to a U.S. company (later learned to be Paramount Energy and Commodities, Inc., "Paramount Inc."). G asked if I would move to Los Angeles to assist with the inversion process. I told him I was not interested in being an employee, but I was willing to consider acting as an independent consultant, hired under a consultancy contract, because I had enjoyed working with Mr. Troost and had great respect for his business acumen.

27. In describing Paramount's (the group of companies') business, G claimed he owned a helicopter company in Nashville, Tennessee, called XP Services. I have lived in Nashville and am familiar with the area. I was generally familiar with XP Services, and I had served in the military with XP Services' President and CEO, Rodney Allison, who was a U.S. Army Special Operations helicopter aviator. I asked G whether he knew Mr. Allison, which G said he did. When I asked G where "his" helicopter company was located, G was not able to say with any specificity; he said generally it was near the airport south of Nashville. G claimed "his" company, XP Services, performed Blackhawk helicopter refitting services, which I knew about already, and that XP Services had a contract with the Indonesian government to refit C-130 military airplanes. The latter surprised me because Mr. Allison specializes in helicopters, not fixed-wing aircraft. I later learned that G was lying about owning XP Services, as I explain later in this affidavit.

28. G also mentioned owning a Turkish oil terminal. I had already known about this terminal before I met G. Mr. Troost, and I previously discussed this terminal prior to me meeting Mr. Srivastava.

5

09.27.23 / [initials]
Date   Initials

29. During this meeting, G told me that he was born in Cleveland, Ohio (which would have made him a U.S. citizen) and that he graduated from the University of Southern California ("USC"). I had noticed, though, that Gaurav Srivastava spoke with a slight Indian-British accent like the accent of an Indian-British friend of mine with whom I attended military staff college.

30. G asked me whether I knew General Wesley Clark, the retired four-star Army general, former Supreme Allied Commander Europe of NATO, and former U.S. presidential candidate, who now is a civilian consultant. I know General Clark from my military service in the Balkans and maintain regular contact with him to this day. Many months later, General Clark confirmed to me information demonstrating that G was lying about various things G told me when we worked together. For example, I learned that General Clark had only recently introduced G to several individuals with whom G falsely had claimed he had longstanding relationships relating to G's supposed work with the U.S. government.

31. After this meeting, I negotiated and finalized a consulting contract, effective January 6, 2023, between my personal consulting company and Paramount Energy & Commodities Inc., signed by its then-director Thomas Giordano-Lascari, and ultimately moved to Los Angeles at G's request to live in a corporate-subsidized apartment. The apartment was across the courtyard from the Paramount Inc. office located at 11766 Wiltshire Boulevard, Suite 800, Los Angeles, California. I understood all work I performed at G's direction was on behalf of Paramount Inc. and not any other company; I did not have any other consulting agreements with any other company affiliated with Gaurav Srivastava.

### Select Contacts with Gaurav Srivastava

32. When I moved to Los Angeles and started consulting for Paramount Inc. full-time in January 2023, I spent the first week or so immersed in papers and in meetings with lawyers at Baker & Hostetler LLP, led by partner Jeff Berg, about PECSA, its subsidiaries and the potential inversion into a U.S. company. Mr. Troost was not at these meetings. I learned that Paramount Inc. was a subsidiary of PECSA. I also saw charts showing that Mr. Troost (not any Paramount entity) owned 100% of company called Solas International Terminals DMCC, which owned SITMED FZCO which owned 40% of the Turkish oil terminal called GTS.

33. In around February 2023, G asked me to come to his house in Santa Monica to meet his wife, Sharon Srivastava. I looked up the address in California public property records and learned that G was leasing this house at the time. I also at some point discovered in carrying out some due diligence on Gaurav and Sharon Srivastava, that there had been a few fraud and nonpayment allegations against them by several creditors claiming the Srivastava's owed substantial amounts of money.

34. I learned from G that he had just bought a different house in the Pacific Palisades neighborhood which was worth well over US $20 million. G asked me to meet at the new house the next day, which I did. I learned that G's real estate agent had been Baker & Hostetler LLP partner Jeff Berg's son (I met him at that house), who also arranged for the builders that ultimately performed approximately US $1.1 million or more worth of work on the new house.

6


09.27.23 / Date  Initials

35. When I arrived at G's house, multiple people were working with Sharon Srivastava. She introduced me to them as "our family office chief of staff," which upset me because I had no role with the Srivastava family office, though I kept my frustration to myself while at the new house. I later spoke to Mr. Srivastava and told him I was not interested in working for the family office and recommended he get another person to take that role and assist his wife.

While at the new house during the meeting, I spoke with the people Sharon Srivastava was meeting with and learned they specialized in providing search engine optimization services. I saw on the screen of a computer that Mrs. Srivastava was holding, and I learned from the discussion that Mrs. Srivastava was trying to remove negative information about G and her related to prior allegations of fraud and bill non-payment and trying to raise up coverage of their family foundation. She asked them if they could remove the negative articles, which they could not, but with a lot of effort and work, they might be able to push the negative results down the page.

36. Sometime after this, the head of the search optimization firm started texting me asking for payment, sending an invoice for between US $60,000 and $80,000. Also, builders who had performed work on the new house started contacting me asking for payment, as they were not receiving payment either. G put me in a role where creditors would contact me, rather than him.

37. At some point during my time in Los Angeles, I was asked to present a threat assessment to Sharon Srivastava about the potential likelihood of threats to Gaurav Srivastava and his family. My assessment was that there was a low-level threat to the family. Sharon Srivastava became emotional and was upset at me, saying that the assessment must be higher since, she claimed, G had been held hostage in the Democratic Republic of the Congo by ISIS in 2008. Gaurav asked me to have a conversation with her to clear the air. We had that conversation. I listened to her politely. After that call, I never had any interactions with her again. I knew from my military service that this could not be accurate; ISIS did not emerge as a threat in the DRC until long after 2008.

38. Over time, G and I spent more and more time together on Paramount-related business. G began to make more claims about his supposed connections with the U.S. DOJ and FBI. In one meeting at Jeff Berg's office, which I attended with Gaurav Srivastava, both told me how they met: About 15 years prior (when G must have been in his early 20's) Gaurav had some type of business issue which there was a claimed threat on his person. There was an engagement with the FBI as Mr. Berg laughed how they would come into the same conference room where we were meeting and would take their jackets off and the employees of the law firm would see the agents' weapons.

39. According to Gaurav, he and Mr. Berg were close and maintained a close relationship over the years, however, Mr. Berg stated to me that years went by after the first engagement he had with Gaurav and then, one night (I thought it was early 2022), Mr. Berg and his wife were walking to a restaurant for dinner and bumped into Gaurav Srivastava, who was walking the other way. After that, Jeff Berg began to represent G in connection with his current businesses, according to Mr. Berg.

40. I first came to understand that G was not American citizen when he had me prepare draft paperwork for the U.S. Customs and Border Patrol in about late February to early March

7

09.27.23 / *[initials]*
Date   Initials

of 2023. G told me had lived for some time in London and had left a significant amount of household goods in storage in London. G was not paying the storage fees and the company contacted him to tell him they were going to sell whatever was in his storage facility. G asked me to deal with it, so I did. Through a contact in the UK, I arranged for the stored items to be retrieved and delivered to a shipping company. G wanted them to be shipped to the United States. Neither I nor my contact in the UK knew the specific contents.

41. As I understand it, anyone shipping a container into the United States must fill out a U.S. Customs form identifying the contents and certifying with a signature the accuracy of the representation. I prepared the form for G to sign, since the contents belonged to him, and it required the signatory's U.S. passport information, so I asked G to send me an image of his passport. By a messaging application he texted me his passport, but I saw that it was from India. After I observed it briefly, but before I could download it, G deleted it. He then sent me a number. I asked if this was a U.S. passport number, because I recognized that it was not in the correct form. G said it was, but I knew it was not.

The following day, G called me and instructed me to put someone else's name on the form. G then told me to pre-fill out the form with the name, Owen Onouye, whom I knew from G was a California lawyer who had previously been convicted of a narcotics-trafficking offense and spent time in prison. G gave me Mr. Onouye's U.S. passport information. I understand that either G or Owen Onouye filed the form electronically with U.S. Customs. I asked G why he did not want his own information on the form; G claimed that on a prior trip into the U.S. he had been caught with undeclared gold coins (I believe they were coins, but I could be mistaken), and he was worried he was flagged in the system and his container would be stopped and examined. I followed his instructions and sent him the draft form as he had instructed me.

42. On June 22, 2023, I received an email from Thomas Giordano-Lascari, the director of Paramount Inc. and a lawyer who I understood represented G's family office, copying Gaurav Srivastava and Jeff Berg, among others, which asked "can you please advise where the container of G's personal belongings that you shipped to Los Angeles is?" I do not know what happened with the form or the container.

43. In or around late March or early April 2023, G asked me to meet him at Jeff Berg's law office. I arrived and waited in reception. A while later, Rodney Allison, the CEO and President of XP Services (the helicopter company) came out from a room to reception with G and Jeff Berg. Mr. Allison and I had a friendly, non-substantive exchange and he left. A week or two later, Jeff Berg, who knew by then I had lived in Nashville, Tennessee, asked me if I knew a good audit firm in Tennessee for XP. Berg said they had not done a diligence audit yet on XP because they had not bought it yet. Therefore, I know that G had lied to me in January when he claimed to own a helicopter company that was doing a massive deal with the Indonesian military. I later learned that Rodney Allison did not like Gaurav Srivastava, and that is why he ultimately did not sell him XP. I also learned from documents from Jeff Berg that Paramount was not actually attempting to purchase XP; it was a company called Unity Accipiter.

44. In around this period, late March or early April 2023, I was part of discussions with Mr. Troost, Gaurav Srivastava, Jeff Berg and others at a restaurant called Mr. Chow, off of Rodeo Drive in Beverly Hills, about the Turkish oil terminal, GTS. There was no acrimony about how it was purchased or who owned it. The discussion was about the operational side. In fact, I

8

09.27.23 / AL
Date    Initials

understood from my participation in those discussions that G had known Mr. Troost owned his stake privately outside of Paramount entities' balance sheets with a Turkish partner.

45. In April 2023, Gaurav Srivastava was pushing hard to complete the inversion of PECSA into Paramount Inc. as quickly as possible. However, Mr. Troost was resistant at this point, saying that he wanted to be sure the planned business arrangements satisfied OFAC and with their Swiss counterparts, SECO. I was present when G assured Mr. Troost that G personally had met with the Deputy Director of OFAC, who had spoken to the director of SECO in Switzerland, and that they supported the project. However, I learned G's statements were false when, on April 27, 2023, SECO sent a document request to PECSA in Switzerland (I saw the document for the first time on May 1, 2023, when Mr. Troost sent it to me as he was attempting to reach Mr. Srivastava). The request asked (as I understood it) for some information about the potential involvement in PECSA in the operations of its Dubai subsidiary, Paramount Energy and Commodities DMCC, which meant that G was not truthful when he said that SECO had approved the project.

46. On May 2, 2023, I was with G in Washington, D.C., where we met a lobbyist named Ankit Asari. During small talk, Mr. Asari asked me how our travel had been, and I was complementary of the American budget airline JetBlue, which G and I had flown from California to Washington, D.C. When I did that, G kicked me under the table. He also texted me, in sum and substance, "Do not talk about our travels." I later learned from G that he had claimed falsely that we had supposedly flown in from San Diego on G's private jet. G told me I had to "fix this." I refused.

47. Around the same general time, late April 2023, G and I met with Greg Schultz, who I understood had been President Biden's campaign manager during the 2020 election. I had asked G how he knew Mr. Schultz, and G said Mr. Schultz had been his college roommate at USC. After this meeting, I was speaking with Mr. Schultz outside of G's presence to negotiate a contract to assist G through his family office, Cedar West LLC. It came up during my conversation with Mr. Schultz that he had attended Ohio State University; he knew some people from Ohio State that I also knew. Not only was G's claim of being a former college roommate false, I later learned from General Wesley Clark that he had introduced G to Mr. Schwartz for the first time only recently, during an event I also attended.

48. As to Gaurav Srivastava's citizenship, I was provided by representatives of the Atlantic Council a resume and background statement authored by G to be published on the Atlantic Council's website, which reads, in part, "Gaurav Srivastava is an American businessman and philanthropist. He and his wife, Sharon, are the benefactors of the Atlantic Council's new Gaurav and Sharon Srivastava Institute for National Security and Intelligence." Gaurav Srivastava had asked to donate money to the Council to set up this institute. When the Atlantic Council performed due diligence on Gaurav Srivastava, I am informed that it discovered that he is not an American citizen, that it disassociated itself from Gaurav Srivastava, and that it returned any money he had donated in about mid-May 2023.

49. In about March or April 2023, Gaurav Srivastava had meetings with former CIA personnel John Maguire and Mary Beth Long. Mr. Maguire is a former Deputy Station Chief for the CIA in Iraq. Mary Beth Long is a former Operations Officer for the CIA. I know they are now private consultants and have worked together. Mr. Maguire has stayed connected to

9

09.27.23 / [Initials]
Date    Initials

Mr. Srivastava. I do not believe that Ms. Long accepted any engagement opportunities from Mr. Srivastava.

50. On May 9 to 11, 2023, I was in Washington, D.C. with Gaurav Srivastava and attended meetings with various non-U.S. officials, including the UAE and Turkish Ambassadors to the United States, May 9 and 10, respectively. During those meetings, G said he was an American businessman who owned Paramount Inc., an American company. During those meetings, Gaurav Srivastava spoke positively of the business.

51. Later in the day, on May 10, 2023, I was with G when we learned that PECSA had withdrawn from the impending inversion with Paramount Inc., fired Baker & Hostetler LLP as its counsel, and rescinded whatever partnership agreement existed between Mr. Troost and G. G was furious and arranged to have a follow up appointment to return to see the Turkish Ambassador on May 11.

52. I went to the Turkish Embassy with G. When we arrived at the Embassy by car, the Ambassador came out and got in, rather than having us go inside. After we drove a bit, the three of us left the car and walked in a park near Massachusetts Avenue in Northwest D.C. While the three of us walked, G told the Ambassador that Mr. Troost was working for the Russians. I knew this was not true. He also asked the Ambassador to try to break up the relationship between Mr. Troost and his Turkish business partners and claimed Mr. Troost had stolen the Turkish terminal GTS from Paramount. None of this had come up in the meeting with that Ambassador on the morning of May 10, before Mr. Troost had ended the relationship.

53. I saw one draft proposed media article showing that John Maguire and Gaurav Srivastava wrote an article about Mr. Troost and Paramount containing information that I understood was not true about Paramount. Several articles came out during this time period, but I do not recall which article is the one I saw before it came out in the media. These articles included the May 16, 2023, article entitled "President of Russia Vladimir Putin's Hidden War—Niels Troost Crime Syndicate," at https://thyblackman.com/2023/05/16/president-of-russia-vladimir-putins-hidden-war-niels-troost-crime-syndicate.

54. For example, the May 16 article alleged that Mr. Troost was the "front man" for Ganady Timchenko. I saw no evidence nor heard any discussions with the lawyers that this was true. It alleged that "you see Timchenko's fingerprints all over the oil deals passed through Troost's Switzerland-based" PECSA. I saw no evidence supporting this statement It alleged that Mr. Troost "is one of the largest clandestine funders of the Wagner group." Mr. Troost does not fund, nor has ever funded, Wagner group, to my knowledge. I saw no evidence of this statement. It alleged that Mr. Troost was "the ringleader of a global covert criminal enterprise." I have never seen evidence in support of this statement. It alleged that Mr. Troost used charities to fund terrorist organizations and to assist "the Turkish and Iraqi armies engage in their war of terror." I saw no evidence of these statements. In fact, I saw evidence that Mr. Troost provided monetary contributions to NGOs for humanitarian type equipment and support.

55. Given the nature of all the recent activity and understanding that G was not paying people, including me, in late May 2023 and June 2023, I started carefully considering G's conduct as a whole, re-evaluating together many of the things he had told me, and tracking down information which contradicted G's stories. During that same time, I attempted several

10

09.27.23 / [initials]
Date   Initials

times to contact Mr. Troost to pass on some information about G, but I was unable to reach him. Around the same time, through a contact of mine, I reported to the Los Angeles field office of the FBI that Gaurav Srivastava had been telling people he regularly goes to the Federal Building in Los Angeles to meet with the FBI and that he was a source (which is one of many false U.S. government connections G claimed). I was informed approximately 10 to 14 days later that the FBI dispatched special agents to confront and interview G and was recommended to stay away from Mr. Srivastava and to work through my legal counsel if there was any need.

56. I have prepared this affidavit with the assistance and advice of my legal counsel, James D. Kay, Jr. Esq., of the firm Kay Griffin Evans PLLC, in Nashville, Tennessee, who is representing me in connection with the matters referred to in this affidavit. I have fully read and considered every statement in this affidavit, reviewed it with Mr. Kay, initialed each page and each paragraph, and I attest to its truthfulness. I understand it may be used in connection with various civil and criminal matters, including internationally.

James P. Reese

Sworn to before me this 27 day of September 2023.

Eleanor Vera Williams
Notary Public

11