# Exhibit 32

**BakerHostetler**

Baker&Hostetler LLP

Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5403

T 202.861.1500
F 202.861.1783
www.bakerlaw.com

**ATTORNEY-CLIENT PRIVILEGED**
**ATTORNEY WORK PRODUCT**
**CONFIDENTIAL**

To:       Paramount Energy & Commodities SA

From:  BakerHostetler

Date:   May 8, 2023

Re:       Corporate Inversion

---

Paramount Energy & Commodities, SA ("SA") is a Swiss company that will soon be moved under a U.S. holding company, Unicom Worldwide Inc., a Delaware corporation ("Unicom"). This memo addresses how SA can be transferred to Unicom, which is expected to be subject to U.S. regulations, tax, and banking (the "Inversion"). This memo also addresses how Paramount Energy and Commodities DMCC ("DMCC"), a United Arab Emirate ("UAE") company and a wholly owned subsidiary of SA, can be handled in connection with the Inversion. SA and DMCC will remain separate corporate entities in their respective jurisdictions.

---

**The Current Business**

SA conducts business globally. Operations primarily consist of trading and transporting oil and gas products. SA primarily serves western countries other than the United States, including the UK and surrounding countries, but it also conducts business in Africa and elsewhere. SA has not conducted any business operations involving the Russian Federation or transacted Russian petroleum products since mid-2022.

Since mid-2022, the operations of SA's wholly owned subsidiary domiciled in the UAE (DMCC) has consisted exclusively of transporting oil and gas products from the Kozmino port in Russia to the Qingdao port in mainland China at prices above the price caps promulgated by various western countries, including G7 member countries (i.e. Canada, France, Germany, Italy, Japan, UK, U.S., and EU) (the "Russian Price Cap"). The Russian Price[1] Cap has also been

---

[1] While this memo generally describes certain aspects of U.S. sanctions related to the Inversion, more focused information on that topic is attached hereto as Exhibit A (the "Sanctions Memo").

implemented by non-G7 countries, including Switzerland (the "Implementing Countries"), to stem the flow of revenues fueling the Russian war effort in Ukraine.

The Russian Price Cap sanctions do not permit SA or any other persons from Implementing Countries to be involved in, or otherwise support or assist, DMCC's operations. It is our understanding that DMCC is not subject to the Implementing Countries' Russian Price Cap[2] and may continue to engage in its business operations under the current laws and regulations. SA has compliance policies and procedures in place for its employees and keeps its business operations separate from DMCC to comply with the Russian Price Cap.

### The Inversion for SA

Bringing SA under a U.S. parent corporation is an effort of SA's U.S.-person stockholder, who accounts for 50% of SA's ownership. SA's other 50% is held by a Dutch national residing in Switzerland. The specific means of conducting the Inversion may be varied, but whatever form the Inversion takes, it will require a tax and regulatory analysis, and input from other specialists in multiple jurisdictions for the resulting structure to be tax efficient and legally compliant. The form of transaction under consideration described below will result in SA's current stockholders being 50-50 owners of Unicom.

### Share Transfer[3]

Transferring the shares of SA from the current stockholders to a U.S. corporation would be a straight-forward way to make SA a wholly owned subsidiary of a U.S. parent company. This would be done by preparing a stock purchase agreement with two sellers (i.e. both of SA's current stockholders) who will sell their SA shares to Unicom, which was recently formed. DMCC would remain a subsidiary of SA. The current stockholders of SA would become 50-50 owners of Unicom. The overall result would be that SA and DMCC would remain in place to the extent not explicitly modified.

### The Inversion for DMCC

To comply with the Russian Price Cap, DMCC's operations cannot be directed, supported, or assisted by SA or any other person from an Implementing Country. On December 5, 2022, the Implementing Countries instituted the Russian Price Cap at $60 per barrel on Russian-origin oil. The sanctions prohibit persons from Implementing Countries from financing or providing certain maritime services for Russian-origin oil traded above the price cap,[4] but such U.S. sanctions do not prohibit foreign subsidiaries of U.S. entities from conducting such business if no U.S. person is involved.

---

[2] This has been advised upon by counsel in the UAE, the U.S., and Switzerland, but no other remaining Implementing Countries, though we are advised that DMCC's operations involve no persons from Implementing Countries.

[3] While it is possible to do an asset sale, such a form of transaction does not appear to be useful here and is thus omitted from consideration. A merger is also possible, but it involves additional process and does not appear to provide any U.S. tax benefit.

[4] As of February 5, 2023, the Implementing Countries placed additional price caps on Russian origin petroleum products, which apply separately to premium to crude (cap of $100 per barrel) and discount to crude (cap of $45 per barrel).

Violating such sanctions, directly or indirectly, can result in DMCC being barred from conducting business entirely and incurring significant monetary penalties.[5] One way to address this is through structuring; namely, using a limited partnership entity, likely formed in the UAE. For this to work, limited partnerships in UAE must be sufficiently similar to limited partnerships in the U.S. under Delaware law, which they appear to be.

### UAE Limited Partnership Statutes

UAE has multiple free zones. Local counsel in the UAE, as well as U.S. funds counsel at BakerHostetler, have reviewed the limited partnership statutes in two specific free zones: (i) Abu Dhabi Global Markets ("ADGM"), and (ii) Dubai International Financial Center ("DIFC"). Based on such review, U.S. funds counsel determined that the essential elements of a limited partnership, as it is known in the U.S., exist in both ADGM and DIFC. Those elements are (1) that owners are limited partners who do not take part in the conduct or management of the business of the limited partnership, and (2) the general partner has the sole power to control and bind the partnership. Because these elements are present in limited partnership law of both ADGM and DIFC, both jurisdictions appear to be sufficiently similar to Delaware law such that a limited partnership can be used to separate the management of DMCC from SA while retaining SA's economic interest in DMCC.

### Separating Ownership from Management

If SA becomes a limited partner holding substantially all interest in a limited partnership, we believe SA would have only an economic interest in that partnership with no right to take part in its management. The general partner would instead be responsible for management of DMCC.

Transferring DMCC into such a limited partnership, with an appropriately drafted limited partnership agreement, seems capable of legally precluding SA from directing DMCC's operations. The general partner would need to be a person who is permitted to participate in DMCC's business. Such a person could not be subject to any applicable restrictions on DMCC's business. We believe a UAE-person would be permitted to act as general partner, but persons from other jurisdictions could potentially fit as well.

### Logistical Considerations Related to Separation

Special considerations will need to be accounted for in a customized limited partnership agreement in order for the contemplated limited partnership structure to work as intended.

#### *Removal of the General Partner*

In order for a general partner to be fully independent from influence by SA, its employees, and its owners, the limited partnership agreement's removal provision must be carefully drafted. At-will removal would undermine the goal of legal separation. Removing the general partner managing DMCC must be limited to for-cause removal, where "cause" is determined by a neutral

---

[5] Even without any violation occurring, the U.S. government retains the ability to apply so-called secondary sanctions on any entity it deems, in its sole discretion, to be conducting activity contrary to the interests of the United States. The impact of secondary sanctions can have a materially adverse impact on the overall business.

4888-1897-5837.6

third-party arbiter. An assessment will need to be conducted in order to designate the appropriate arbiter in the limited partnership agreement. If a general partner must be replaced, the replacement general partner would need to satisfy the relevant criteria in order to avoid potential violations of applicable sanctions.

### *Ownership of the Limited Partnership*

For DMCC to remain under SA's ownership, SA must own substantially all equity interest in the limited partnership containing DMCC such that the limited partnership would be a nearly wholly owned subsidiary of SA. The remaining equity interest in the limited partnership would be issued as a nominal interest to the general partner.

### *Rogue General Partner*

The person selected to be general partner would need to be trusted. If the general partner were to abuse its position in a way that warrants for cause removal (e.g. embezzlement, serious legal violations, etc.), SA would have no *immediate* recourse. Addressing such a situation would require adjudication and perhaps a judgment from a court or arbitrator, depending on the terms of the limited partnership agreement.

### *Risk-Benefit Analysis*

A certain degree of risk is inherent to the limited partnership structure under consideration. In the worst-case scenario, a rogue general partner could abscond with all of DMCC's assets, and SA would become a hopeful plaintiff. Finding a trustworthy general partner can fortunately de-risk the situation significantly. Conversely, the benefit of having a limited partnership structure in place as intended is that DMCC's existing revenue stream can continue and grow without the regulatory risks that currently exist.

Even though SA does not exert influence over DMCC, there is nothing legally prohibiting that from occurring. It would be unwise for SA to do so because violating sanctions has serious consequences that could effectively end DMCC's business, but SA remains free to make such an unwise decision. Under the contemplated limited partnership structure, both Unicom and SA would have no ability to influence DMCC as a matter of law and contract. The same is true of Unicom as the ultimate parent company. This would provide peace of mind around regulatory compliance issues.

The limited partnership structure situates full operational control within the UAE, which is outside the jurisdiction of the Implementing Countries. U.S. sanctions on Russia could be extended to cover foreign subsidiaries of U.S. entities, but currently the only limitation on foreign subsidiaries is for those in Iran and Cuba. We have no information suggesting that the Russia sanctions will be expanded to include foreign subsidiaries, but it remains a possibility. One way to de-risk this potential change in U.S. law, however, is to account for it in the relevant documentation such that DMCC would be removed from Unicom simultaneously and automatically with the change in law in a way that results in compliance with all applicable law. While it appears that benefits outweigh risks, SA and its ownership will need to make that determination.

<u>Effect of Inversion for DMCC</u>

Subject to advice of regulatory and tax counsel in all applicable jurisdictions, moving DMCC under a limited partnership could solve Unicom, SA, and DMCC's current regulatory concerns. The limited partnership would be created and structured as discussed above.

**Additional UAE Entity with Inversion for Certain International Business**

SA has been presented with various opportunities to initiate and conduct business throughout the African continent, as well as other opportunities in non-sanctioned countries. For financing and regulatory compliance reasons, such African business should be placed in a new entity formed either in Switzerland or the UAE, but not comingled with DMCC.

Because such opportunities would presumably not violate sanctions if conducted by persons of Implementing Countries, which remains subject to confirmation, the business and related activity would be permissible for such persons to conduct. Since DMCC's current operations cannot be conducted by such persons, it is advisable to segregate the African and other business entirely from DMCC.

Comingling future African and other business with DMCC increases the risk that persons from Implementing Countries will become involved in DMCC's operations, which presents heightened compliance risks. Even if such persons conducting African business within DMCC were instructed to avoid involvement with DMCC's current operations, any failure to comply with such an instruction – whether intentionally or accidental – could result in serious sanctions violations and penalties.

Based on the foregoing, the African or other business segment should remain separate from DMCC. The form of such other business, and exactly where in the overall corporate structure it is situated, will be subject to further tax and regulatory advice from counsel in all relevant jurisdictions. Subject to their confirmation and any necessary factual diligence, DMCC should remain carefully isolated.

**<u>Exhibit A</u>**

**Sanctions Memo**

(attached)

**Exhibit A to Corporate Inversion of SA**

The operations and business of Paramount Energy & Commodities SA ("**Paramount SA**") and Paramount Energy and Commodities DMCC ("**Paramount DMCC**") can continue in their current form after the Inversion.

- The U.S. economic sanctions administered by U.S. Department of Treasury Office Foreign Assets Control ("**OFAC**") restrict the activities of U.S. persons, which include U.S. citizens and permanent residents; any individual located in the United States, including non-U.S. citizens traveling in the United States; and U.S. entities.

- The inversion will not make Paramount SA or Paramount DMCC a U.S. person or subject them to OFAC sanctions; they will be foreign subsidiaries of a U.S. entity. OFAC sanctions do not apply to foreign subsidiaries of U.S. companies except in two limited cases – under the Iran and Cuba sanctions regulations. We understand that Paramount SA and Paramount DMCC do not engage in or conduct business in or with Iran or Cuba. Thus, U.S. sanctions should not apply to their business activities after the inversion.

- We understand that Paramount SA and Paramount DMCC's operations will remain separate and independent of Unicom, one another, and the other subsidiaries of Unicom.

- After the inversion, Paramount SA's new compliance officer will be a U.S. person and his actions must comply with OFAC sanctions. We understand that this will not materially impact Paramount SA, as its current business does not include activities that would be covered by U.S. sanctions.

- Because Paramount DMCC is engaged in the trading of Russian-origin crude oil above the price cap implemented by the U.S. and select other nations, there will continue to be a possibility that the U.S. could impose secondary sanctions on Paramount DMCC, including naming it as a Specially Designated National ("**SDN**"). After the inversion, however, the likelihood of secondary sanctions could increase due to Paramount DMCC having a U.S. parent company.

- While Paramount SA and Paramount DMCC may continue their operations after the inversion in their current form, they will be subject to additional U.S. laws, including the Foreign Corrupt Practices Act and anti-boycott regulations. Based upon our understanding of the facts, these regulatory matters should not materially impact operations.

4878-8680-4834.1