# Exhibit 36

**FRANCOIS MAURON**, who, being duly sworn, deposes and says under oath that:

1. I am of sound mind, over 18 years old, and otherwise competent to make this statement. This statement is a first-hand account based on my own observations. It is a summary of some of the relevant events but does not include each and every fact that I observed or learned during the events described in my statement. To the extent this statement includes my recollection of statements made by others or me, I am reporting those in sum and substance and in part, unless I specifically say otherwise.

2. I reside in Dubai. Professionally, I am a banker.

3. I started a company in 2003 in Geneva, Switzerland. Niels Troost was a client of mine for approximately 15 years. I handled aspects of Mr. Troost's finances and financial operations.

4. In 2020, in coordination with Mr. Troost, I established a commodity trading company in Dubai called Paramount Energy and Commodities DMCC ("PDMCC"), of which I was the sole shareholder. The original goal of PDMCC was to engage in Iraqi oil trading. Although direct oil trading did not materialize, the company successfully financed an Iraqi oil export operation and the construction of a private oil terminal.

5. PDMCC began trading Russian crude oil around April 2022. At that time, there were no sanctions or other trading restrictions in place. However, Swiss banks that had previously financed the business informed PECSA that they would prefer the activity to be conducted through PECSA's Dubai subsidiary. Since PDMCC already had established banking relationships in the UAE from its prior presence, it was decided that PDMCC would continue the trading operations from the UAE. Despite challenging market conditions and ongoing uncertainty, PDMCC was able to operate successfully.

6. During the summer of 2022, I started to hear rumors about a second shareholder from the employees of Paramount Energy & Commodities SA ("PECSA") in Geneva. Until then, I understood that Mr. Troost, through a holding company, was the sole shareholder of PECSA, which was the sole shareholder of PDMCC at the time.

7. I wanted to know the identity of the second shareholder to do due diligence and inform financial institutions within a reasonable amount of time. I spoke with Maurice Taylor, PECSA's director, who did not know at that time the second shareholder's identity. Finally, in October 2022, I received information that the second shareholder was Nicolas Bravard. I knew Bravard to be a financial professional from Switzerland who knew nothing about oil trading.

8. In November 2022, Mr. Troost and Mr. Srivastava called me via Signal. Mr. Srivastava told me to loan $51 million to a company called "Arsari" as part of a renewable energy investment in Indonesia. I said I usually structure loans through joint ventures. But Mr. Srivastava replied that the loan involved the brother of the Indonesian defense minister, who was very powerful, and that it had already been decided to structure it a certain way. This is why, said Mr. Srivastava, the loan had to come from PDMCC. Mr. Srivastava put me in contact with the general counsel of Arsari. PDMCC did not have an attorney in the transaction. At this stage I did not know yet that Mr. Srivastava was the new shareholder.

Page 1 of 4                                                                                                                Initials: ____

9. I made numerous revisions to the draft loan agreement and refused to sign it without first obtaining board approval from PECSA, which was ultimately granted. Approximately two weeks after PDMCC transferred the funds to Arsari, I came across a public report indicating that Mr. Srivastava had recently purchased a mansion in California for more than $20 million. I brought this up in conversations with individuals at PECSA, suggesting that the purchase might have been made using the funds lent to Arsari, but at the time, no one was willing to believe it.

10. Toward the end of November 2022, I announced my intention to resign from PDMCC. Mr. Troost expressed that he wanted me to stay, as he trusted me, but he was also reconsidering whether PDMCC should continue its operations at all, particularly in light of the upcoming implementation of the G7 price cap. At that time, he was leaning towards halting all Russian oil trading. I later came to understand that he ultimately did not stop because he was under significant pressure from Mr. Srivastava, who claimed that the U.S. Government was now fully supporting Paramount and would severely punish Mr. Troost if he discontinued the operations.

11. In December 2022, I participated in a conference call along with various PDMCC and PECSA employees, as well as Mr. Troost, Gaurav Srivastava and Jim Reese. Mr. Srivastava led the call. Mr. Troost introduced him as a new shareholder of PECSA; Mr. Reese was introduced as the human resources manager for the entire group of companies. Mr. Srivastava said that he was an American investor, and all new human resources policies would go to a lawyer, Jeff Berg, in California. Mr. Srivastava asked that all personal information about the employees be sent to Mr. Berg.

12. During this call, we were told that there would be a restructuring of the company and all the employees needed to do what they were told or they could exit the company. There was no discussion of stopping oil shipments, and Mr. Srivastava did not ask questions or seem curious about PDMCC's operations. While Mr. Srivastava did not mention trading Russian oil on this call, I know that he knew about these operations, because Mr. Srivastava had seen PDMCC's records.

13. The conference call turned acrimonious when Susanne Silver, a PECSA employee, started asking a lot of questions challenging Mr. Srivastava.

14. The day after the call, I spoke with Mr. Troost. I said that PDMCC was doing well and asked why we needed Mr. Srivastava, and why the company needed to be "saved." Mr. Troost told me that I did not understand and that I could not be told everything that he knew about the reasons he brought Mr. Srivastava in.

15. In December 2022, Mr. Srivastava and Mr. Berg traveled to Dubai as a follow-up to the earlier conference call. They met with me and several PDMCC employees in the company's boardroom. Mr. Troost was not present. During the meeting, Mr. Srivastava and Mr. Berg reviewed PDMCC's contracts related to the trading of Russian ESPO crude oil, as well as its Russian oil trading activities more broadly.

16. During this meeting, Mr. Srivastava stated that he was working closely with Mr. Troost and making decisions together with him. He added that all matters, including contracts and employee decisions, had to be approved by Mr. Berg and that Mr. Berg should be copied on all

communications. I asked both Mr. Srivastava and Mr. Berg if they were certain about this arrangement, given that Mr. Berg was a U.S. lawyer and that PDMCC was lawfully engaged in trading Russian oil, which is subject to U.S. sanctions. I cautioned that this could create sanctions exposure for Mr. Berg in the United States if any transaction data were routed through the U.S. Nonetheless, Mr. Berg insisted that it was acceptable for him to receive the company's records because he was a lawyer.

17. Mr. Srivastava and Mr. Berg stated that the purpose of the meeting was to ensure that PDMCC's Russian oil trades were compliant with U.S. laws. I responded that this made little sense, as U.S. regulations did not apply to a UAE-based company owned by a Swiss entity and ultimately controlled by a Swiss resident. They replied that they were in the process of securing an OFAC license. I questioned this, asking why the U.S. would grant such a license to a non-U.S. company. Mr. Srivastava and Mr. Berg insisted they had the right contacts and were confident they could obtain the license, claiming they understood the process better than I did. Mr. Berg reassured us that PDMCC could continue trading Russian oil above the price cap and that the license was forthcoming. It was at this point that I began to realize why Mr. Troost had brought Mr. Srivastava into the business. While Mr. Troost had previously considered winding down the Russian oil operations, Mr. Srivastava persuaded him to continue by promising he could obtain an OFAC license through his alleged connections within the U.S. government.

18. Around Christmas 2022, I met Mr. Srivastava - who was staying at the Four Seasons Hotel in Megève, France - along with Mr. Troost and Nicolas Bravard at that same hotel. During this meeting, Mr. Srivastava told us that everything was "fine" in terms of U.S. law enforcement and OFAC compliance, stating, "I control this." He claimed to have many "friends" within U.S. law enforcement and said he had made substantial political donations. He assured us he could secure an OFAC license. To reinforce his claim, he showed us a photo on his mobile phone of himself and his wife alongside President Biden. Mr. Srivastava appeared highly confident and self-assured. He also mentioned that he was in contact "with the lady at SECO," referring to the Swiss sanction authority, and said he was speaking directly with both OFAC and SECO. This meeting further clarified why Mr. Niels Troost, rather than ceasing Russian oil operations as he had initially considered, was persuaded to continue—encouraged by Mr. Srivastava's repeated promises of support from U.S. authorities.

19. This meeting left me suspicious of Mr. Srivastava. With every question I ever raised, he had vague responses assuring me he would take care of things. I am detail-oriented, and so the lack of any specificity in any of his answers led me to conclude that he did not know what he was talking about. And so, I resigned from PDMCC by the beginning of February 2023. I thought it was too risky; I was worried the U.S. would penalize trading over the price cap even by a UAE-based entity, and I did not want to be in a dispute with the U.S. Government.

20. On April 3 and 4, 2023, Mr. Bravard and an accountant from Geneva named Pavlov Protopapa came to Dubai and reviewed all of PDMCC's books. They had full access to the books, which had not yet been finalized. They took electronic copies of them. I understood that Mr. Srivastava wanted an audit to ensure that the profits from trading Russian ESPO prior to June 1, 2022, would remain with Mr. Troost, while those earned after that date would be shared between them. I also understood that they were fully aware that PDMCC's core business involved trading Russian ESPO, which was at times priced above the G7 price cap.

21. I have fully read, understood, and considered every statement in this affidavit, all of which are true to the best of my recollection. I understand that this affidavit may be used in connection with civil and criminal matters in multiple jurisdictions, and that false statements in this document might subject me to prosecution for perjury or other similar crimes. I have not been offered any benefits, not received any benefits, not been made any promises of future benefits, and I have no expectation of receiving any benefits from any third parties in exchange for signing this affidavit. I am doing so of my own free will and because the facts to which I am attesting are true.

Signature of Affiant, Francois Mauron

THE UNDERSIGNED NOTARY ASSUMES NO RESPONSABILITY AS TO THE CONTENT OF THE PRESENT DOCUMENT.

Subscribed and sworn before me this 17th day of July, 2025

Seen by the undersigned, Maître Bénédict ARNBÄCK, a duly authorized Notary public in Geneva, exclusively for legalization of the above signature affixed in my presence by Mr. François Edouard MAURON.

Geneva, July 17th, 2025.




Page 4 of 4

Initials: ___